# In the
# United States Court of Appeals
# for the Seventh Circuit

◆——◆

**THE ESTATE OF NELLE HARPER LEE,**
BY AND THROUGH ITS PERSONAL REPRESENTATIVE, **TONJA CARTER,**
AND **HARPER LEE, LLC,**

*Respondents/Appellants,*

v.

**THE DRAMATIC PUBLISHING COMPANY,**

*Petitioner/Appellee.*

◆——◆

On Appeal from the United States District Court
for the Northern District of Illinois
Case No. 1:21-cv-05541-MFK
The Honorable Matthew F. Kennelly

◆——◆

## BRIEF OF APPELLANTS AND REQUIRED
## SHORT APPENDIX

◆——◆

David G. Hymer (Counsel of record)
Riley A. McDaniel
Bradley Arant Boult Cummings LLP
1819 Fifth Avenue North
Birmingham, Alabama 35203
Telephone: (205) 521-8000
Facsimile: (205) 521-8800
dhymer@bradley.com
rmcdaniel@bradley.com

*Attorneys for Appellants*

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 23-1309

Short Caption: Dramatic Publishing Co. v. Estate of Nelle Harper Lee, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☑    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Estate of Nelle Harper Lee, by and through its personal representative Tonja Carter, and Harper Lee, LLC

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Bradley Arant Boult Cummings LLP; Taft, Stettinius & Hollister LLP; Latham & Watkins

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

N/A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: s/ David G. Hymer    Date: 4/8/2025

Attorney's Printed Name: David G. Hymer

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☑    No ☐

Address: 1819 Fifth Avenue North

Birmingham, AL 35233

Phone Number: 205-521-8000    Fax Number: 205-521-8800

E-Mail Address: dhymer@bradley.com

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 23-1309

Short Caption: Dramatic Publishing Co. v. Estate of Nelle Harper Lee, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> ✓    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Estate of Nelle Harper Lee, by and through its personal representative Tonja Carter, and Harper Lee, LLC

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Bradley Arant Boult Cummings LLP; Taft, Stettinius & Hollister LLP; Latham & Watkins

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: s/ Riley A. McDaniel    Date: 4/8/2025

Attorney's Printed Name: Riley A. McDaniel

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ✓

Address: 1819 Fifth Avenue North

Birmingham, AL 35233

Phone Number: 205-521-8000    Fax Number: 205-521-8800

E-Mail Address: rmcdaniel@bradley.com

# TABLE OF CONTENTS

**Page**

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT .................................i

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT ...............................ii

TABLE OF AUTHORITIES .....................................................vi

INTRODUCTION ..................................................................1

JURISDICTIONAL STATEMENT ..............................................2

STATEMENT OF THE ISSUES ...............................................3

STATEMENT OF THE CASE ..................................................3

    A.    Statutory and legal background. ..........................................3

    B.    Statement of facts. ...........................................................5

        1.    Ms. Lee grants amateur acting rights in the Novel to Dramatic in 1969 and terminates those rights in 2011. ...........................................................5

        2.    Ms. Lee grants Rudinplay rights to create a stage adaptation of the Novel. ...............................................6

        3.    A dispute concerning the licensing rights to the Novel occurs, resulting in an arbitration between Dramatic and the Estate and LLC. ..............................8

        4.    The arbitrator rules in favor of Dramatic. ....................8

    C.    Post-arbitration proceedings. ...........................................11

        1.    Dramatic moves to confirm the arbitrator's interim award in the district court and the Estate and LLC move to vacate it. ........................................11

2.    Dramatic files a supplemental motion to confirm the Peck Order. ........................................................ 12

3.    Atticus files a declaratory judgment action against Dramatic in the Southern District of New York. ........................................................................ 13

4.    The SDNY Court holds that Dramatic did not retain exclusive rights to license the Sergel Play. ...... 14

SUMMARY OF ARGUMENT ................................................ 16

STANDARD OF REVIEW .................................................... 18

ARGUMENT ...................................................................... 18

I.    The district court erred in confirming the arbitrator's erroneous interpretation of 17 U.S.C. § 304(c). ............................. 18

     A.    Atticus and Sorkin are not bound by the arbitrator's ruling. ...................................................................... 20

     B.    The arbitrator disregarded the Copyright Act by negating the effect of Ms. Lee's termination of the 1969 Grant. ...................................................................... 24

          1.    The statute's plain language allows the termination of an exclusive license. ........................... 25

          2.    The arbitrator misunderstood and misapplied Mills Music in reaching his erroneous ruling. ........... 32

          3.    The arbitrator ignored the purpose of Section 304(c). ........................................................... 35

          4.    Guidance from the Copyright Office confirms that the arbitrator misinterpreted Section 304(c). ............ 38

     C.    The arbitrator's disregard of settled copyright law violates the rights of third parties Atticus and Sorkin. ....... 40

    D.    Dramatic's additional arguments for affirmance are unavailing................................................................................44

          1.    Dramatic's argument concerning the timing of Ms. Lee's grant of rights to Rudinplay is not properly before this Court, and it is wrong in any event. ...........................................................................45

          2.    Dramatic is wrong that the arbitrator relied on a purported admission by the Estate and LLC that Ms. Lee did not convey rights to Rudinplay that had previously been the subject of the terminated exclusive grant to Dramatic........................................48

II.    The district court erred by giving Dramatic more relief with respect to the Peck Order than the arbitrator awarded. ...............50

CONCLUSION ........................................................................................54

CERTIFICATE OF COMPLIANCE........................................................55

CERTIFICATE OF SERVICE.................................................................56

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Affymax, Inc. v. Ortho-McNeil-Janssen Pharms., Inc.,*
  660 F.3d 281 (7th Cir. 2011) .................................................... 19, 40, 43

*Atticus Limited Liability Company v. Dramatic Publ'g Co.,*
  No. 22-CV-10147 (DLC), 2023 WL 3135745 (S.D.N.Y. Apr.
  27, 2023) .............................................................................. *passim*

*Baldwin v. EMI Feist Catalog, Inc.,*
  805 F.3d 18, 22 (2d Cir. 2015) ............................................................ 29

*Barnhart v. Sigmon Coal Co.,*
  534 U.S. 438 (2002) ............................................................................ 47

*Baxter Int'l, Inc. v. Abbott Lab'ys,*
  315 F.3d 829 (7th Cir. 2003) .............................................................. 43

*Bennett v. Spear,*
  520 U.S. 154 (1997) ............................................................................ 27

*Brumley v. Albert E. Brumley & Sons, Inc.,*
  822 F.3d 926 (6th Cir. 2016) .............................................................. 29

*Cannon v. Armstrong Containers Inc.,*
  92 F.4th 688 (7th Cir. 2024) .............................................................. 22

*Classic Media, Inc. v. Mewborn,*
  532 F.3d 978 (9th Cir. 2008) .............................................................. 29

*Conn. Nat'l Bank v. Germain,*
  503 U.S. 249 (1992) ............................................................................ 47

*CPR Mgmt., S.A. v. Devon Park Bioventures, L.P.,*
  19 F.4th 236 (3d Cir. 2021) ................................................................ 50

*E.E.O.C. v. Waffle House, Inc.,*
  534 U.S. 279 (2002) ............................................................................ 40

vi

*George Watts & Son, Inc. v. Tiffany & Co.*,
   248 F.3d 577 (7th Cir. 2001) ............................................................ 43

*Gotham Holdings, LP v. Health Grades, Inc.*,
   580 F.3d 664 (7th Cir. 2009) ............................................................ 41

*Hyatt Franchising, L.L.C v. Shen Zhen New World I, LLC*,
   876 F.3d 900 (7th Cir. 2017) ...................................................... *passim*

*Marvel Characters, Inc. v. Simon*,
   310 F.3d 280 (2d Cir. 2002) ....................................................... 30, 31

*Mazer v. Stein*,
   347 U.S. 201 (1954) ........................................................................ 43

*Menke v. Monchecourt*,
   17 F.3d 1007 (7th Cir. 1994) ...................................................... 51, 52

*Metro Tech Serv. Corp. v. Payless Shoe Source, Inc.*,
   No. 07C0101, 2007 WL 2003039 (N.D. Ill. July 6, 2007) ................. 50

*Mills Music, Inc. v. Snyder*,
   469 U.S. 153 (1985) ............................................................. 32, 33, 34

*Nat'l Football League Players Ass'n v. Nat'l Football League
   Mgmt. Council*,
   523 Fed. Appx. 756 (2d Cir. 2013) .................................................... 51

*Part-Time Fac. Ass'n at Columbia Coll. Chicago v. Columbia
   Coll. Chicago*,
   892 F.3d 860 (7th Cir. 2018) ............................................................ 18

*Peacock v. Thomas*,
   516 U.S. 349 (1996) ........................................................................ 52

*Penguin Grp. (USA) Inc. v. Steinbeck*,
   537 F.3d 193 (2d Cir. 2008) ................................................... 4, 25, 31

*Prostyakov v. Masco Corp.*,
   513 F.3d 716 (7th Cir. 2008) ............................................................ 18

*Rosenblum v. Travelbyus.com Ltd.*,
299 F.3d 657 (7th Cir. 2002) ....................................................... 21, 22

*Siegel v. Warner Bros. Ent.*,
690 F. Supp. 2d 1048, 1055 (C.D. Cal. 2009) .................................... 26

*Tranzact Techs., Inc. v. 1Source Worldsite*,
406 F.3d 851 (7th Cir. 2005) ............................................................. 53

*U.S. S.E.C. v. Hyatt*,
621 F.3d 687 (7th Cir. 2010) ............................................................. 53

*United States v. Franz*,
886 F.2d 973 (7th Cir. 1989) ............................................................. 27

*United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. PPG Indus., Inc.*,
751 F.3d 580 (7th Cir. 2014) ............................................................. 51

*United Steelworkers of Am., Loc. 4839 v. New Idea Farm Equip. Corp.*,
917 F.2d 964 (6th Cir. 1990) ............................................................. 45

*United Steelworkers of Am. v. Danly Mach. Corp.*,
852 F.2d 1024 (7th Cir. 1988) ........................................................... 52

*Waite v. UMG Recordings, Inc.*,
450 F. Supp. 3d 430 (S.D.N.Y. 2020) ......................................... 25, 35

*Zimmerman v. N. Am. Signal Co.*,
704 F.2d 347 (7th Cir. 1983) ............................................................. 27

**Statutes**

9 U.S.C. § 9 ........................................................................................ 2

9 U.S.C. § 10(a)(4) .......................................................................... 19

9 U.S.C. § 11 ............................................................... 17, 18, 50, 52

17 U.S.C. § 101 ............................................................................ 4, 33

17 U.S.C. § 106 ............................................................ 3

17 U.S.C. § 106(2) ....................................................... 25

17 U.S.C. § 201(a) ........................................................ 3

17 U.S.C. § 201(d)(2) ................................................... 3

17 U.S.C. § 203 ........................................................... 35

17 U.S.C. § 304 ........................................................... 29

17 U.S.C. § 304(c) ................................................. *passim*

17 U.S.C. § 304(c)(5) ............................................. 4, 30

17 U.S.C. § 304(c)(6) ......................................... 4, 25, 28

17 U.S.C. § 304(c)(6)(A) ...................................... *passim*

17 U.S.C. § 304(c)(6)(D) ............................. 44, 45, 46, 47

28 U.S.C. § 1291 ........................................................... 2

28 U.S.C. § 1332 ........................................................... 2

Copyright Act ....................................................... *passim*

Federal Arbitration Act ............................... 3, 18, 51, 52

**Other Authorities**

*Copyright Laws: Hearing Before the Subcomm. on Patents,
   Copyrights, and Trademarks of the Senate Comm. on the
   Judiciary*, 99th Cong., 1st Sess. (1985) ............................. 37

Notices of Termination, www.copyright.gov/recordation/
   termination.html (last accessed April 7, 2025) ................... 39

Restatement (Second) of Judgments § 40 (1982) ................ 22

Virginia E. Lohmann, *The Errant Evolution of Termination
   of Transfer Rights and the Derivative Works Exception*, 48
   Ohio St. L.J. 897, 910–912 (1987) ............................. 36, 37

## INTRODUCTION

This case presents one of the limited circumstances where a federal court can and must reexamine a legal ruling by an arbitrator. The arbitrator's injunction requires parties to the arbitration to violate the legal rights of third parties who had not agreed to arbitrate. Under this Circuit's controlling precedents, a federal court can review the arbitrator's legal ruling in this situation.

This case arises from a dispute over the scope of stage rights for dramatizations of Harper Lee's American masterpiece *To Kill a Mockingbird* (the "Novel"). At issue is a provision of the Copyright Act of 1976 that permitted Ms. Lee to terminate a 1969 grant to Dramatic Publishing Company ("Dramatic") of exclusive stage rights for non-first-class performances of dramatizations of the Novel.

In an arbitration between Ms. Lee's Estate and Dramatic, the arbitrator erroneously interpreted the Copyright Act as preserving Dramatic's exclusive rights even after Ms. Lee's statutorily-permitted termination. Consistent with that erroneous ruling, the arbitrator issued an injunction that required Ms. Lee's Estate to violate the rights of third parties who had not agreed to be bound by the arbitration.

The district court erred by confirming the arbitrator's award.  In addition, the district court erred by including relief in its judgment beyond what the arbitrator awarded.

## JURISDICTIONAL STATEMENT

Dramatic filed this action against the Estate of Nelle Harper Lee (the "Estate") and Harper Lee, LLC ("LLC"), seeking confirmation of an arbitration award pursuant to 9 U.S.C. § 9.  A1.[1]  The district court had jurisdiction under 28 U.S.C. § 1332; there is complete diversity among the parties and more than $75,000 is in controversy.  The district court entered final judgment on January 13, 2023.  SA25.

The Estate and LLC filed their notice of appeal on February 10, 2023.  Dkt. 81.[2]  This Court has jurisdiction under 28 U.S.C. § 1291.

---

[1] "SA#" refers to citations to the Required Short Appendix; "A#" refers to citations to the Separate Appendix.

[2] "Dkt." refers to documents filed in No. 1:21-cv-05541 (N.D. Ill.).  "App. Dkt." refers to documents filed in this appeal. Pagination used corresponds to the pagination of the Pacer header.

## STATEMENT OF THE ISSUES

I.     Did the district court err in confirming the arbitrator's erroneous interpretation of 17 U.S.C. § 304(c) given that the arbitrator's ruling required the Estate and LLC to violate the rights of third parties under the Copyright Act?

II.    Did the district court exceed its authority under the Federal Arbitration Act ("FAA") by including in its judgment relief not awarded by the arbitrator?

## STATEMENT OF THE CASE

### A.    Statutory and legal background.

The Copyright Act affords authors an exclusive bundle of rights in their written works. 17 U.S.C. § 106. And although "[c]opyright in a work . . . vests initially in the author . . . of the work," *id.* § 201(a), the Copyright Act allows authors to transfer rights "comprised in a copyright"—including the right to prepare and license a "derivative work"—to another person, *id.* § 201(d)(2). A "derivative work" is "a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version,

sound recording . . . or any other form in which a work may be recast, transformed, or adapted." *Id.* § 101.

The Copyright Act also allows authors to recapture previously-transferred rights through a termination process. *Id.* § 304(c). Under Section 304(c), authors may "terminat[e]" the "exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it" within a specified period under certain conditions. *Id.* Once terminated, "all rights" covered by the grant "revert" to the author (or her successor). *Id.* § 304(c)(6). This termination provision "create[s] for authors or their statutory heirs" an "inalienable right to terminate the grant of a transfer or license." *Penguin Grp. (USA) Inc. v. Steinbeck*, 537 F.3d 193, 198 (2d Cir. 2008). Indeed, "[t]ermination of the grant may be effected notwithstanding any agreement to the contrary." 17 U.S.C. § 304(c)(5).

At the same time, the Copyright Act allows a person to whom the author had granted the right to prepare a derivative work to continue to "utilize" the derivative work that was created before termination. *Id.* § 304(c)(6)(A) ("A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the

grant after its termination . . . .").  This is known as the Derivative Works Exception.

## B.     Statement of facts.

### 1.     Ms. Lee grants amateur acting rights in the Novel to Dramatic in 1969 and terminates those rights in 2011.

In 1969, Ms. Lee entered into an agreement with Dramatic, which granted Dramatic the right to create and license a dramatization of the Novel (the "1969 Agreement").  A140 at § 2(a).  The 1969 Agreement gave Dramatic the exclusive worldwide amateur stage rights to the Novel:

> [Ms. Lee] hereby grants to [Dramatic] the complete right throughout the world: (a) To write or cause to be written a dramatization based upon and/or adapted from the [Novel], but agrees that said dramatization . . . is to be the only one of the amateur acting rights of which [Ms. Lee] will permit to be leased and/or licensed; and [Ms. Lee] reserves all rights not expressly granted to [Dramatic], including but not limited to the professional acting, radio broadcasting, television and motion picture rights; (b) To lease the amateur acting rights in and to the [Novel] and/or the Play and/or parts thereof . . . .

*Id*.  § 2(a)–(b) (the "1969 Grant").   Pursuant to this 1969 Grant, Christopher Sergel wrote a dramatization of the Novel (the "Sergel Play").

In April 2011, Ms. Lee gave notice to Dramatic that she was terminating the 1969 Grant under 17 U.S.C. § 304(c), effective April 26, 2016. A145.

### 2. Ms. Lee grants Rudinplay rights to create a stage adaptation of the Novel.

In June 2015, Ms. Lee entered an agreement with Rudinplay, Inc. ("Rudinplay") that ultimately resulted in the creation of a new stage adaptation of the Novel (the "Rudinplay Agreement"). A152. The Rudinplay Agreement designated Rudinplay as Ms. Lee's agent to "procure a playwright . . . to create a dramatic adaption of the Novel." *Id.* § 1. Upon receiving Ms. Lee's "written approval" of the selected playwright, Rudinplay had the "exclusive option" to acquire the right to "create, develop, produce and present a live stage play" based on the Novel. *Id.* § 2(a). The option would "be deemed exercised" upon the "initial commercial first class production of the Play presented on Broadway or in the West End of London." A153 at § 4.

Recognizing the effect of the Derivative Works Exception, the parties to the Rudinplay Agreement included a provision acknowledging that Dramatic would remain free to utilize the Sergel Play on a non-exclusive basis:

[Rudinplay] acknowledges that pursuant to an agreement (the "Prior Agreement") dated June 26, 1969 between [Ms. Lee] and [Dramatic], [Ms. Lee] granted [Dramatic] the right to create a play . . . based on the Novel, and to exploit the amateur acting rights (as defined in the Prior Agreement) in the [Sergel Play]. [Ms. Lee] represents that [she] has terminated the Prior Agreement effective April 26, 2016. [Rudinplay] acknowledges that, notwithstanding such termination, the amateur acting rights to the [Sergel Play] can continue to be exploited following such termination under the terms of the Prior Agreement **on a non-exclusive basis in the United States**, and on an exclusive basis elsewhere. **The rights granted hereunder shall be subject to the rights granted under the Prior Agreement, as limited by such termination**.

A152–53 at § 2(b) (emphasis added).

Aaron Sorkin wrote the new stage adaptation of the Novel (the "Sorkin Play"). The Sorkin Play premiered on Broadway in November 2018—thus exercising the option in the Rudinplay Agreement and effectuating the grant of rights to Rudinplay. Dkt. 41-2 at 4–5; Dkt. 23-8 at 3. The rights granted to Rudinplay under the Rudinplay Agreement are now held by Atticus LLC ("Atticus"). Dkt. 23-8 at 3.

The Sorkin Play became the highest grossing straight play in the history of Broadway.

### 3. A dispute concerning the licensing rights to the Novel occurs, resulting in an arbitration between Dramatic and the Estate and LLC.

After the Sorkin Play opened on Broadway, a dispute arose concerning certain licenses for the Sergel Play that Dramatic had issued in the United States and the United Kingdom. Dramatic filed an arbitration demand against the Estate in March 2019, and later added LLC as a party in the amended demand. Dkt. 23-12. Dramatic initiated the arbitration under Section 4(k) of the 1969 Agreement, which provides that "[a]ny controversy arising out of [the 1969 Agreement] is to be arbitrated in Chicago by and under the rules of the American Arbitration Association." A141 at § 4(k). The Estate and LLC counterclaimed against Dramatic. Dkt. 23-13. The arbitration concerned the scope of Dramatic's "amateur" rights under the 1969 Grant and whether Dramatic retained exclusive rights following Ms. Lee's termination of the 1969 Grant.

### 4. The arbitrator rules in favor of Dramatic.

The arbitrator issued an interim award (corrected) on October 21, 2021. A15. The arbitrator first addressed the meaning of "amateur acting rights" under the 1969 Agreement, finding that the term meant

"non-first-class" rights.  A23.  Next, interpreting the Derivative Works Exception, he ruled that even "after termination," Dramatic retained "all the exclusive rights granted to it in the 1969 Agreement."  A75.

Despite Section 304(c) providing that an "exclusive or nonexclusive grant" is "subject to termination," 17 U.S.C. § 304(c), the arbitrator surprisingly declared that there was no "clear statement in the statute divesting derivative authors of . . . exclusive rights."  A82–83.  After reaching that conclusion, the arbitrator held that Rudinplay—which was not a party to the arbitration—had "no stock and amateur rights for live theatrical productions" of the Novel because, he reasoned, Rudinplay's "rights [we]re subject to Dramatic's rights under the terms of [the] 1969 Agreement."  A85–86.

Based on that holding, the arbitrator enjoined the Estate and LLC from giving Rudinplay and Sorkin the right to license the Sorkin Play in non-first-class theaters—something Ms. Lee had already done in the Rudinplay Agreement—or assisting Rudinplay and Sorkin in the licensing of the Sorkin Play in non-first-class theaters:

> The Estate and the LLC shall be enjoined from (i) licensing or granting any third party, including, but not limited to, Scott Rudin ("Rudin") and Rudinplay, Inc., Atticus LLC, any other entity owned, controlled or operated by Scott Rudin, and any

entity assigned or licensed rights from Rudinplay (collectively referred to herein as "Rudinplay Affiliates"), any non-first-class stage rights in *To Kill a Mockingbird*; . . . (iii) encouraging, inducing, assisting, approving or consenting to Rudin's or Rudinplay Affiliates' wrongful licensing of Rudinplay's version of *To Kill a Mockingbird* for any non-first-class production throughout the world . . . .

A20 at ¶ 13.

The arbitrator separately entered an order (the "Peck Order") concerning an unrelated arbitration proceeding between the Estate and the successors to Robert Mulligan, Alan J. Pakula, and Gregory Peck (the "Peck Arbitration"). A157. The Peck Order required the Estate to take certain steps in the event of a settlement in the Peck Arbitration involving live stage rights:

> The Estate is in settlement negotiations with the Respondents/Counterclaimants in the Peck Arbitration. The Estate will not enter into any settlement in the Peck Arbitration or with any of the parties in the Peck Arbitration involving live stage rights in the presence of an audience that conflicts in any way with any of Dramatic's rights under the 1969 Agreement . . . as such rights are determined in this Arbitration. Any settlement agreement entered into by the Estate in connection with the Peck Arbitration that addresses the issue of stage rights will include a statement that the agreement is subject to Dramatic's stage rights as such rights are determined in this Arbitration or in any appeal thereof.

A161.

## C. Post-arbitration proceedings.

### 1. Dramatic moves to confirm the arbitrator's interim award in the district court and the Estate and LLC move to vacate it.

After the arbitrator issued his interim award, Dramatic initiated confirmation proceedings in the district court to confirm the arbitrator's interim award, A1, and the Estate and LLC moved to vacate it. A103. The Estate and LLC argued that the award should be vacated because, *inter alia*, the arbitrator issued declaratory and injunctive relief to Dramatic based on an erroneous interpretation of 17 U.S.C. § 304(c) that would cause the Estate and LLC to violate the legal rights of third parties—Atticus and Sorkin.[3] A107–08.

Although the district court agreed that an "arbitrator cannot require the parties to violate the legal rights of third parties who did not consent to arbitration," the district court effectively held that Atticus and

---

[3] The Estate and LLC also argued that the award should be vacated because (a) the arbitrator exceeded his powers by declaring the Estate to have broad indemnification obligations to Dramatic beyond what Ms. Lee and Dramatic agreed to; and (b) because a portion of the award was too ambiguous and indefinite to be enforced. The district court rejected the first argument and remanded the case to the arbitrator to clarify the issues addressed in the second argument. SA8, SA15. After the arbitrator clarified the award on remand, the district court confirmed the clarified award. SA18.

Sorkin were bound by the arbitrator's determination of the meaning of Section 304(c) of the Copyright Act. SA10. The district court's ruling turned on the provision in the Rudinplay Agreement acknowledging that the grant to Rudinplay was "subject to the rights granted under the [1969 Agreement], as limited by such termination." SA9–10. Based on that provision, the district court found that "Rudinplay did not acquire the right to license its version of the play in non-first-class theaters" because the "arbitrator determined" that "Dramatic continues to exclusively hold all non-first-class rights." SA10.

### 2. Dramatic files a supplemental motion to confirm the Peck Order.

Months later, Dramatic filed a supplemental motion to confirm the Peck Order. A157. The district court confirmed the Peck Order and ordered the parties to confer on the form and language of a final judgment. SA23.

The parties submitted a proposed final judgment with areas of disagreement noted for the district court. One area of disagreement was the scope of the district court's judgment pertaining to the Peck Arbitration. Dramatic proposed including language in the final judgment that was not included in the arbitrator's Peck Order:

> The Estate is hereby ordered to take all necessary steps to ensure that the judgment and order in Atticus Corp. et al v. Carter et al, Case No. 22-cv-00059, currently pending in the United States District Court for the Southern District of Alabama are amended to reflect that the agreed order is subject to Dramatic's stage rights as set forth in this judgment or as modified in any appeal thereof.

A187.

The parties provided the district court a "points of disagreement" document explaining the differences in their proposed orders. The Estate explained that the language Dramatic proposed went "beyond mere confirmation of the September 2, 2021, order and essentially ask[ed] [the district court] to issue a separate order directing the Estate to take action that was not the subject of these confirmation proceedings." A180. The district court nonetheless entered final judgment with Dramatic's additional language on the Peck Arbitration. SA26 at ¶ 5(c).

### 3. Atticus files a declaratory judgment action against Dramatic in the Southern District of New York.

In November 2022, Atticus (Rudinplay's successor under the Rudinplay Agreement) filed a declaratory judgment action against Dramatic in the United States District Court for the Southern District of New York (the "SDNY Court"). Atticus sought a "declaration that (1)

Atticus and Sorkin have the right, in relation to Dramatic, to present any and all Second-Class, Stock, Amateur and Ancillary Performances of the Sorkin Play in the United States; and (2) any such productions of the Sorkin Play have not infringed and could not infringe any purported copyright interest Dramatic claims to hold to the Novel." *Atticus Limited Liability Company v. Dramatic Publ'g Co.*, No. 22-CV-10147 (DLC), 2023 WL 3135745, at *4 (S.D.N.Y. Apr. 27, 2023) (cleaned up).

4. **The SDNY Court holds that Dramatic did not retain exclusive rights to license the Sergel Play.**

On April 27, 2023, the SDNY Court issued its opinion on the effect of Ms. Lee's termination. The SDNY Court "readily conclude[d]" that "an exclusive license to perform a derivative work" does not "remain[] exclusive following a valid termination of a license." *Id.* at *5. The SDNY Court rested its opinion on the "unambiguous" statutory language of Section 304(c) that "provides that the '*exclusive*' grant of copyright 'is subject to termination.'" *Id.* (quoting 17 U.S.C. § 304(c)). The SDNY Court explained that the Derivative Works Exception merely allows a "grantee to continue to 'utilize' derivative works created during the term of the license without the threat of litigation from the author of the

original work or the author's heirs following such a termination." *Id.* at *6.

The SDNY Court also found that the acknowledgement in Section 2(b) of the Rudinplay Agreement could not "be read as an agreement by Rudinplay to become a party to the terminated 1969 Agreement and thereby to be bound by the arbitration provision in that agreement, or to otherwise adopt the arbitration provision in that earlier agreement." *Id.* at *9. The SDNY Court explained that "Section 2(b) simply acknowledges that Lee had previously given Dramatic a license to create a derivative work, and that the license given to Rudinplay to create another derivative work from the Novel would not preclude Dramatic from performing the Sergel Play." *Id.*

Dramatic then appealed that merits ruling to the Second Circuit. The appeal is fully briefed, and the Second Circuit heard argument on it on October 21, 2024.[4] The United States Copyright Office filed an amicus

___

[4] The SDNY Court also awarded attorneys' fees to Atticus based upon the SDNY Court's finding that Dramatic "needlessly and unreasonably prolonged th[e] litigation" because "[i]t had no financial incentive to restrain its litigation conduct" and thus "was not sufficiently mindful of its obligations to act in good faith and advance arguments reasonably supported by the facts and the law." *Atticus*, 2023 WL 7151604, at *4. Dramatic and Atticus both filed appeals from the fee award. Those

curiae brief in that appeal on the issue of whether Section 304(c) of the Copyright Act allows Dramatic to retain its exclusive right to utilize its derivative work after Ms. Lee's termination of the 1969 Grant. A copy of that amicus brief is attached hereto as Exhibit 1.

## SUMMARY OF ARGUMENT

When, as here, an arbitrator orders a party to violate the legal rights of third parties who did not consent to arbitration, the arbitrator exceeds his authority, and the arbitrator's award cannot be confirmed.

The district court cut short its analysis of this central issue in the case by erroneously holding that Atticus and Sorkin were bound by the arbitrator's ruling that the Derivative Works Exception in Section 304(c) of the Copyright Act preserves Dramatic's exclusive right under the 1969 Agreement to create a dramatization of the Novel for non-first-class productions. That was plain error—Atticus and Sorkin did not consent to arbitration or to be bound by the arbitrator's award.

The district court should have proceeded to determine that the arbitrator erred in its interpretation of Section 304(c) of the Copyright

_____

appeals were also argued to the Second Circuit and are under submission.

Act. Although the *"exclusive* or nonexclusive grant" of a copyright interest "is subject to termination," 17 U.S.C. § 304(c) (emphasis added), the arbitrator incorrectly held the opposite. The arbitrator's legal determination was flat wrong based on the plain language in the statute, applicable precedent from the Supreme Court, the history and purpose of the Act, and guidance from the Copyright Office on the meaning of the Act.

That legal error led the arbitrator to order the Estate and LLC to ignore the effect of Ms. Lee's termination of the 1969 Grant under Section 304(c) of the Copyright Act to the detriment of Atticus and Sorkin. In essence, the arbitrator ordered the Estate and LLC in their dealings with Atticus and Sorkin to act as though Section 304(c) means something other than what Congress provided. Because the arbitrator's erroneous legal ruling requires the Estate and LLC to violate the rights of those third parties, the district court erred in confirming the award.

On a separate note, in connection with its confirmation of the Peck Order, the district court erred by awarding relief that went beyond the arbitrator's ruling. A district court's authority to modify an arbitration award is limited. Under Section 11 of the FAA, a district court can modify

an award only if the award is miscalculated, is based on a matter not submitted to the arbitrators, or is imperfect in form not affecting the merits of the dispute. 9 U.S.C. § 11. The FAA does not empower a district court to award additional relief that the arbitrator did not include in his ruling. But that is what the district court did here. The district court modified the arbitrator's award to give Dramatic more relief than the arbitrator awarded in the Peck Order. In doing so, the district court exceeded its authority under the FAA.

## STANDARD OF REVIEW

"In reviewing a district court's affirmation or vacation of an arbitrator's award," this Court accepts "findings of fact that are not clearly erroneous and review[s] questions of law *de novo*." *Part-Time Fac. Ass'n at Columbia Coll. Chicago v. Columbia Coll. Chicago*, 892 F.3d 860, 865 (7th Cir. 2018) (quoting *Prostyakov v. Masco Corp.*, 513 F.3d 716, 723 (7th Cir. 2008)).

## ARGUMENT

## I. The district court erred in confirming the arbitrator's erroneous interpretation of 17 U.S.C. § 304(c).

The district court erred in confirming the arbitrator's erroneous interpretation of 17 U.S.C. § 304(c).

Although Section 10(a)(4) of the FAA "does not make legal errors a ground on which a judge may refuse to enforce an award," *Hyatt Franchising, L.L.C v. Shen Zhen New World I, LLC,* 876 F.3d 900, 902 (7th Cir. 2017), an arbitrator's authority to interpret the law is not without limit. Relevant to this appeal, "[a]rbitrators 'exceed[ ] their powers' under § 10(a)(4) if they order the parties to violate the rights of persons who have not agreed to arbitrate." *Id*. at 903 (second alteration in original); *accord Affymax, Inc. v. Ortho-McNeil-Janssen Pharms., Inc.*, 660 F.3d 281, 284 (7th Cir. 2011) ("[A] court may set aside an award that directs the parties to violate the legal rights of third persons who did not consent to the arbitration.").

The district court acknowledged that the Estate and LLC's argument for why the arbitrator's ruling on the meaning of Section 304(c) could not be confirmed "consist[ed] of three key premises"—(1) "Lee received the non-first-class rights as a result of termination, meaning the arbitrator erred in interpreting the Copyright Act;" (2) "Rudinplay obtained the legal right to license the play for non-first-class productions from Lee;" and (3) "enjoining the respondents from assisting Rudinplay and its affiliates to license the play suffices as a violation of third-party

rights that warrants vacating the award." SA8–9. Yet the district court failed to reach the central question—whether the arbitrator's incorrect interpretation of the Copyright Act and his corresponding injunction caused the Estate and LLC to violate the rights of third parties—because he effectively found that Atticus and Sorkin were bound by the arbitrator's interpretation of the meaning of the Copyright Act. SA10. That was error.

Atticus and Sorkin did not consent to arbitration and are not bound by the arbitrator's ruling. Had the district court not erred with that initial finding, it would have found that the arbitrator's disregard of the Copyright Act violates the rights of Atticus and Sorkin. This Court thus should reverse the district court's confirmation of the arbitrator's ruling on the effect of Ms. Lee's termination of the 1969 Grant.

## A. Atticus and Sorkin are not bound by the arbitrator's ruling.

Contrary to the district court's ruling, Atticus and Sorkin are not bound by the arbitrator's ruling on the meaning of the Copyright Act.

The district court held that "Rudinplay did not acquire the right to license its version of the play in non-first-class theaters" because the "arbitrator determined that following Lee's termination of the

license . . . Dramatic continue[d] to exclusively hold all non-first-class rights." *Id.* To reach that conclusion, the district court necessarily found that Atticus and Sorkin were bound by the arbitrator's determination of the meaning of the Copyright Act. The district court rested its finding on Section 2(b) in the Rudinplay Agreement:

> [Lee] represents that [she] has terminated the Prior Agreement [with Dramatic] effective April 26, 2016. [Rudinplay] acknowledges that, notwithstanding such termination, the amateur acting rights to the Prior Adaptation continue to be exploited following such termination on a non-exclusive basis in the United States, and on an exclusive basis elsewhere. **The rights granted hereunder shall be subject to the rights granted under the Prior Agreement, as limited by such termination**.

SA9 (alterations in original). The district court reasoned that this provision "means that if Dramatic is properly found to have retained the right to produce the play in non-first-class theatres, then Rudinplay did not acquire that right." SA10. And according to the district court, that was "exactly what transpired" at the arbitration. *Id.*

The district court erred in holding that Atticus and Sorkin were bound by the arbitrator's determination. "[A]rbitration is a matter of contract between the relevant parties; no party can be required to arbitrate absent an agreement to do so." *Rosenblum v. Travelbyus.com*

*Ltd.*, 299 F.3d 657, 662 (7th Cir. 2002). And "[m]ere reference to another contract or document is not sufficient to incorporate its terms into a contract. There must be an express intent to incorporate." *Id.* at 666. Likewise, although "a party may agree to refrain from exercising his right to a day in court in return for being spared the burden of active litigation, no such agreement should be inferred except upon the plainest circumstances." *Cannon v. Armstrong Containers Inc.*, 92 F.4th 688, 709 (7th Cir. 2024) (quoting Restatement (Second) of Judgments § 40 (1982)).

The relevant facts, which are undisputed, establish that Atticus (and its predecessor Rudinplay) and Sorkin never agreed to take part in or be bound by an arbitration. Neither Atticus nor Sorkin are parties to the 1969 Agreement. And the provision that the district court relied on from the Rudinplay Agreement merely recognized that Dramatic could— consistent with the Copyright Act's termination provisions—continue to utilize its adaptation of the Novel on a non-exclusive basis. A152–53 at § 2(b). It was not an agreement by Atticus and Sorkin to be bound by any arbitration between Ms. Lee and Dramatic, as the district court necessarily had to determine to reach its conclusion.

In addressing the identical issue, the SDNY Court found that Atticus and Sorkin were not bound by the arbitrator's decision. Looking at the same provision from the Rudinplay Agreement on which the district court relied, the SDNY Court concluded that the provision "cannot be read as an agreement by Rudinplay to become a party to the terminated 1969 Agreement and thereby to be bound by the arbitration provision in that agreement, or to otherwise adopt the arbitration provision in that earlier agreement." *Atticus*, 2023 WL 3135745, at *9. According to the SDNY Court, Section 2(b) of the Rudinplay Agreement just "acknowledges that Lee had previously given Dramatic a license to create a derivative work, and that the license given to Rudinplay to create another derivative work from the Novel would not preclude Dramatic from performing the Sergel Play." *Id*.

The SDNY Court's ruling makes good sense. To reach the district court's conclusion, the agreement would need to be re-written to state that Rudinplay's rights "shall be subject to the rights granted under the Prior Agreement, as limited by the effect of termination as to be determined by an arbitrator pursuant to the arbitration provision in the Prior Agreement." No such language exists here.

The district court thus erred by binding Atticus and Sorkin to the arbitrator's ruling on the meaning of the Copyright Act.

**B.    The arbitrator disregarded the Copyright Act by negating the effect of Ms. Lee's termination of the 1969 Grant.**

Because Atticus and Sorkin were not bound by the arbitrator's decision, the district court should have proceeded to determine that the arbitrator erred in his interpretation of Section 304(c) of the Copyright Act.

The arbitrator held that Dramatic's right to exploit the "amateur acting rights" conveyed by the 1969 Grant remains exclusive to Dramatic in the United States, in perpetuity, under Section 304(c)(6)(A)—a reading that prevents Ms. Lee or her successors from ever recapturing or exploiting any of the "amateur acting rights" conveyed by the 1969 Grant. A75. The arbitrator cited no cases supporting his conclusion on the statute's meaning because no such case exists. Even though the termination provision in Section 304(c) has been the law for 45 years, no party in Dramatic's position has ever obtained a ruling that its derivative-work rights remain exclusive after termination.

The arbitrator's interpretation of Section 304(c) was wrong based on the plain statutory language, applicable Supreme Court precedent, the Act's history and purpose, and the Copyright Office's guidance on the meaning of the Act.

### 1. The statute's plain language allows the termination of an exclusive license.

Under the statute's plain language, authors have the right to terminate exclusive licenses. As Section 304(c) explains, "the *exclusive* or nonexclusive grant of a transfer or license of the renewal copyright or any right under it" is "subject to termination." 17 U.S.C. § 304(c) (emphasis added). After termination, "all rights under this title that were covered by the terminated grant revert" to the author. *Id.* § 304(c)(6). The right to prepare or authorize derivative works thus reverts to the author because it is a "right[] under this title," *id.*, codified in 17 U.S.C. § 106(2).

Section 304(c)—applicable by its plain terms to exclusive licenses and to grants of derivative-work rights—thus "create[s] for authors or their statutory heirs . . . an inalienable right to terminate the grant of a transfer or license." *Penguin*, 537 F.3d at 198; *see also, e.g., Waite v. UMG Recordings, Inc.*, 450 F. Supp. 3d 430, 438 (S.D.N.Y. 2020) (concluding

that the "unequivocal purpose" of Copyright Act's termination provisions is to "provide a mechanism by which artists can reclaim their copyright after the work has had time to become more valuable"); *Siegel v. Warner Bros. Ent.*, 690 F. Supp. 2d 1048, 1055 (C.D. Cal. 2009) (reasoning that the purpose of termination right "is to provide authors or their heirs a meaningful opportunity to recapture the right to the extension in the copyright term afforded . . . by the 1976 Act"). Thus, "an exclusive license to perform a derivative work" does not "remain[] exclusive following a valid termination of a license." *Atticus*, 2023 WL 3135745, at *5.

Dramatic, of course, retains some ability to continue licensing—*i.e.*, "utilize"—the Sergel Play in the United States under the Derivative Works Exception. 17 U.S.C. § 304(c)(6)(A). That was not in dispute at the arbitration. The dispute instead centered on whether Dramatic could continue to license its derivative work *exclusively*. That is where the arbitrator disregarded the law. The arbitrator found that despite Ms. Lee's termination, Dramatic's post-termination ability to license amateur acting rights for dramatizations of the Novel remains *exclusive*. A75. The arbitrator thus prohibited the Estate or LLC from licensing the

production of *any* dramatization of the Novel in any manner covered by the original grant's definition of "amateur acting rights."

The arbitrator's ruling has no basis in copyright law. Indeed, it disregards the plain language of the Copyright Act and renders portions of Section 304(c) meaningless. "It is the cardinal principle of statutory construction" that a court must "give effect, if possible, to every clause and word of a statute rather than to emasculate an entire section." *Bennett v. Spear*, 520 U.S. 154, 173 (1997) (cleaned up). Consistent with that directive, this Court held that "a court should not construe a statute in a way that makes words or phrases meaningless, redundant, or superfluous." *United States v. Franz*, 886 F.2d 973, 978 (7th Cir. 1989) (quoting *Zimmerman v. N. Am. Signal Co.*, 704 F.2d 347, 353 (7th Cir. 1983)).

Yet that is precisely what the arbitrator's ruling does—a finding that an exclusive license to prepare a derivative work is interminable cannot be squared with Section 304(c)'s language. Starting with the text of the Derivative Works Exception, Congress spelled out that the privilege to continue utilizing derivative works "does not extend to the preparation after the termination of other derivative works based upon

the copyrighted work covered by the terminated grant." 17 U.S.C. § 304(c)(6)(A). In other words, the carveout for "utilizing" derivative works does not prevent the author (or her successor) from creating or authorizing the creating of *new* works. The arbitrator's ruling renders that right meaningless. According to the arbitrator, the exclusive right to license a derivative work created under a terminated grant continues in perpetuity, preventing the author or her licensees from utilizing new derivative works.

To that point, on an even more basic level, Section 304(c) provides that "the exclusive . . . grant of a transfer or license of the renewal copyright or any right under it" is "subject to termination." 17 U.S.C. § 304(c). Congress included the Derivative Works Exception just to explain how the existing derivative work could continue to be "utilized" after termination. The arbitrator's interpretation renders meaningless Congress's carefully delineated structure by which the termination of the exclusive license occurs but the derivative work can continue to be used. Indeed, although Section 304(c)(6) states that "all rights . . . covered by the terminated grant revert," 17 U.S.C. § 304(c)(6), the arbitrator found that *no* rights reverted following Ms. Lee's termination. Thus, under the

arbitrator's decision, there can never be an effective termination of an exclusive license for a derivative work. But that was not Congress's intent; it made clear that an "exclusive . . . grant" is "subject to termination" under the Copyright Act. *Id.* § 304(c).

Unsurprisingly, the SDNY Court rejected the arbitrator's erroneous interpretation. As that court explained, the arbitrator's "interpretation fails" because it "would thwart the plain language of the Copyright Act, rendering any exclusive license interminable." *Atticus*, 2023 WL 3135745, at *7. "The Derivative Works Exception does not, and cannot, eviscerate the statutory termination right of § 304(c)." *Id.*[5]

---

[5] *Accord, e.g.*, *Baldwin v. EMI Feist Catalog, Inc.*, 805 F.3d 18, 22 (2d Cir. 2015) (holding that heirs recaptured rights to song following termination of grant conveying "all rights and interests whatsoever now or hereafter known or existing, heretofore or at any time or times hereafter acquired or possessed by Grantor in and to [the Song and various derivative works], . . . and all United States reversionary and termination interests in copyright now in existence or expectant, including all rights reverted, reverting or to revert to Grantor[,] his heirs, executors, administrators or next of kin by reason of the termination of any transfers or licenses covering any extended renewal term of copyright pursuant to Section 304 of the Copyright Act of 1976 . . . ." (alterations in original)); *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 980 (9th Cir. 2008) (same, with respect to grant of "[a]ll motion picture (including musical motion picture), television and radio rights in and to the said literary work[s] . . . throughout the world for the full period of the renewal copyrights in the work[s] and any further renewals or extensions thereof"); *Brumley v. Albert E. Brumley & Sons, Inc.*, 822 F.3d 926, 929 (6th Cir. 2016) (same,

The arbitrator's decision also cannot be squared with other language in the Derivative Works Exception. The exception provides that a derivative work prepared under the original grant before termination may continue to be exploited "*after* its termination." 17 U.S.C. § 304(c)(6)(A) (emphasis added). If the arbitrator were correct that exclusive derivative-work rights cannot be terminated, there would be no need for the exception at all—it is only because the derivative-work rights *are terminable* that the exception was created.

Finally, the arbitrator's decision ignores the Copyright Act's provision that parties cannot override the termination right in Section 304(c). By the Copyright Act's plain terms, "[t]ermination of the grant may be effected *notwithstanding any agreement to the contrary.*" 17 U.S.C. § 304(c)(5) (emphasis added). "[T]he clear Congressional purpose behind § 304(c) was to prevent authors from waiving their termination right by contract." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 290 (2d Cir. 2002). Indeed, if an exclusive license was "outside

---

with respect to grants "assign[ing] and transfer[ring] . . . all of [the couple's] right title and interest" and "all rights to obtain renewals or copyrights in the future upon Works written or composed by [the author]").

the purview" of Section 304(c), "the termination provision would be rendered a nullity; litigation-savvy publishers would be able to utilize their superior bargaining position to compel authors to agree that a [license was exclusive] to get their works published." *Id.* at 290–91. Thus, based on the plain language of the Copyright Act, the exclusivity language in the 1969 Agreement cannot prevent the termination of the 1969 Grant. *See Penguin*, 537 F.3d at 198 (Section 304(c) created "an inalienable right to terminate the grant of a transfer or license").

In sum, although Dramatic can continue to license the Sergel Play under the Derivative Works Exception, that carveout does not deprive the Estate and LLC of the post-termination right to exploit the reclaimed amateur acting rights in the Novel. As of the effective termination date, Dramatic just retained the continuing ability to "utilize" the derivative work it had prepared under the grant. Congress did not create a carveout from termination altogether. By holding otherwise, the arbitrator clearly erred.

### 2. The arbitrator misunderstood and misapplied *Mills Music* in reaching his erroneous ruling.

The arbitrator principally relied on the Supreme Court's decision in *Mills Music, Inc. v. Snyder*, 469 U.S. 153 (1985), to reach his holding. A78. But *Mills Music* undermines his conclusion.

To start*, Mills Music* answered a different question than the one here. The question in that case was "whether an author's termination of a publisher's interest in a copyright also terminates the publisher's contractual right to share in the royalties on such derivative works." *Mills Music*, 469 U.S. at 156. *Mills Music* "did not address the question of whether an exclusive license remains exclusive following a valid termination, and, accordingly, does not help Dramatic." *Atticus*, 2023 WL 3135745, at *7.

Furthermore, *Mills Music* refutes the fundamental premise of the arbitrator's award—that exclusivity is merely a contract term like a royalty rate or a territorial restriction, such that it is one of the "terms of the grant" that remains in effect under the Derivative Works Exception. The arbitrator relied on *Mills Music* for the proposition that "although the termination has caused the *ownership* of the copyright to revert to the [author], nothing in the statute gives [the author] any right to acquire

any *contractual rights* that the [Derivative Works] Exception preserves." A80 (emphasis added) (quoting *Mills Music*, 469 U.S. at 167). Yet that ignores that *exclusivity is ownership* under the Copyright Act. If ownership reverts upon termination, as *Mills Music* correctly acknowledges, so too does exclusivity, because the terms are synonymous under the Copyright Act.

Section 101 of the Copyright Act defines the "transfer of copyright *ownership*" as "an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the *exclusive* rights comprised in a copyright, whether or not it is limited in time or place of effect, but *not including a nonexclusive license*." 17 U.S.C. § 101 (emphasis added). The Act is clear: a transfer of exclusivity *is* a transfer of ownership. *Mills Music* is also clear that ownership reverts upon termination; mere contractual rights do not. 469 U.S. at 167. Exclusivity thus is not a contractual right and is not merely a "term of the grant" preserved under the Derivative Works Exception.

So when *Mills Music* states that termination causes "ownership" of rights in the work to revert to the grantor, *id.*, it necessarily means that *exclusivity* has reverted to the grantor. So obvious was that point that no

party in *Mills Music* even disputed it. All that remained with the grantee in *Mills Music*—the "terms of the grant" that continued to govern under the Derivative Works Exception—were accounting details about who paid what to whom for *non*-exclusive post-termination exploitations of the work at issue. *See id.* at 167–68. The grantee's exclusivity was not at issue because exclusivity was not a mere contractual "term of the grant."

Despite this clear authority, the arbitrator disregarded the holding in *Mills Music* to find that "[t]he *exclusive rights* granted to Dramatic in 1969 that the Estate claims have now reverted to it are *the very contractual rights* that the Exception preserves to Dramatic." A80 (emphasis added). *Mills Music* says the opposite: "The statutory transfer of *ownership* of the copyright cannot fairly be regarded as a statutory assignment of contractual rights." 469 U.S. at 168. The arbitrator thus conflates exclusivity with the "terms of the grant," in defiance of *Mills Music* and the statutory definition written by Congress, both of which explicitly distinguish between ownership (which includes exclusivity) and contractual rights.

### 3. The arbitrator ignored the purpose of Section 304(c).

The arbitrator's award also disregarded "the unequivocal purpose of the termination provision," which is to "provide a mechanism by which artists can reclaim their copyright after the work has had time to become more valuable." *Waite*, 450 F. Supp. 3d at 438 (construing the parallel termination mechanism in 17 U.S.C. § 203). Contrary to this policy objective, the arbitrator concluded that Ms. Lee "reclaimed" nothing from Dramatic when she exercised her termination rights. Instead, he found that Ms. Lee's termination left both the author and grantee in the same position, nullifying the termination right Congress created.

Trying to paper over the effect of his ruling, the arbitrator suggested that the Estate and LLC were not left "empty-handed" because his ruling would "not inhibit the Estate from exercising all the myriad rights and derivative rights it still controls, such as television, radio, new media, digital media, social media . . . other than the stock and amateur live stage rights Dramatic owns." A82. Yet the effect of an author's statutory right to termination cannot turn on whether the author retained other rights or instead similarly granted them to third parties on an exclusive basis. Congress's purpose in enacting a termination

provision, reflected in the clear language and history of the Act, was for termination of *any grant* to offer a benefit to the author's heirs—that is, to allow the heirs to undo *any* prior deal that could have been more remunerative, had the eventual value of the work been known at the time. *See* 17 U.S.C. § 304(c). By statute, the right of termination is available to all properly-executed grants, not only to certain grants, and the "conditions" identified by the statute do not require that a grant may be terminated only if failure to do so would leave the author's heirs empty-handed. *See id.*

The arbitrator's unprecedented interpretation of the Derivative Works Exception also is inconsistent with the purpose of the exception. The purpose of the exception is to protect the original grantee's investment in making the pre-termination derivative work, by allowing it to keep exploiting that work. *See* Virginia E. Lohmann, *The Errant Evolution of Termination of Transfer Rights and the Derivative Works Exception*, 48 Ohio St. L.J. 897, 910–912 (1987) (hereinafter "Lohmann"). This issue was of great concern to the movie industry at the time the Act was drafted and reflects the expectations of original grantees. *Id.* at 912. When those grantees acquired their derivative-work rights under the

1909 Act, they expected the underlying work to go into the public domain after 56 years:

> Congress determined that the grantee of rights from the original author, the derivative work proprietor, had already received everything it ever had any right to expect, since it had the same fifty-six years as it originally expected under the 1909 Act to recover its investment.

*Id.* at 910.

The derivative work proprietor under the 1909 Act also expected, however, that it could keep exploiting its own work indefinitely—after year 56, it might face competition from new derivative versions, but it could at least keep its own derivative works on the market. Thus, the Derivative Works Exception, correctly understood, preserves this expectation. Former Register of Copyrights, Barbara Ringer, who drafted the termination provisions of the 1976 Act, *see* Lohmann at 908 n.112, explained in her 1985 Senate Hearing testimony[6] that "the purpose of the [derivative works] exception was to keep the derivative

---

[6] *Civil and Criminal Enforcement of the Copyright Laws: Hearing Before the Subcomm. on Patents, Copyrights, and Trademarks of the Senate Comm. on the Judiciary*, 99th Cong., 1st Sess. (1985) (hereinafter "Hearings").

work in circulation and not to deprive the owner of the derivative work of the *use of its own property*." Hearings at 87 (emphasis added).

The arbitrator thus ignored the stated purpose of the Derivative Works Exception and rendered the entire termination provision a nullity with respect to exclusive grants by ruling that exclusivity was a "term of the grant" that was not terminable under Section 304(c). Under the arbitrator's logic, a grantee who received exclusive derivative-work rights under a grant made pursuant to the 1909 Act later acquired exclusivity *throughout* the *extended* renewal term created by the 1976 Copyright Act—even though it only bargained for, paid for, and expected to receive exclusivity during the shorter period granted under the 1909 Act. Compounding this illogical result, the arbitrator says this is true even when the author exercises his or her right of termination. This is not the law Congress wrote and it is the opposite of what Congress intended.

### 4. Guidance from the Copyright Office confirms that the arbitrator misinterpreted Section 304(c).

Guidance from the Copyright Office provides additional confirmation of the arbitrator's legal error. The Copyright Office has explained on its website that "[t]he Copyright Act permits authors or their heirs, under certain circumstances, to terminate the exclusive or

nonexclusive grant of a transfer or license of an author's copyright in a work or of any right under a copyright . . . . [T]he post-termination rights . . . to prepare *new* derivative works revert to the authors or their heirs."   Notices   of   Termination,   [www.copyright.gov/recordation/](www.copyright.gov/recordation/) [termination.html](termination.html) (last accessed April 7, 2025) (emphasis added).

In connection with the appeal of the SDNY Court's ruling that is now pending before the Second Circuit, the Copyright Office submitted an amicus brief that also confirms that the arbitrator's ruling was erroneous.  *See* Ex. 1.  The Copyright Office explained that Section 304(c) "allows authors who may have contracted away their copyright rights to recapture those rights while ensuring the continued distribution of any derivative works created in connection with the original contract."  Ex. 1 at 1[7].  The Copyright Office also noted that the SDNY Court properly rejected the arbitrator's interpretation because it was "inconsistent with the statute's text, structure, and history."  *Id.*  Furthermore, the Copyright Office cautioned that adoption of the arbitrator's view "would stifle innovation by preventing the creation of new derivative works after

---

[7] Pagination corresponds to pagination in brief.

termination," which would be "directly contrary to Congress's clear purpose in the termination provisions and the foundational purposes of copyright law." *Id.* at 2.

* * *

In sum, the plain language of Section 304(c), the controlling Supreme Court precedent in *Mills Music*, Congress's purpose in enacting Section 304(c), and the Copyright Office's guidance establish that the arbitrator made a clear error in holding that Ms. Lee's termination of the exclusive grant to Dramatic in the 1969 Agreement had no effect.

### C. The arbitrator's disregard of settled copyright law violates the rights of third parties Atticus and Sorkin.

The arbitrator's disregard of positive law—the Copyright Act's termination provision—requires the Estate and LLC to violate the rights of Atticus and Sorkin who have not agreed to arbitrate. As this Court has explained, because "[a]rbitration implements contracts," what "the parties cannot do through an express contract they cannot do through an arbitrator." *Affymax*, 660 F.3d at 284. And "[i]t goes without saying that a contract cannot bind a nonparty." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002). Thus, because "[c]ontracts bind only the parties" to them, "[n]o one can 'agree' with someone else that a stranger's" rights

under the law "will be cut off." *Gotham Holdings, LP v. Health Grades, Inc.*, 580 F.3d 664, 665 (7th Cir. 2009).

But that is what the arbitrator's award requires here. The arbitrator's award requires the Estate and LLC to do something they could not agree to do by contract with Dramatic—ignore the effect of Section 304(c) of the Copyright Act to the detriment of Atticus and Sorkin. Indeed, to implement the arbitrator's erroneous interpretation of Section 304(c), the award enjoins the Estate and LLC from "licensing or granting any third party, including, . . . Rudinplay, Inc., Atticus LLC, any other entity owned, controlled or operated by Scott Rudin, and any entity assigned or licensed rights from Rudinplay . . . any non-first-class stage rights in [the Novel]." A20 at ¶ 13. The award also enjoins the Estate and LLC from "encouraging, inducing, assisting, approving or consenting to Rudin's or Rudinplay Affiliates' wrongful licensing of Rudinplay's version of [the Novel] for any non-first-class production throughout the world." *Id.*

Yet, as explained above, Ms. Lee's termination of the 1969 Grant under Section 304(c) meant that Dramatic no longer retained the exclusive right to license the Sergel Play. It was that statutory backdrop

against which Rudinplay and Ms. Lee contracted. Relying on what Section 304(c) says, Ms. Lee issued Rudinplay a license for all stage rights to the Novel, subject only to the rights Dramatic retained following termination. A152–53 at § 2(a)–(b). And based on Section 304(c), Rudinplay (and its successor Atticus) have the right to license the Sorkin Play on a non-exclusive basis to all the same classes of domestic theaters to which Dramatic could still license the Sergel Play.

But now, the arbitrator's award commands the Estate and LLC to operate as if termination under Section 304(c) has no legal effect and to conduct their affairs with Atticus and Sorkin consistent with that erroneous legal interpretation. Take, for example, the Estate and LLC's obligation under the Rudinplay Agreement to consider changes to the royalty arrangement with Atticus. The Rudinplay Agreement obligates the Estate and LLC to consider in good faith changes to the royalty arrangement for productions of the Sorkin Play. A154 at § 5(d). The arbitrator's award implementing his view of Section 304(c) now forecloses that cooperation because the Estate and LLC must operate as if the Copyright Act does not say what it says.

The fact that Atticus and Sorkin obtained a declaration of the

correct interpretation of Section 304(c) in the SDNY Court does not lessen the violation of their rights that the arbitrator's award commands. The Estate and LLC still must conduct their dealings with Atticus and Sorkin based upon the arbitrator's erroneous interpretation of Section 304(c).

So the facts in this case mirror the grounds for reversal set forth in *Affymax and Hyatt*—the arbitrator's award here "directs the parties to violate the legal rights of third persons who did not consent to the arbitration." *Affymax*, 660 F.3d at 284; *accord Hyatt*, 876 F.3d at 903.[8]

---

[8] *Baxter Int'l, Inc. v. Abbott Lab'ys*, 315 F.3d 829 (7th Cir. 2003), on which Dramatic has relied, is not to the contrary. There, this Court affirmed an arbitration award holding that Abbott's exclusive license to sell a pharmaceutical product prohibited Baxter from selling a competing product. *Id.* at 832–33. The Court held that whether the arbitrators' interpretation of the contract had the "effect" of creating a Sherman Act issue—a question that was decided by the arbitrators—did not require reversal of the award. *Id.* But unlike here, that case did not involve an arbitration award "*direct[ing]* the parties to violate the legal rights of third persons." *Affymax*, 660 F.3d at 284 (emphasis added). Indeed, the Court reasoned that "only Baxter"—and not third parties like Atticus and Sorkin—was "distressed by the award." *Baxter*, 315 F.3d at 832. And unlike here, the Court found that Baxter could "solve unilaterally any antitrust problem." *Id.* at 833.

Likewise, in past briefing, Dramatic has insisted the rule set forth in *Affymax* and *Hyatt* applies only to violations of "positive law." *See* Dkt. 32 at 12. But the case on which Dramatic relies states that "the judiciary may step in when the arbitrator has commanded the parties to violate legal norms (principally, but *not exclusively*, those in positive law)." *George Watts & Son, Inc. v. Tiffany & Co.*, 248 F.3d 577, 580 (7th Cir.

Because the Estate, LLC, and Dramatic could not by "mutual consent" strip Atticus and Sorkin of their rights flowing from Section 304(c), nor could the arbitrator. *Hyatt*, 876 F.3d at 903. Only Congress has the authority to alter the effect of a Section 304(c) termination.

### D. Dramatic's additional arguments for affirmance are unavailing.

In addition to its faulty arguments concerning the meaning of Section 304(c) of the Copyright Act, Dramatic has repeatedly made two additional erroneous arguments. In fact, Dramatic has already referenced these arguments in motion practice before this Court. App. Dkt. 18. First, Dramatic contends that Ms. Lee's grant to Rudinplay occurred too soon under Section 304(c)(6)(D) of the Copyright Act. Dkt. 32 at 16–17. That argument is not properly before the Court because the arbitrator did not reach it, and it is wrong in any event. Second, Dramatic makes the bizarre contention that the arbitrator relied on a purported concession by the Estate and LLC that Ms. Lee transferred no

---

2001) (emphasis added). This distinction makes little difference, however, because the Copyright Act is positive law. *See Mazer v. Stein*, 347 U.S. 201, 211 n.21 (1954) ("Title 17 of the United States Code entitled 'Copyrights' was codified into positive law in 1947[.]").

rights to Rudinplay that had previously been part of Dramatic's pre-termination exclusive rights. *Id.* at 14–15. That is also wrong.

1. **Dramatic's argument concerning the timing of Ms. Lee's grant of rights to Rudinplay is not properly before this Court, and it is wrong in any event.**

Dramatic's argument concerning the timing of Ms. Lee's grant of rights to Rudinplay is not properly before this Court and is incorrect.

To start, the arbitrator expressly chose not to rule on Dramatic's argument about the timing of Ms. Lee's grant of rights to Rudinplay under Section 304(c)(6)(D). A85. A district court considering a motion to vacate or modify an arbitration award cannot decide legal questions not reached by the arbitrator. *See United Steelworkers of Am., Loc. 4839 v. New Idea Farm Equip. Corp.*, 917 F.2d 964, 968 (6th Cir. 1990) (recognizing that "courts may not go beyond an award to decide questions that the arbitrator did not decide"). Because the arbitrator did not address Dramatic's Section 304(c)(6)(D) argument, the district court correctly did not address it. And just as the district court cannot decide an issue not reached by the arbitrator, this Court also cannot address that argument.

Even if the issue could be addressed in the federal-court confirmation proceedings, Dramatic is wrong in contending that Ms. Lee's grant to Rudinplay occurred too early under 17 U.S.C. § 304(c)(6)(D). Under Section 304(c)(6)(D), a "further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of the termination." 17 U.S.C. § 304(c)(6)(D). Dramatic claims that Ms. Lee's grant to Rudinplay is ineffective because the Rudinplay Agreement was executed before Ms. Lee's termination of the 1969 Grant was effective. But the execution of the Rudinplay Agreement was not a "further grant" of Dramatic's terminated rights under Section 304(c)(6)(D).

Under the terms of the Rudinplay Agreement, Ms. Lee gave Rudinplay an option to obtain stage rights. A152 at § 2(a). The exercise of the option and the grant of the stage rights would only occur upon the "first paid public performance of the Initial Production."[9] A153 at § 4. That first paid public performance, and thus the actual "further grant"

<hr />

[9] "Initial Production" is defined as "[t]he initial commercial first class production of the [Sorkin] Play presented on Broadway or in the West End of London under Producer's original agreement with the Playwright." A153 at § 4.

by Ms. Lee to Rudinplay of any of Dramatic's terminated stage rights, took place when previews of the Sorkin Play began on Broadway in November 2018, more than two years *after* the effective date of the termination. Dkt. 23-8 at 3; Dkt. 41-2 at 4–5.

Because that "further grant" occurred after the effective date of the termination of the original grant to Dramatic in April 2016, it was valid under Section 304(c)(6)(D). The United States Supreme Court has "stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 461–62 (2002) (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992)). Based upon the plain language of the statute, even if the option in the Rudinplay Agreement was issued before that effective date, the fact that the actual grant occurred after the effective date means that the grant is valid under Section 304(c)(6)(D). That statute states as follows: "[a] *further grant*, **or** *agreement to make a further grant*, of any right covered by a terminated grant is valid only if *it* is made after the effective date of the termination." 17 U.S.C.

§ 304(c)(6)(D) (emphasis added). Under that statutory formulation, if *either* a "further grant" or an "agreement to make a further grant" happens after the effective date, then the one of those that came after is valid.

Thus, not only is Dramatic's argument not properly before the Court, but it is also wrong.

> **2.** **Dramatic is wrong that the arbitrator relied on a purported admission by the Estate and LLC that Ms. Lee did not convey rights to Rudinplay that had previously been the subject of the terminated exclusive grant to Dramatic.**

Dramatic also recently made the preposterous assertion that the arbitrator relied on a purported admission by the Estate and LLC that none of Dramatic's pre-termination exclusive rights could have been transferred to Rudinplay. *See* App. Dkt. 18 at 9–10; Dkt. 32 at 14–15. That is nonsense.

One of the central disputes in the arbitration concerned whether Dramatic retained the exclusive right to license non-first-class productions of the Novel. The arbitrator expressly noted in his award that the Estate and LLC took the position that Ms. Lee had the ability after termination of the 1969 Grant to convey nonexclusive rights to

Rudinplay to license non-first-class productions of the Novel. *See* A74 ("In its prayer for relief, Dramatic seeks a declaration that it continues to have all the rights granted to it under ¶4(e) of the 1969 Agreement, despite the Estate's notice of termination to Dramatic under 17 U.S.C. §304(c). Dramatic claims that those rights include the sole and exclusive right to license dramatizations of TKAM to be performed in stock and amateur theaters. The Estate claims that any such rights were terminated in the U.S. effective April 26, 2016, as a result of Miss Lee's issuance of the notice.").

Dramatic is wrong in suggesting that the arbitrator relied on a purported admission by the Estate and LLC that Ms. Lee did not convey to Rudinplay any of the rights that had been exclusively held by Dramatic before termination of the 1969 Grant. In fact, the section of the arbitration award on which Dramatic's argument hinges does not involve the determination of whether Dramatic retained exclusive rights to license non-first-class productions after termination. Instead, the part of the award on which Dramatic relies relates to the timing of Ms. Lee's termination of the 1969 Grant, an issue that the arbitrator expressly did not decide. A85. Thus, that part of the award is *dicta*.

* * *

In light of the foregoing, the district court should not have confirmed the arbitrator's award on the meaning of Section 304(c).

## II. The district court erred by giving Dramatic more relief with respect to the Peck Order than the arbitrator awarded.

The district court erred by giving Dramatic more relief with respect to the Peck Order than the arbitrator awarded.

A district court can modify an arbitration award only where (1) "there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award;" (2) "the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted;" or (3) "the award is imperfect in matter of form not affecting the merits of the controversy." 9 U.S.C. § 11(a)–(c).[10]

---

[10] Section 11 of the FAA also provides that a court "may modify and correct the award, so as to effect the intent thereof and promote justice between the parties." 9 U.S.C. § 11. But this provision does not provide a catch-all basis for modification. *See CPR Mgmt., S.A. v. Devon Park Bioventures, L.P.*, 19 F.4th 236, 247 (3d Cir. 2021) ("Promoting justice, standing alone, is not one of the enumerated grounds for modifying or correcting an arbitration award. Rather, the structure of § 11 shows that a district court must first conclude that at least one of the grounds for

The "upshot of all this," this Court has explained, is that "there is nothing in the Federal Arbitration Act itself that would authorize a district court to go beyond confirming an arbitrators' award and independently award additional" relief to a party seeking confirmation. *Menke v. Monchecourt*, 17 F.3d 1007, 1009 (7th Cir. 1994); *see also Nat'l Football League Players Ass'n v. Nat'l Football League Mgmt. Council*, 523 Fed. Appx. 756, 760 (2d Cir. 2013) (vacating and remanding where the district court "expanded the terms of the arbitration award"). Thus, unless a party satisfies a ground for modification, a "court will enforce the arbitrator's award as written" and "not interject itself into the arbitration process by elaborating on or rewriting an arbitrator's award." *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. PPG Indus., Inc.*, 751 F.3d

---

modification exists and, if so, then the court may modify the award 'to effect the intent thereof and promote justice between the parties.'") (citation omitted) (quoting 9 U.S.C. § 11); *Metro Tech Serv. Corp. v. Payless Shoe Source, Inc.*, No. 07C0101, 2007 WL 2003039, at *2 (N.D. Ill. July 6, 2007) ("A district court's authority to modify or correct an award so as to promote justice may be invoked only '[i]n either of the following cases' listed in (a)–(c).").

580, 585 (7th Cir. 2014) (quoting *United Steelworkers of Am. v. Danly Mach. Corp.*, 852 F.2d 1024, 1027 (7th Cir. 1988)).

Dramatic never satisfied—or attempted to satisfy—one of the three grounds for modification under 9 U.S.C. § 11. The district court instead went "beyond confirming" the "arbitrators' award and independently award[ed] additional" relief to Dramatic. *Menke*, 17 F.3d at 1009. Specifically, the district court entered a final judgment that contains relief nowhere to be found in the Peck Order:

> The Estate is hereby ordered to take all necessary steps to ensure that the judgment and order in Atticus Corp. et al v. Carter et al, Case No. 22-cv-00059, currently pending in the United States District Court for the Southern District of Alabama are amended to reflect that the agreed order is subject to Dramatic's stage rights as set forth in this judgment or as modified in any appeal thereof.

SA26. The district court exceeded its authority under the FAA by making this "unwarranted modification." *Menke*, 17 F.3d at 1010.

This is no minor quibble. To be sure, once an arbitration award is confirmed and entered as a final judgment, a district court may exercise ancillary jurisdiction "to manage its proceedings, vindicate its authority, and effectuate its decrees." *Peacock v. Thomas*, 516 U.S. 349, 354 (1996). But enforcement proceedings carry protections that were not observed

here. For example, "[d]ue process requires a district court to resolve relevant factual disputes—allowing discovery and holding an evidentiary hearing if necessary—in a civil contempt proceeding." *Tranzact Techs., Inc. v. 1Source Worldsite*, 406 F.3d 851, 855 (7th Cir. 2005). And "the moving party" in contempt proceedings "must establish by clear and convincing evidence that (1) a court order sets forth an unambiguous command; (2) the alleged contemnor violated that command; (3) the violation was significant, meaning the alleged contemnor did not substantially comply with the order; and (4) the alleged contemnor failed to make a reasonable and diligent effort to comply." *U.S. S.E.C. v. Hyatt*, 621 F.3d 687, 692 (7th Cir. 2010). The district court skipped confirmation and went straight to enforcement without giving the Estate a meaningful opportunity to be heard on the issue.

In sum, the district court exceeded its authority by modifying the arbitrator's order to grant additional relief to Dramatic. The Court thus should reverse and remand the case with instructions to the district court to remove the provision in question from its judgment.

## CONCLUSION

For these reasons, the Court should reverse the district court's confirmation of the arbitration award and remand the case for further proceedings consistent with the Court's opinion.

Respectfully submitted,

*/s/ David G. Hymer*

David G. Hymer (Counsel of record)
Riley A. McDaniel
Bradley Arant Boult Cummings LLP
1819 Fifth Avenue North
Birmingham, Alabama 35203
Telephone: (205) 521-8000
Facsimile: (205) 521-8800
dhymer@bradley.com
rmcdaniel@bradley.com

*Attorneys for Appellants The Estate of Nelle Harper Lee and Harper Lee, LLC*

# CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitations of 7th Cir. Rule 32(c) because it contains 11,050 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of 7th Cir. Rule 32(b) and Fed. R. App. P. 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced 14-point font.


/s/ *David G. Hymer*
Of Counsel

## CERTIFICATE OF SERVICE

I certify that, on April 8, 2025, the foregoing was filed using the CM/ECF system, which will serve notice on all counsel of record.

_/s/ David G. Hymer_
Of Counsel

# CIRCUIT RULE 30(d) CERTIFICATION

Pursuant to 7th Cir. R. 30(d), I hereby state that the following Required Short Appendix attached to the foregoing brief and the separately bound appendix contain all materials required by Rule 30(a) and Rule 30(b) of the Circuit Rules.

/s/ *David G. Hymer*

Of Counsel

# Exhibit 1

# No. 23-1226

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————————

ATTICUS LLC,

Plaintiff-Appellee,

v.

THE DRAMATIC PUBLISHING COMPANY,

Defendant-Appellant.

———————————

On Appeal from the United States District Court
for the Southern District of New York

———————————

BRIEF FOR THE UNITED STATES OF AMERICA
AS AMICUS CURIAE IN SUPPORT OF APPELLEE

———————————

*Of Counsel:*

SUZANNE V. WILSON
  *General Counsel and Associate*
  *Register of Copyrights*

EMILY L. CHAPUIS
  *Deputy General Counsel*
  *United States Copyright Office*
  *Washington, DC 20540*

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney*
  *General*

DANIEL TENNY
JOSHUA DOS SANTOS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7224*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-0213*

# TABLE OF CONTENTS

Page

INTRODUCTION AND STATEMENT OF INTEREST ............................. 1

STATEMENT OF THE ISSUE ................................................................. 2

STATEMENT OF THE CASE ................................................................. 2

    A.    Statutory Background ................................................................. 2

    B.    Factual Background ................................................................... 5

    C.    Prior Proceedings ...................................................................... 7

SUMMARY OF ARGUMENT ................................................................. 8

ARGUMENT ......................................................................................... 12

The District Court Correctly Held That the Right To Make New
    Derivative Works Reverts to an Author after Termination of an
    Exclusive Grant. ............................................................................ 12

CONCLUSION ...................................................................................... 27

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                           **Page(s)**

*Brumley v. Albert E. Brumley & Sons, Inc.*,
   822 F.3d 926 (6th Cir. 2016) .................................................................. 25

*Classic Media, Inc. v. Mewborn*,
   532 F.3d 978 (9th Cir. 2008) .................................................................. 19

*Dramatic Publ'g Co. v. Estate of Lee ex rel. Carter*,
   No. 21 C 5541, 2022 WL 17986696 (N.D. Ill. Dec. 29, 2022) .................... 7

*Fogerty v. Fantasy, Inc.*,
   510 U.S. 517 (1994) ............................................................................... 20

*Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.*,
   155 F.3d 17 (2d Cir. 1998) ............................................................... 13, 15

*Fred Fisher Music Co. v. M. Witmark & Sons*,
   318 U.S. 643 (1943) ............................................................................... 18

*Miller Music Corp. v. Charles N. Daniels, Inc.*,
   362 U.S. 373 (1960) ............................................................................... 19

*Mills Music, Inc. v. Snyder*,
   469 U.S. 153 (1985) ................................................ 4, 5, 18, 19, 21, 22, 23

*Penguin Grp. (USA) Inc. v. Steinbeck*,
   537 F.3d 193 (2d Cir. 2008) ................................................................... 24

*Stewart v. Abend*,
   495 U.S. 207 (1990) ............................................................................... 24

*Twentieth Century Music Corp. v. Aiken*,
   422 U.S. 151 (1975) ............................................................................... 11

*Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*,
   924 F.3d 32 (2d Cir. 2019)........................................................................ 2

*Woods v. Bourne Co.*,
   60 F.3d 978 (2d Cir. 1995) ............................................................ 5, 15, 19

ii

**U.S. Constitution:**

Art. I, § 8, cl. 8 ................................................................. 11, 17

**Statutes:**

17 U.S.C. § 23 (1926) ...................................................... 25

17 U.S.C. § 101 ................................................................. 3

17 U.S.C. § 102 ................................................................. 2

17 U.S.C. § 103(a) ............................................................. 3

17 U.S.C. § 103(b) ...........................................................3, 15

17 U.S.C. § 106 ...............................................................2, 12

17 U.S.C. § 106(1) ............................................................. 3

17 U.S.C. § 106(2) .............................................. 3, 8, 10, 14, 17, 23

17 U.S.C. § 106(4) ............................................................. 3

17 U.S.C. § 201(a) ............................................................. 2

17 U.S.C. § 201(d) ............................................................. 3

17 U.S.C. § 202 ............................................................... 12

17 U.S.C. § 203 ................................................................. 4

17 U.S.C. § 304(a) (1998) .................................................. 25

17 U.S.C. § 304(a) (1976) .................................................. 25

17 U.S.C. § 304(c) ........................... 4, 5, 7, 8, 10, 12, 13, 14, 20, 26

17 U.S.C. § 304(c)(3)-(4) ................................................... 4

17 U.S.C. § 304(c)(5) .......................................... 8, 10, 12, 19, 24

17 U.S.C. § 304(c)(6) .............................................4, 12, 14, 20, 26

17 U.S.C. § 304(c)(6)(A)  ............................................. 5, 9, 10, 11, 13, 14, 15,
16, 19, 20, 21, 23, 26

17 U.S.C. § 304(c)(6)(A)-(F)  ....................................................5, 12

17 U.S.C. § 501(b)  ...................................................................... 17

**Legislative Materials:**

H.R. Rep. No. 94-1476 (1976) .............................................4, 5, 25

Register of Copyrights, 87th Cong., *Copyright Law Revision:*
*Rep. on the General Revision of the U.S. Copyright Law*
(Comm. Print 1961), https://perma.cc/2T8K-UY2B ............................... 18

**Other Authority:**

Order, *Dramatic Publ'g Co. v. Estate of Lee ex rel. Carter,*
No. 23-1309 (7th Cir. May 25, 2023) ........................................................ 7

## INTRODUCTION AND STATEMENT OF INTEREST

The United States has an interest in the proper interpretation of the copyright laws, which foster innovation and creative expression by protecting the rights of authors to profit from their original works while simultaneously allowing the creation and dissemination of new works. The particular provision at issue here allows authors who may have contracted away their copyright rights to recapture those rights while ensuring the continued distribution of any derivative works created in connection with the original contract.

In particular, this case concerns the statutorily authorized termination of an exclusive grant to create and perform a play based on Harper Lee's novel, *To Kill a Mockingbird*, in certain types of productions. The district court correctly held that upon termination of the grant, the novel's author once again enjoyed the right to commission new plays based on the novel, including for the types of performances that were the subject of the prior grant. The court rejected the argument that the prior grantee could not only continue to exploit the play that had already been written, but could also preclude any other artists from performing new plays under the circumstances described in the grant. Defendant's contrary interpretation of the statute is inconsistent with the statute's text, structure, and history. And defendant's logic, if applied more

broadly, would stifle innovation by preventing the creation of new derivative works after a termination. That result is directly contrary to Congress's clear purpose in the termination provisions and the foundational purposes of copyright law.

## STATEMENT OF THE ISSUE

Although the parties address several other issues, the United States will address only the following question:

Whether the district court correctly held that upon an author's termination of an exclusive license to prepare and perform a derivative work, the prior grantee does not retain any exclusive rights in the original work, and the author regains the exclusive right to commission or preclude new derivative works.

## STATEMENT OF THE CASE

### A.    Statutory Background

The Copyright Act of 1976 establishes copyright protection for certain original works of authorship. *See* 17 U.S.C. § 102. That protection "vests initially in the author." *Id.* § 201(a). The copyright in the author's work is defined as a set of "exclusive rights to do and to authorize" uses of the work that are enumerated in the statute. *Id.* § 106; *see Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 44 (2d Cir. 2019) ("The Copyright Act

grants copyright holders a bundle of exclusive rights.").  For example, as initial copyright owner, the author has the exclusive right "to reproduce the copyrighted work" and "to perform the copyrighted work publicly."  17 U.S.C. § 106(1), (4).

The author's copyright also includes the exclusive right "to prepare derivative works based upon the copyrighted work."  17 U.S.C. § 106(2).  "A 'derivative work' is a work based upon one or more preexisting works, such as a … dramatization, fictionalization, motion picture version, sound recording, … or any other form in which a work may be recast, transformed, or adapted." *Id.* § 101.  Thus, for example, an author who owns the copyright in her novel has the exclusive right to prepare or authorize adaptations of the novel for film or stage productions.  Any such derivative work is eligible for its own copyright protection.  *See id.* § 103(a).  But a derivative work's copyright "extends only to the material contributed by the author of" the derivative work and does not create any right in the "preexisting material employed in the work" or "imply any exclusive right in the preexisting material." *Id.* § 103(b).

Authors may "[t]ransfer" either the entire copyright in their works or a portion of their rights to another person.  17 U.S.C. § 201(d).  Frequently, authors transfer rights in their works to publishers as a condition of having

3

their works published.  *See Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172-73 (1985); H.R. Rep. No. 94-1476, at 124 (1976).

Since 1976, Congress has allowed authors a second chance to reap profit from their work by granting authors a right to terminate a previous grant within the United States.  The relevant provisions state that authors or statutorily defined heirs may "terminat[e]" "the exclusive or nonexclusive grant of a transfer or license of" a copyright "or any right under it" within a specified period of time and under certain conditions.  17 U.S.C. § 304(c) (listing termination requirements for works copyrighted before 1978); *id.* § 203 (requirements for grants executed in or after 1978).  For a work copyrighted before 1978, the author may terminate a grant during a five-year window beginning 56 years after the copyright in the work was secured upon service of proper and timely notice.  *Id.* § 304(c)(3)-(4).  When an author or heir terminates a grant in accordance with those requirements, "all of a particular author's rights under [the Copyright Act] that were covered by the terminated grant revert, upon the effective date of termination, to that author."  *Id.* § 304(c)(6).  Congress enacted these provisions "to relieve authors of the consequences of ill-advised and unremunerative grants that had been made before the author had a fair opportunity to appreciate the true value of his work."  *Mills Music*, 469 U.S. at 172-73; H.R. Rep. No. 94-1476, at 124.

4

The termination right does not apply to "work[s] made for hire," which Congress categorically exempted. 17 U.S.C. § 304(c). It is also subject to specified statutory "limitations." *See id.* § 304(c)(6)(A)-(F). The limitation regarding derivative works, relevant here, provides that:

> A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant.

*Id.* § 304(c)(6)(A). This limitation encourages investment in a derivative work and protects public access to the work after an author terminates a previous grant. *See Mills Music*, 469 U.S. at 173. This ensures, for example, that a film studio may continue to distribute a film based on a novel even if the novel's author later terminates the grant that originally allowed the studio to make the film. *See Woods v. Bourne Co.*, 60 F.3d 978, 986 (2d Cir. 1995). But the limitation does not include any right to prepare new derivative works. *See* 17 U.S.C. § 304(c)(6)(A); *see also* H.R. Rep. No. 94-1476, at 127.

## B. Factual Background

The dispute at issue here arises from Harper Lee's grant of rights to create stage adaptations of *To Kill a Mockingbird*. In 1969, Lee granted The Dramatic Publishing Company (Dramatic) an exclusive right to make adaptations of *To Kill a Mockingbird* for certain kinds of theatrical

performances.  In particular, Lee gave Dramatic "the complete right throughout the world" to create a dramatization of the novel that was "to be the only one the amateur acting rights of which [Lee] will permit to be leased and/or licensed."  Dkt. No. 65, at 3 (alteration in original) (quotation marks omitted).  The grant was limited to "non-first class" theatrical performances, which excludes, for example, first-class performances at venues on Broadway or London's West End.  *Id.* at 3-4, 11 n.4.

Decades later, Lee terminated the grant to Dramatic and provided all stage rights to a different company, "subject to the rights granted under" the 1969 agreement with Dramatic, "as limited by [the] termination."  Dkt. No. 65, at 6 (quotation marks omitted).  This second grant of stage rights eventually led to a successful Broadway play written by Aaron Sorkin.  The current owner of those rights, Atticus LLC, now seeks to exploit the Sorkin play in "non-first class" performances as well.  *See id.* at 6, 11 n.4.

In proceedings not directly at issue here, Dramatic brought arbitration claims against Lee's estate, seeking, among other things, a declaration that Dramatic retained the right to exclude any other party from non-first-class performances of stage adaptations based on *To Kill a Mockingbird*.  *See* Dkt. No. 65, at 6-10.  The arbitrator ruled in favor of Dramatic, and the Northern District of Illinois confirmed the award under the deferential standard of

6

review applicable to arbitration decisions, without engaging substantively with the parties' statutory arguments. *See Dramatic Publ'g Co. v. Estate of Lee ex rel. Carter*, No. 21 C 5541, 2022 WL 17986696 (N.D. Ill. Dec. 29, 2022). Lee's estate appealed to the Seventh Circuit, which has placed the case in abeyance pending mediation. *See* Order, *Dramatic Publ'g Co. v. Estate of Lee ex rel. Carter*, No. 23-1309 (7th Cir. May 25, 2023).

## C. Prior Proceedings

In this litigation, Atticus sought a declaration that it has the right to present the Sorkin play in non-first-class performances. *See* Dkt. No. 1, at 12-13. Atticus argued that the termination of Lee's grant to Dramatic caused all rights previously granted to Dramatic to revert to Lee. As a result, Atticus argued that Lee regained the right to authorize new derivative works based on *To Kill a Mockingbird* for the kinds of performances described in the grant, and the derivative-work limitation preserved only Dramatic's ability to continue exploiting the play that it had previously created.

The district court "readily conclude[d]" that Dramatic does not retain a right to preclude new derivative works based on the novel for the kinds of performances at issue. Dkt. No. 65, at 15. The Court noted that the Copyright Act expressly provides that "exclusive" grants may be terminated. *Id.* at 16 (quoting 17 U.S.C. § 304(c)). The limitation regarding pre-existing derivative

7

works, the Court explained, merely "permits a grantee to continue to 'utilize' derivative works created during the term of the license without the threat of litigation from the author." *Id.* And the court rejected Dramatic's argument that exclusivity is a "term[]" of use preserved under the derivative-work limitation, reasoning that "[s]uch a reading would thwart the plain language of the Copyright Act, rendering any exclusive license interminable." *Id.* at 18. In later orders, the court rejected other arguments that Dramatic raised against Atticus's claim and entered judgment in favor of Atticus. *See* Dkt. Nos. 87, 88, 100.

## SUMMARY OF ARGUMENT

Congress has given authors a right to terminate previous "exclusive or nonexclusive" grants of rights. 17 U.S.C. § 304(c). When an author exercises that termination right, all copyright rights covered by the grant revert to the author. *Id.* § 304(c)(5). One of the rights that may revert to the author is the right to create or authorize new derivative works based on the author's work, such as films or plays based on an author's novel. *Id.* § 106(2). But Congress has protected public access to derivative works made before the termination by providing that such works may "continue to be utilized under the terms of the grant after its termination," although this privilege does not confer any right

8

with respect to "preparation … of other derivative works" "after the termination." *Id.* § 304(c)(6)(A).

Here, Harper Lee granted Dramatic an exclusive right to create a stage adaptation of *To Kill a Mockingbird* for certain kinds of performances. Decades later, Lee sent Dramatic a notice of termination. As the district court correctly held, an effective termination in these circumstances has straightforward results. Lee would regain the right to create or authorize new stage adaptations of *To Kill a Mockingbird* in the United States. Meanwhile, Dramatic could continue exploiting its existing adaptation under the limits previously agreed upon in the terminated grant. Dramatic could not, however, block performances of new plays based on *To Kill a Mockingbird* by relying on the terminated grant's exclusivity.

Dramatic argues that the derivative-work limitation is broader and preserves an exclusivity right in *To Kill a Mockingbird* itself—namely the right to continue excluding certain productions of new plays based on *To Kill a Mockingbird*, even after Lee terminated Dramatic's grant. That is incorrect. The derivative-work limitation states merely that an existing derivative work "may continue to be utilized under the terms of the grant after [the] termination." 17 U.S.C. § 304(c)(6)(A). The referenced "terms of the grant" are terms for "utiliz[ing]" the extant derivative work, such as royalty terms. *Id.*

9

Such "terms" of use do not include the right to preclude performance of new derivative works based on *To Kill a Mockingbird* because exclusivity is not a term about how to utilize Dramatic's existing derivative work. By statute, such a right to exclude is a right in *To Kill a Mockingbird*, which may be exercised regardless of whether Dramatic uses its play, and which reverts to the author "notwithstanding any agreement to the contrary." *Id.* § 304(c)(5); *see id.* § 106(2). The statutory text further makes clear that the prior grantee does not retain any right in the "preparation … of other derivative works" based on the original work "after the termination." *Id.* § 304(c)(6)(A). That instruction makes sense only if the right to create and perform new derivative works reverts to the author.

Taken to their logical conclusion, Dramatic's contrary arguments reduce to the proposition that the derivative-work limitation creates a categorical exemption from termination for all grants to prepare a derivative work. That argument is clearly foreclosed by the text. Congress did not create a categorical exemption for derivative-work grants as it did for a "work made for hire," 17 U.S.C. § 304(c), instead preserving only a limited ability to continue using an existing derivative work without violating the author's rights. And the derivative-work limitation itself assumes that the grant can be terminated

10

by referring repeatedly to the "termination" and "terminated grant." *Id.* § 304(c)(6)(A).

The anomalous results that Dramatic's position would produce are enough to reject it. Dramatic's reasoning would suggest that an author cannot terminate *any* rights in a previous grant if a former grantee has created a derivative work, because in its view *all* grant terms are preserved and a copyright right in the original work can be re-framed as a term for utilizing the existing derivative work. Just as strikingly, Dramatic's logic would mean that *no one* could create a new derivative work following a termination if the prior grantee had previously created a derivative work. Here, for example, Dramatic's view leads to the illogical result in which neither the author nor the prior grantee could create new stage adaptations of *To Kill a Mockingbird* for performances satisfying the terms of the original grant. And if Lee's original grant to Dramatic had been broader and granted all rights in derivative works, no one could create new derivative works based on *To Kill a Mockingbird* at all after the termination. That result contravenes not only Congress's purpose in the termination provisions, but the constitutionally recognized interest in "promoting broad public availability of literature, music, and the other arts." *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975); *see* U.S. Const. art. I, § 8, cl. 8.

11

## ARGUMENT

### The District Court Correctly Held That the Right To Make New Derivative Works Reverts to an Author after Termination of an Exclusive Grant.

The Copyright Act provides authors a copyright in their works. 17 U.S.C. § 202. A copyright comprises a set of "exclusive rights," including the exclusive right to prepare or authorize preparation of a derivative work based on the author's work, such as a film or play based on a novel. *Id.* § 106. Authors may grant some or all of those rights to others, but Congress has given authors a right to "terminat[e]" either "exclusive or nonexclusive" grants after a period of time and under certain circumstances, "notwithstanding any agreement to the contrary." *Id.* § 304(c), (c)(5). When an author terminates a grant, "all of a particular author's rights under [the Copyright Act] that were covered by the terminated grant revert, upon the effective date of termination, to that author." *Id.* § 304(c)(6).

Congress exempted "work[s] made for hire" from the termination provisions, but otherwise an author's termination right is subject only to enumerated statutory "limitations." *See* 17 U.S.C. § 304(c)(6)(A)-(F). The limitation at issue here concerns derivative works. Congress provided that "[a] derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination."

12

*Id.* § 304(c)(6)(A). But Congress specified that "this privilege does not extend to the preparation … of other derivative works based upon the copyrighted work covered by the terminated grant." *Id.* This limitation ensures that an existing derivative work based on the author's work (such as a film based on a book) can continue to be marketed even after the author of the original work terminates the prior grant, thus "encourag[ing] investment by derivative work proprietors and … assur[ing] that the public retains access to the derivative work." *Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.*, 155 F.3d 17, 22 (2d Cir. 1998) (alteration and quotation marks omitted). But under the statute's plain terms, the prior grantee's ability to use the existing derivative work does not preserve any right with respect to *new* works—neither a right to create new works nor a right to exclude the author from authorizing the creation of new works. 17 U.S.C. § 304(c)(6)(A).

In the agreement at issue here, Harper Lee granted to Dramatic an exclusive right to prepare a play based on her novel, *To Kill a Mockingbird*, for certain kinds of performances. Dramatic created a play pursuant to this grant. Several decades later, Lee sent Dramatic a notice of termination. The right to terminate any "exclusive" grant in 17 U.S.C. § 304(c) by its terms allows such a termination and clearly would cause the exclusive right to prepare new

13

derivative works for those kinds of performances to revert to Lee.[1] The question here is whether the limitation regarding derivative works changes that result. *See* 17 U.S.C. § 304(c)(6)(A). The parties agree that the derivative-work limitation protects Dramatic's ability to keep exploiting the play that it created before termination according to the terms of use in the grant (such as royalty terms and restrictions on venues). But the parties dispute whether Dramatic retains any right to preclude Lee from authorizing *new* adaptations of *To Kill a Mockingbird* for the kinds of performances at issue.

1. The district court correctly concluded that, if the termination was effective, the right to make or authorize new derivative works reverted to Lee, and Dramatic does not retain any right to block performance of new derivative works in productions satisfying the terms of the original grant. The termination provisions allow an author to terminate an "exclusive" grant, at which point "all rights under this title" revert to the author, 17 U.S.C. § 304(c), (c)(6). The right to prepare or authorize derivative works is a "right[] under this title," *id.*, codified in 17 U.S.C. § 106(2), and therefore reverts to the author.

---

[1] The United States takes no position on Dramatic's arguments (Br. 39-44) that Lee's termination was ineffective for other reasons.

Nothing in the derivative-work limitation's language suggests that a prior grantee retains any such right in the original work. That limitation provides only that existing derivative works may "continue to be utilized under the terms of the grant after its termination." 17 U.S.C. § 304(c)(6)(A). That language by its terms does not preserve any of the former grantee's rights *in the original work*; it instead prevents authors from using infringement suits to interfere with the continued use of pre-existing derivative works. *See Woods v. Bourne Co.*, 60 F.3d 978, 986 (2d Cir. 1995) (explaining that without this limitation "authors might use their reversion rights to extract prohibitive fees from owners of successful derivative works or to bring infringement actions against them").

 The limitation's language also makes clear that it does not preserve all terms of the grant, but only "terms of the grant" for "utiliz[ing]" the derivative work. 17 U.S.C. § 304(c)(6)(A). Such terms of use would include royalty provisions or limits on use (for example, the terms in Lee's grant to Dramatic that limit use to "non-first-class" productions with certain geographical restrictions). *Cf. Fred Ahlert*, 155 F.3d at 22-24 (holding that grantee's new use of a derivative work violated the terms of use). But just as "[t]he copyright in a … derivative work … does not imply any exclusive right in the preexisting material," 17 U.S.C. § 103(b), so too that limited ability to keep using the

15

derivative work does not include any other copyright interest in the original work, such as the right to preclude performance of new derivative works based on *To Kill a Mockingbird*.

The derivative-work limitation's second clause underscores that a prior grantee retains no interest in "the preparation … of other derivative works based upon the copyrighted work" "after the termination." 17 U.S.C. § 304(c)(6)(A). This language bars a prior grantee from making any new derivative works based on the original work and makes plain that all rights regarding new derivative works revert to the author. If the grantee retained a right to exclude others from making derivative works but could not make new works itself, then *no one* could make or authorize new derivative works. Moreover, the fact that the second clause focuses on the grantee's own creative activities, rather than on its ability to restrict the creative activities of others, reinforces the inference that the first clause has a similar focus.

This case illustrates the anomalous consequences that would occur if a grantee retained such a right to exclude post-termination. Following an effective termination in this case, no one would have the right to authorize new stage adaptations of *To Kill a Mockingbird* for non-first-class performances. Even more strikingly, if Lee had originally granted Dramatic exclusive rights to make and perform any kind of derivative work, no new plays, films, or even

16

translations based on *To Kill a Mockingbird* could be utilized at all post-termination.  That result is irreconcilable with Congress's intent that the limitation would encourage public access to derivative works and the basic purposes of copyright law under the Constitution.  *See* U.S. Const. art. I, § 8, cl. 8 (granting Congress the power "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries").

Such an outcome would also create dissonance between provisions of the Copyright Act.  If a grantee retains exclusivity and a corresponding right to exclude following a termination, the right to prepare new derivative works would be either extinguished or unusable—making it impossible for anyone to exercise one of the exclusive rights enumerated in section 106 of the Copyright Act and calling into question whether anyone is the owner of that exclusive right.  *See* 17 U.S.C. § 106(2).   In turn, that could create the strange result that no one would be the "legal or beneficial owner" who could "institute an action for any infringement" of the right to create derivative works.  *See id.* § 501(b).

The statute's history reinforces the proper operation of the termination provisions and the derivative-work limitation.  Congress's adoption of the termination provisions reflects its interest in ensuring that authors can enter into bargains that reflect the worth of their copyrighted works, while also

17

protecting public access to derivative works. *See Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172-73 (1985). Even before the Copyright Act of 1976, Congress had long recognized that authors must often assign their rights before they know how much their works are worth. Congress previously tried to address this problem by providing authors with a right to renew their copyrights, which resulted in a new right, free of all grants made of the original copyright term. But because of the unequal bargaining power that many authors had at the time of assignment, publishers often thwarted that provision by requiring authors to assign their renewal rights at the outset, and the Supreme Court had held such assignments to be lawful. *See id.*; *see also id.* at 183-84 (White, J., dissenting); Register of Copyrights, 87th Cong., *Copyright Law Revision: Rep. on the General Revision of the U.S. Copyright Law* 53 (Comm. Print 1961), https://perma.cc/2T8K-UY2B (noting this history); *Fred Fisher Music Co. v. M. Witmark & Sons*, 318 U.S. 643, 657 (1943) (holding lawful an assignment of renewal rights).

At the same time, Congress was concerned about public access to existing derivative works. Under the Copyright Act of 1909, it had been unclear whether publishers could continue to market a derivative work if they had not obtained the author's renewal rights (which sometimes occurred when renewal rights passed by operation of law to the author's heirs upon their

18

death). *See Mills Music*, 469 U.S. at 183-84 (White, J., dissenting) (describing the statute's history); *see Miller Music Corp. v. Charles N. Daniels, Inc.*, 362 U.S. 373, 375 (1960) (holding that renewal rights passed to heirs when the author died before the renewal term, regardless of the author's prior grant of those rights to another party). Some studios pulled successful films from the market because they feared infringement suits. Others, like the studio that produced *Gone with the Wind*, paid the author's heirs large sums to avoid such suits. *See Mills Music*, 469 U.S. at 183-84, 183 n.8 (White, J., dissenting).

The termination provisions address both problems. Instead of a renewal right that authors could contract away, Congress gave authors a broad right to terminate a copyright grant "notwithstanding any agreement to the contrary." 17 U.S.C. § 304(c)(5); *see Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 983-95 (9th Cir. 2008) (describing the "'*inalienable*'" nature of the termination right). But Congress preserved public access to derivative works that already exist at the time of termination by preventing a situation in which authors or heirs could hold a derivative work hostage by demanding that it be pulled from the market. *See Woods*, 60 F.3d at 986; 17 U.S.C. § 304(c)(6)(A).

That history accords with the district court's holding in this case. An author's termination of an exclusive grant to prepare a derivative work causes the author to regain the right to commission new works, and the prior grantee

retains only the ability to keep using an existing play made before termination. As noted, however, Dramatic's interpretation would prevent the author (and the prior grantee) from making or authorizing new derivative works. That result would directly contravene Congress's purposes and the foundational principle that "copyright law ultimately serves the purpose of enriching the general public through access to creative works." *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 527 (1994).

**2.** Dramatic's primary argument to the contrary is that the derivative-work limitation categorically exempts derivative-work grants from the termination provisions because the limitation preserves all "terms of the grant." *See* Br. 25, 29. This argument fundamentally misconstrues the limitation and ignores its context.

Congress did not draft the derivative-work limitation as a complete carveout like the exemption for "work[s] made for hire." 17 U.S.C. § 304(c). The provision is a more narrow "limitation[]" among other clarifications of the termination right. *See id.* § 304(c)(6). The limitation's language refers only to an ability to "continue … utiliz[ing]" an existing derivative work and assumes that the termination has taken place by repeatedly referring to the "termination" or the "terminated grant." *Id.* § 304(c)(6)(A). If, as discussed above, preventing others from performing new derivative works is not a means

20

of "utiliz[ing]" a grantee's own play, the phrase "under the terms of the grant" does not make Dramatic's argument any stronger.  It also would have been bizarre for Congress to use that language—including references to "termination" and the "terminated grant"—if the limitation was preserving all terms in the grant, such that nothing at all is terminated or reverts to the author.  And given Congress's express carveout for works made for hire, it makes little sense to conclude that Congress sought to achieve such a broad exemption through the roundabout means of saying that existing derivative works may be "utilized under the terms of the grant after its termination," *id.*—particularly given the practical significance of such an exemption.

Dramatic seeks support for its expansive reading of the limitation in the Supreme Court's decision in *Mills Music*, 469 U.S. 153, but Dramatic misreads that opinion.  There, a songwriter granted his rights in a musical work to a publisher, which granted licenses to record companies, and the songwriter later terminated the original grant.  The question was whether the publisher was still entitled to royalties under the terms of the first grant post-termination, or whether the record companies had to pay their royalties directly to the songwriter only under the terms of the later contracts.  *Id.* at 155-56, 158.  The Court held that the derivative-work limitation preserved all relevant royalty

terms in a chain of derivative-work grants, not just the terms in the last contract in the chain. *Id.* at 169.

That decision does not hold that the derivative-work limitation preserves all terms, including a former grantee's rights in the original work. To the contrary, the Court recognized that "the termination has caused the ownership of the copyright to revert to the" author. *See Mills Music*, 469 U.S. at 167. That conclusion would not have made sense if, as Dramatic urges, *all* terms survive. At a minimum, the decision does not help Dramatic because the Court did not address an argument that the prior grantee retains a right to preclude new derivative works, despite the limitation's second clause.

Dramatic quotes general language in *Mills Music* and subsequent decisions (Br. 30-36), but the cited language does not support Dramatic's reading. For example, Dramatic seeks support for its suggestion that no terms in derivative-work grants can be terminated by citing the Court's statement that "the consequences of a termination … simply do not apply to derivative works that are protected by the Exception defined in § 304(c)(6)(A)." *Mills Music*, 469 U.S. at 164. But by its terms, that language refers to protection for the existing derivative work itself, and not to any right in the original work, such as a right to preclude new derivative works based on the original work.

22

Similarly, Dramatic relies on the Court's statement that the derivative-work limitation "preserve[s] the total contractual relationship, which entitled [the grantee] to make duly authorized derivative works." *Mills Music*, 469 U.S. at 169. Dramatic takes this language out of context, suggesting that the limitation "preserve[s] the total contractual relationship" by preserving all the terms of the grant that relate to derivative works. But that language clearly refers to the need to preserve terms *of use* in all contracts within a chain of grants, rather than just one contract. The Court elsewhere made clear it was referring to "the terms of the grant *that were applicable to the use* of derivative works." *Id.* at 177 (emphasis added). And Dramatic's reading cannot be reconciled with the statute's plain text, which explicitly provides that when a grant is terminated, the grantee's "privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant." *See* 17 U.S.C. § 304(c)(6)(A).

Dramatic also argues that a right to preclude performances of new stage adaptations of *To Kill a Mockingbird* is effectively part of its right to continue utilizing its play. *See* Br. 36-38. As explained, that argument is incorrect. By statute, the right to create and perform new derivative works for the performances at issue is a copyright right in the subject work, *To Kill a Mockingbird*. *See* 17 U.S.C. § 106(2). It is not a mere term for using Dramatic's

23

play.  The distinction between terms of use and preclusion of new works is clear in practice: Dramatic could exercise a right to preclude new adaptations of *To Kill a Mockingbird* without ever utilizing its existing play.  And this is also clear outside the termination context: for example, an author can preclude others from creating new derivative works even if she has never created or authorized a derivative work and therefore none exists.

Moreover, Dramatic's attempt to recast rights in the original work as terms of use for a derivative work would suggest that grantees can defeat the termination provisions through creative contracting.  Publishers could, for example, insist on promises by the author not to exercise any copyright right— such as distribution of the original work—and frame that transfer of rights as a term of using the derivative work.  That is precisely the kind of contractual loophole that Congress set out to avoid when it stated that "[t]ermination of the grant may be effected *notwithstanding any agreement to the contrary*."  17 U.S.C. § 304(c)(5) (emphasis added).  As this Court and the Supreme Court have recognized, Congress created "an *inalienable* right to terminate the grant of a transfer or license."  *Penguin Grp. (USA) Inc. v. Steinbeck*, 537 F.3d 193, 197-98 (2d Cir. 2008) (emphasis added); *Stewart v. Abend*, 495 U.S. 207, 230 (1990) ("The 1976 Copyright Act … provides an inalienable termination right").  That is a "key feature of the termination right" that prevents contract terms from

24

"thwart[ing]" the right. *Brumley v. Albert E. Brumley & Sons, Inc.*, 822 F.3d 926, 930 (6th Cir. 2016).

Dramatic urges that termination of its exclusive right to certain kinds of theatrical performances of *To Kill a Mockingbird* would improperly disrupt the value that Dramatic received as part of its deal with Lee. *See* Br. 37-38. But Dramatic has already received more than the full benefit of its original bargain. At the time Lee made her original grant to Dramatic in 1969, copyrights lasted only for an initial term of 28 years and a renewal term of 28 years, for a total of 56 years. *See* 17 U.S.C. § 23 (1926). When Congress created the termination right in 1976, it did not disturb rights during that 56-year period. Instead, Congress extended copyrights by 19 years and designed the termination right to begin with that extension period. *See* 17 U.S.C. § 304(a) (1976); H.R. Rep. No. 94-1476, at 140 ("[T]he extended term represents a completely new property right, and there are strong reasons for giving the author, who is the fundamental beneficiary of copyright under the Constitution, an opportunity to share in it."). Congress later extended the length of copyrights by another 20 years. *See* 17 U.S.C. § 304(a) (1998). Those extensions of Lee's copyright provide Dramatic with *more* value than it bargained for, not less, even if Dramatic does not retain a right to exclude new derivative works.

25

In any event, the termination provisions are designed to allow the author to cancel the original deal transferring exclusive rights. As the district court observed, the provisions expressly allow termination of an "*exclusive* or nonexclusive grant," 17 U.S.C. § 304(c) (emphasis added); Dkt. No. 65, at 16, 18, and the limitation refers to the "termination" and the "terminated grant" without suggesting that exclusive grants cannot be terminated, 17 U.S.C. § 304(c)(6)(A). Dramatic's argument also proves too much by suggesting that authors could never terminate a full copyright assignment once the grantee has created a derivative work, as the author's use of the other reverted copyright rights could potentially have some impact on the value of using the preexisting derivative work. That result is irreconcilable with the statute's logic. Congress designed the derivative-works limitation to encourage investment in derivative works and public access to such works. Congress did not set out to protect the grantee's exact market for distribution or exploitation of its derivative work by preventing the public from enjoying any new derivative works.

In short, Congress did not render the statutory right to termination self-defeating by transforming the derivative work "limitation[]" into a sweeping exemption from termination. *See* 17 U.S.C. § 304(c)(6). The limitation creates an important, but limited, allowance for the continued utilization of derivative

26

works that had previously been created under the terms of a grant. It does not go further and enable the prior recipient of an exclusive grant to prohibit the creation or authorization of any new derivative works. Nothing in the statute's text, purpose, or history supports such a counterintuitive result that directly contravenes the basic purposes of copyright law.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's holding that an effective termination causes the right to authorize new derivative works to revert to the author.

Respectfully submitted,

*Of Counsel:*

SUZANNE V. WILSON
  *General Counsel and Associate*
  *Register of Copyrights*

EMILY L. CHAPUIS
  *Deputy General Counsel*
  *United States Copyright Office*
  *Washington, DC 20540*

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney*
  *General*

DANIEL TENNY

 *s/ Joshua Dos Santos*
JOSHUA DOS SANTOS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7224*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-0213*
  *Joshua.y.dos.santos@usdoj.gov*

MARCH 2024

27

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Local Rule 29.1 because it contains 6,032 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Calisto MT 14-point font, a proportionally spaced typeface.

*s/ Joshua Dos Santos*

_____

Joshua Dos Santos

## CERTIFICATE OF SERVICE

I hereby certify that on March 20, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Joshua Dos Santos*

_____

Joshua Dos Santos

**ADDENDUM**

# TABLE OF CONTENTS

17 U.S.C. § 304(c) ............................................................................ A1

17 U.S.C. § 304(c)

§ 304. Duration of copyright: Subsisting copyrights.

* * *

(c) Termination of Transfers and Licenses Covering Extended Renewal Term.-
-In the case of any copyright subsisting in either its first or renewal term on
January 1, 1978, other than a copyright in a work made for hire, the exclusive
or nonexclusive grant of a transfer or license of the renewal copyright or any
right under it, executed before January 1, 1978, by any of the persons
designated by subsection (a)(1)(C) of this section, otherwise than by will, is
subject to termination under the following conditions:

(1) In the case of a grant executed by a person or persons other than the
author, termination of the grant may be effected by the surviving person or
persons who executed it. In the case of a grant executed by one or more of
the authors of the work, termination of the grant may be effected, to the
extent of a particular author's share in the ownership of the renewal
copyright, by the author who executed it or, if such author is dead, by the
person or persons who, under clause (2) of this subsection, own and are
entitled to exercise a total of more than one-half of that author's
termination interest.

(2) Where an author is dead, his or her termination interest is owned, and
may be exercised, as follows:

(A) The widow or widower owns the author's entire termination interest
unless there are any surviving children or grandchildren of the author, in
which case the widow or widower owns one-half of the author's interest.

(B) The author's surviving children, and the surviving children of any
dead child of the author, own the author's entire termination interest
unless there is a widow or widower, in which case the ownership of one-
half of the author's interest is divided among them.

(C) The rights of the author's children and grandchildren are in all cases
divided among them and exercised on a per stirpes basis according to the
number of such author's children represented; the share of the children of
a dead child in a termination interest can be exercised only by the action
of a majority of them.

(D) In the event that the author's widow or widower, children, and
grandchildren are not living, the author's executor, administrator,

A1

personal representative, or trustee shall own the author's entire termination interest.

(3) Termination of the grant may be effected at any time during a period of five years beginning at the end of fifty-six years from the date copyright was originally secured, or beginning on January 1, 1978, whichever is later.

(4) The termination shall be effected by serving an advance notice in writing upon the grantee or the grantee's successor in title. In the case of a grant executed by a person or persons other than the author, the notice shall be signed by all of those entitled to terminate the grant under clause (1) of this subsection, or by their duly authorized agents. In the case of a grant executed by one or more of the authors of the work, the notice as to any one author's share shall be signed by that author or his or her duly authorized agent or, if that author is dead, by the number and proportion of the owners of his or her termination interest required under clauses (1) and (2) of this subsection, or by their duly authorized agents.

(A) The notice shall state the effective date of the termination, which shall fall within the five-year period specified by clause (3) of this subsection, or, in the case of a termination under subsection (d), within the five-year period specified by subsection (d)(2), and the notice shall be served not less than two or more than ten years before that date. A copy of the notice shall be recorded in the Copyright Office before the effective date of termination, as a condition to its taking effect.

(B) The notice shall comply, in form, content, and manner of service, with requirements that the Register of Copyrights shall prescribe by regulation.

(5) Termination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant.

(6) In the case of a grant executed by a person or persons other than the author, all rights under this title that were covered by the terminated grant revert, upon the effective date of termination, to all of those entitled to terminate the grant under clause (1) of this subsection. In the case of a grant executed by one or more of the authors of the work, all of a particular author's rights under this title that were covered by the terminated grant revert, upon the effective date of termination, to that author or, if that author is dead, to the persons owning his or her termination interest under clause (2) of this subsection, including those owners who did not join in

A2

signing the notice of termination under clause (4) of this subsection. In all cases the reversion of rights is subject to the following limitations:

(A) A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant.

(B) The future rights that will revert upon termination of the grant become vested on the date the notice of termination has been served as provided by clause (4) of this subsection.

(C) Where the author's rights revert to two or more persons under clause (2) of this subsection, they shall vest in those persons in the proportionate shares provided by that clause. In such a case, and subject to the provisions of subclause (D) of this clause, a further grant, or agreement to make a further grant, of a particular author's share with respect to any right covered by a terminated grant is valid only if it is signed by the same number and proportion of the owners, in whom the right has vested under this clause, as are required to terminate the grant under clause (2) of this subsection. Such further grant or agreement is effective with respect to all of the persons in whom the right it covers has vested under this subclause, including those who did not join in signing it. If any person dies after rights under a terminated grant have vested in him or her, that person's legal representatives, legatees, or heirs at law represent him or her for purposes of this subclause.

(D) A further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of the termination. As an exception, however, an agreement for such a further grant may be made between the author or any of the persons provided by the first sentence of clause (6) of this subsection, or between the persons provided by subclause (C) of this clause, and the original grantee or such grantee's successor in title, after the notice of termination has been served as provided by clause (4) of this subsection.

(E) Termination of a grant under this subsection affects only those rights covered by the grant that arise under this title, and in no way affects rights arising under any other Federal, State, or foreign laws.

A3

(F) Unless and until termination is effected under this subsection, the grant, if it does not provide otherwise, continues in effect for the remainder of the extended renewal term.

* * *

# REQUIRED SHORT APPENDIX

# REQUIRED SHORT APPENDIX

# TABLE OF CONTENTS

Memorandum Opinion and Order (June 17, 2022) ............................ SA1

Memorandum Opinion and Order (Dec. 29, 2022) ........................... SA18

Final Judgment Order (Jan. 13, 2023) ............................................. SA25

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **THE DRAMATIC PUBLISHING COMPANY,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 21 C 5541** |
| | ) | |
| **TONJA CARTER, et al.,** | ) | |
| | ) | |
| **Respondents.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY, District Judge:

This lawsuit and underlying arbitration concern the stage rights to adaptions of Nelle Harper Lee's novel, *To Kill a Mockingbird*. In 1969, Lee granted The Dramatic Publishing Company (Dramatic) exclusive rights to license amateur acting rights to dramatizations of her novel. Almost 50 years later, Lee terminated that grant and transferred the novel's stage rights to Rudinplay, Inc.

The Rudinplay agreement prompted Dramatic to sue Lee's Estate and the related Harper Lee, LLC (collectively the Estate). The dispute ended up in arbitration under the 1969 agreement, and the arbitrator entered an award in favor of Dramatic. For the reasons below, the Court grants the Estate's motion in part and denies Dramatic's motion to confirm the award as modified. The Court agrees with Dramatic that it is entitled to attorney's fees, the amount of which the Court will determine at a later date.

### Background

Harper Lee wrote the American classic, *To Kill a Mockingbird*, in 1960. Nine

SA1

years later, she signed a contract with Dramatic that granted the production company

an exclusive right to prepare a dramatization of the novel.  This agreement granted

Dramatic the "complete right throughout the world . . . [t]o lease the amateur acting

rights in and to" the novel.  Resp'ts' Mot. to Vacate, Ex. A ¶ 2 (dkt. no. 22-2).

Conversely, Lee "reserve[d] all rights not expressly granted to [Dramatic], including but

not limited to the professional acting . . . rights."  *Id.*

In April 2011, Lee notified Dramatic that she was terminating the grant of rights

effective April 2016, pursuant to subsection 304(c) of the Copyright Act—a provision

that permits copyright owners to reclaim licensed works under certain conditions.  *See*

17 U.S.C. § 304(c).  Four years later in June 2015, Lee entered into an agreement with

Rudinplay, Inc.  This contract gave Rudinplay all stage rights to the novel "subject to the

rights granted under the [1969 agreement], as limited by [Lee's] termination."  Resp'ts'

Mot. to Vacate, Ex. E ¶ 2(b) (dkt. no. 22-6).  Aaron Sorkin then wrote the play that the

Rudinplay agreement authorized, and Atticus LLC obtained the rights granted to

Rudinplay.

After the Sorkin play debuted, Dramatic filed an arbitration demand against the

Estate pursuant to the original 1969 agreement and later added the LLC as a party.[1]

Dramatic claimed that the respondents had breached the 1969 agreement and tortiously

interfered with contracts that Dramatic had with various licensees.  The respondents

filed a counterclaim against Dramatic, alleging that Dramatic had breached the 1969

agreement.

---

[1] Lee died in February 2016, and Tonja Carter serves as the representative of the
Estate.  The Estate succeeded Lee's rights under the 1969 agreement.

The arbitrator entered a 91-page interim award on October 21, 2021 that rejected the respondents' counterclaims and largely found them liable on Dramatic's claims. *See* Interim Arbitration Award (dkt. no. 21). In an extensive examination of the record, the arbitrator first interpreted the original 1969 contract and concluded that the original grant to Dramatic consisted of all "non-first-class rights," a term that references a three-tier classification of theaters. *See id.* at 9–29. Specifically, the term non-first-class rights, as interpreted by the arbitrator, denotes rights to productions in regional and community theaters, as opposed to Broadway productions. The arbitrator premised this finding on the testimony of expert witnesses, trade usage of certain contractual terms, and the practices of the parties over the years. This finding resolved the parties' respective breach of contract claims.

The arbitrator also analyzed the legal effect of Lee's termination of Dramatic's rights in determining what declaratory relief to award. *See id.* at 61–71. Subsection 304(c) of the Copyright Act provided the framework for that analysis, as it is the provision that describes when a copyright owner may terminate the grant of an exclusive license and what the grantee retains after such a termination. 17 U.S.C. § 304(c). This provision also contains a "Derivative Works Exception," which specifies that "a derivative work prepared under authority of the grant [of a license] before its termination may continue to be utilized under the terms of the grant after its termination." *Id*. § 304(c)(6)(A). The arbitrator concluded that according to the statutory exception, Dramatic maintained the right to continue exclusively licensing the non-first-class rights play rights to the novel, notwithstanding Lee's termination of its license.

Lastly as relevant to this decision, the arbitrator awarded not just damages but

3

also equitable relief that obligated the Estate to indemnify Dramatic against lawsuits brought by Rudinplay and other similar third parties. *See* Interim Arbitration Award at 7 (dkt. no. 21). These indemnification obligations only appear at the beginning of the award under the "Other Findings and Relief" header; the award does not connect them to the original 1969 contract indemnification obligations.

On November 11, 2021, Dramatic filed a motion to confirm the interim award as modified. On January 14, 2022, the respondents filed a cross-motion to vacate the award. The arbitrator entered a final award on January 28, 2022, that incorporated the interim award and finalized costs and attorney's fees.[2]

### Discussion

Under the Federal Arbitration Act (FAA), "arbitration awards are largely immune from . . . scrutiny in court." *Cont'l Cas. Co. v. Certain Underwriters at Lloyds of London*, 10 F.4th 814, 816 (7th Cir. 2021). Vacating an award is permitted in only four circumstances, just one of which is relevant to this case: "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). Modifying an arbitration award is permitted in only three circumstances. 9 U.S.C. § 11(c). Put simply, the available judicial review is "tightly limited." *Standard Sec. Life Ins. Co. of N.Y. v. FCE Benefit Adm'rs, Inc.*, 967 F.3d 667, 671 (7th Cir. 2020).

### A. Respondents' motion to vacate

The respondents raise three arguments for why the Court should vacate the

---

[2] Dramatic's motion to confirm the final award has been stayed pending ruling on the motions concerning the interim award. Because the final award incorporates the interim award, the Court will refer to the latter as "the award" throughout the opinion.

arbitrator's award: 1) the award imposed an indemnification obligation that is overly broad and beyond the scope of the arbitrator's authority; 2) the arbitrator's interpretation of the Copyright Act will force the Estate to violate the legal rights of third parties; and 3) the award is ambiguous in its use of the term "non-first-class rights."

### 1.     Indemnification obligations

The arbitration award requires the Estate to indemnify Dramatic for any lawsuits brought against Dramatic by certain third parties, such as Dramatic's licensees and Rudinplay.  *See* Interim Arbitration Award at 7 (dkt. no. 21).  These indemnification obligations also extend to any lawsuits against Dramatic based on the transfer of non-first-class rights.  As noted above, the arbitrator did not expressly explain his imposition of these obligations.  This, at least in part, drives the parties' dispute over whether the obligations are overly broad and fall beyond the scope of the arbitrator's authority.

The respondents argue that the indemnification obligations were inappropriately imposed because they extend beyond the terms of the 1969 agreement and cover matters that are not yet in controversy.  By way of example, the Estate is concerned with the possibility of a Dramatic licensee suing Dramatic over an entirely unrelated play and triggering the indemnity obligation given its broad language.  For its part, Dramatic contends that the indemnification obligations imposed by the arbitration do not derive from the 1969 agreement itself but instead represent entirely new relief, which is permissible due to the lack of limitations in the original 1969 agreement.  In supporting the imposition of these obligations, Dramatic points to the arbitrator's finding in Dramatic's favor on the question of tortious interference.

Two provisions in the 1969 agreement between Lee and Dramatic are potentially

5

relevant to this dispute.  Section 1(b) of the agreement states: "[Ms. Lee] will defend, indemnify and hold harmless [Dramatic] from and against any monetary losses or other losses whatsoever, including reasonable attorney's fees, caused by reason of the breach or alleged breach of any agreement and/or representation made herein by [Ms. Lee]."  Resp'ts' Mot. to Vacate, Ex. A ¶ 1(b) (dkt. no. 22-2).  Section 4(k) of the agreement specifies that "[a]ny controversy arising out of this agreement is to be arbitrated."  *Id.* ¶ 4(k).  The Court will refer to these two provisions as the indemnity and arbitration clauses.

It appears correct, as the respondents note, that the indemnification obligations imposed in the arbitration award extend beyond the 1969 agreement's indemnity clause. Dramatic does not dispute this.

But the 1969 indemnity clause is not what gave the arbitrator authority to resolve the parties' dispute.  That authority came from the arbitration clause.  The Seventh Circuit has noted that in the context of an arbitration clause, the term "'arising out of' reaches all disputes having their origin or genesis in the contract, whether or not they implicate interpretation or performance of the contract per se."  *Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1033 (7th Cir. 2012) (quoting *Sweet Dreams Unlimited, Inc. v. Dial–A–Mattress Int'l, Ltd.*, 1 F.3d 639, 642 (7th Cir.1993)).  Furthermore, "arising out of" language "necessarily creates a presumption of arbitrability, which requires that any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  *Id.* at 1034 (cleaned up).  The controversy that gave rise to the arbitration stems from stage licensing rights to *To Kill a Mockingbird*, which unquestionably implicates the 1969 agreement's arbitration clause.  The Estate does not dispute this.

6

SA6

Once parties properly enter arbitration, the arbitrator has wide discretion. He "acts as the parties' agent and as their delegate may do anything the parties may do directly." *George Watts & Son, Inc. v. Tiffany & Co.*, 248 F.3d 577, 580 (7th Cir. 2001). Put differently, a court "must treat the arbitrator's award as if it represented an agreement between" the parties themselves. *E. Associated Coal Corp. v. United Mine Workers of Am., Dist. 17*, 531 U.S. 577, 580 (2001).

The indemnification obligations imposed as part of the arbitration award fall squarely within the arbitrator's discretion. Arbitrators can award a "wide range of remedies" to ensure "successful arbitration," and indemnification is one such remedy. *Yasuda Fire & Marine Ins. Co. of Eur., Ltd v. Cont'l Cas. Co.*, 37 F.3d 345, 351 (7th Cir. 1994). The Court notes, in this regard, that the arbitrator found the Estate liable not just for breach of contract but also for tortious interference with contract—specifically interference with Dramatic's contracts with its licensees. *See* Interim Arbitration Award at 81–85 (dkt. no. 21). Although the arbitrator did not in so many words connect the indemnification obligations to his tortious interference finding, it makes sense that the new obligations arise from that finding in that they broadly cover situations in which Dramatic licensees sue Dramatic.

An argument can be made that the arbitrator could have tailored the indemnification obligations he imposed so that they *expressly* referenced lawsuits that concern *To Kill a Mockingbird*. But that is plainly what he meant, and in any event the possibility that the arbitrator could have tailored his award more narrowly does not mean that he exceeded his power such that the FAA would allow this Court to vacate the award. *Cf.* 9 U.S.C. § 10(a)(4). Put simply, the indemnity provision in the agreement

7

was not a limitation on the arbitrator's power, particularly when it came to dealing with tort claims. *See Prostyakov v. Masco Corp.*, 513 F.3d 716, 725 (7th Cir. 2008) (explaining how "[n]othing in the Agreement limited [the arbitrator's] authority to fashion [the] equitable award.").

For these reasons, the Court finds no basis to vacate the award based on the indemnification obligations imposed by the arbitrator.

### 2. Violation of third-party rights

An arbitrator cannot require the parties to violate the legal rights of third parties who did not consent to arbitration. This rule follows from the general principle that an "arbitration implements contracts, and what the parties cannot do through express contract they cannot do through an arbitrator." *Affymax, Inc. v. Ortho-McNeil-Janssen Pharms., Inc.*, 660 F.3d 281, 284 (7th Cir. 2011); *see also Hyatt Franchising, L.L.C. v. Shen Zhen New World I, LLC*, 876 F.3d 900, 903 (7th Cir. 2017).

The respondents argue that one provision of the award directs the Estate to violate the rights of third parties, particularly Aaron Sorkin and Atticus LLC.[3] Specifically, the respondents point to the requirement that they refrain from helping Rudinplay and its affiliates, which includes Sorkin and Atticus, license Rudinplay's version of *To Kill a Mockingbird* for any non-first-class production. *See* Interim Arbitration Award at 6 (dkt. no. 21). The respondents' argument consists of three key premises: first, Lee received the non-first-class rights as a result of termination,

---

[3] The respondents also contend that the award will "adversely affect" the legal rights of members of the general public because they will not be able to see the Sorkin play outside of first-class theaters. This argument lacks merit. The public does not possess a legal right to see a particular version of a play, let alone in particular locations.

meaning the arbitrator erred in interpreting the Copyright Act; second, Rudinplay

obtained the legal right to license the play for non-first-class productions from Lee; and

third, enjoining the respondents from assisting Rudinplay and its affiliates to license the

play suffices as a violation of third-party rights that warrants vacating the award.

Accepting all three premises is necessary as a basis to vacate the award because legal

error is not a legally permissible basis to vacate an arbitrator's award. *Halim v. Great

Gatsby's Auction Gallery, Inc.*, 516 F.3d 557, 563 (7th Cir. 2008).

 Much of the briefing focuses on the first premise—determining what rights a

grantee retains, and the exclusivity of those rights, following termination under the

Copyright Act. But the Court need not address whether the arbitrator erred on that

issue, because the Estate's argument falls short on the second premise regardless.

The second premise turns on the proposition that Rudinplay actually obtained the non-

first-class rights from Lee: if Rudinplay did not receive those rights, then it has no right

to license its version of the play in non-first-class theaters. Sorkin and Atticus would be

in the same boat as well, as their rights are tied to Rudinplay.

 Dramatic argues that Rudinplay did not receive non-first-class rights from Lee

based on the terms of the Rudinplay Agreement itself. Paragraph 2(b) of that

agreement states the following:

> [Lee] represents that [she] has terminated the Prior Agreement [with
> Dramatic] effective April 26, 2016. [Rudinplay] acknowledges that,
> notwithstanding such termination, the amateur acting rights to the Prior
> Adaptation continue to be exploited following such termination on a non-
> exclusive basis in the United States, and on an exclusive basis elsewhere.
> *The rights granted hereunder shall be subject to the rights granted under
> the Prior Agreement, as limited by such termination.*

Resp'ts' Mot. to Vacate, Ex. E ¶ 2(b) (dkt. no. 22-6) (emphasis added). In short, this

clause says that the rights granted to Rudinplay are subject to those previously granted to Dramatic.  This limitation means that if Dramatic is properly found to have retained the right to produce the play in non-first-class theatres, then Rudinplay did not acquire that right.

This is exactly what transpired.  The arbitrator determined that following Lee's termination of the license, under the Derivative Works Exception, Dramatic continues to exclusively hold all non-first-class rights.  Thus by the terms of the Rudinplay Agreement, Rudinplay does not own the non-first-class rights—as they never returned to the Estate following its termination of Dramatic's license.  The arbitrator put it this way: "Because Rudin's rights are subject to Dramatic's rights under the terms of 1969 Agreement, and because Dramatic's exclusive rights are preserved by the Derivative Works Exception, it follows that Rudin has no stock and amateur rights for live theatrical productions of [the novel]."  Interim Arbitration Award at 71–72 (dkt. no. 21).

In short, Rudinplay did not acquire the right to license its version of the play in non-first-class theaters.  This means that the arbitration award cannot possibly direct the Estate to violate the rights of third parties like Sorkin and Atticus, as they do not have a legal right to license the play in non-first-class theaters either.  The Court concludes that vacating the award on this basis is not appropriate.

### 3.    Non-first-class rights ambiguity

One of the central disputes that the arbitrator was tasked with resolving was determining what rights Lee granted to Dramatic under the 1969 agreement and what rights Dramatic retained following her 2016 termination of those rights.  The relevant grant language reads as follows:

10

The Owner [Miss Lee] hereby grants to the Publisher [Dramatic] the complete rights throughout the world:

> (a) To write or caused to be written a dramatization based upon and/or adapted from the Property [the Novel], but agrees that said dramatization (herein called the "Play") is to be the only one the amateur acting rights of which the Owner will permit to be leased and/or licensed; and the Owner reserves all rights not expressly granted to the Publisher, including but not limited to the professional acting, radio broadcasting, television and motion picture rights;

> (b) To lease the amateur acting rights in and to the Property and/or the Play and/or parts thereof;

Resp'ts' Mot. to Vacate, Ex. A ¶ 2 (dkt. no. 22-2).  The contract further provided the following definition for the term "amateur acting rights":

> The phrase "amateur acting rights" as used herein shall mean performances by living actors in the immediate presence of an audience and shall include all performance rights for little theatres, community theatres and/or drama associations, colleges, universities, high school and other school groups, churches, clubs and other amateur organizations or groups therein or connected therewith, together with all stock, repertoire, lyceum and Chautauqua performances whether any or all of the abovementioned performances are given by paid and/or unpaid actors, but shall not include Broadway production rights nor first-class professional road and/or first-class touring production rights.

*Id.* ¶ 4(e).

The arbitrator found the definitional provision instructive.  Although there was a "clear dichotomy" between "amateur acting rights" and "stock rights"[4] in the definitional provision, the arbitrator found that both of these sets of rights were included in the grant to Dramatic and were distinguishable from "Broadway production rights" and "first-class touring production rights."  *See* Interim Arbitration Award at 10–11 (dkt. no. 21).

---

[4] The arbitrator used the shorthand term "stock rights" to refer to the contractual language "all stock, repertoire, lyceum and Chautauqua performances."  *See* Interim Arbitration Award at 10 n.4 (dkt. no. 21).

SA11

Recognizing, however, that much of this language consisted of "terms of art in the theater industry" that "do not have a single consistent, uniform meaning," the arbitrator adopted the term "non-first-class rights" as a descriptor of what Dramatic owned. *Id.* at 11. This descriptor also mapped on to the three classes of theater productions in the business today: 1) first class/Broadway; 2) regional/resident/repertory; and 3) community/local. *Id.* at 12. The arbitrator accordingly issued the following declaratory relief as part of the award: "Under the 1969 Agreement, Dramatic has worldwide exclusive rights to all non-first-class theater or stage rights in *To Kill a Mockingbird* ('non-first-class rights') and has all rights under the Agreement that provide for Dramatic to enjoy the full exercise of all non-first-class theater or stage rights." *Id.* at 6.

The respondents argue that the term "non-first-class rights," as used in the arbitrator's award, is ambiguous. They are particularly concerned with the award's declaratory relief, and they contend that the lack of a clear definition of "non-first-class rights" leaves the Estate uncertain of its future rights under the award. As a specific example, they point to an instance where the award reserves to the Estate the rights to off-Broadway productions. According to the Estate, these off-Broadway rights sometimes fall within the second class of theaters listed above, and thus the award is inconsistent in saying that Dramatic exclusively holds all non-first-class rights while reserving off-Broadway rights to Lee. Because of this uncertainty, the Estate asserts that the award should be remanded for clarification.

An arbitrator's award must be enforced as written, but if it is "too ambiguous to be enforced," a court may remand the matter back to the arbitrator for clarification. *Bhd. of*

12

*Locomotive Eng'rs v. Union Pac. R.R. Co.*, 500 F.3d 591, 592 (7th Cir. 2007); *see generally Colonial Penn Ins. Co. v. Omaha Indem. Co.*, 943 F.2d 327, 333–34 (3d Cir. 1991) ("Although there is no explicit provision in the [FAA] for such a remand, courts have uniformly stated that a remand to the arbitration panel is appropriate in cases where the award is ambiguous.").  An award is ambiguous if it "is susceptible to more than one interpretation."  *Bhd. of Locomotive Eng'rs*, 500 F.3d at 592 (quoting *Green v. Ameritech Corp.*, 200 F.3d 967, 977 (6th Cir. 2000).  The Seventh Circuit has recently emphasized, however, that courts should, "if possible, resolve apparent ambiguities by examining the arbitrator's opinion and the record.'"  *Nano Gas Techs., Inc. v. Roe*, 31 F.4th 1028, 1031 (7th Cir. 2022) (quoting *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. PPG Indus., Inc.*, 751 F.3d 580, 585 (7th Cir. 2014)).  Accordingly, the threshold issue is whether the term "non-first-class rights" as used in the award is ambiguous, and if so, whether the record resolves the ambiguity such that the parties can be reasonably certain of their rights moving forward.

The Court concludes that the arbitrator's use of the term "non-first-class rights" is ambiguous due to the imprecision of the dividing line between first-class and other rights.  Critically, the award does not offer a definitive definition of what the term "non-first-class-rights" encompasses, and even Dramatic concedes in its response brief that "the exact boundary of first-class [rights] may be gray."  Resp. to Resp'ts' Mot. to Vacate Arbitration Award at 25 (dkt. no. 32).

The classification of off-Broadway productions illustrates this.  On the one hand, the award states that off-Broadway productions are an example of "non-stock professional acting rights" (i.e. first-class rights) reserved to the Estate.  Interim

13

Arbitration Award at 27 (dkt. no. 21). The respondents read this statement to mean that the Estate owns the rights to all off-Broadway productions. But the arbitrator's award immediately follows this statement with a citation to the testimony of Dramatic's president, in which he explained that the classification of off-Broadway productions depends on the contract. *See* Resp. to Resp'ts' Mot. to Vacate, Ex. K at 3235–36 (dkt. no. 32-11) (testifying that "a commercial first-class open-ended run on an off-Broadway contract . . . would fall to Ms. Lee," whereas "an Equity mini-contract or showcase code production off-Broadway . . . would fall to [Dramatic]"). Dramatic contends that the arbitrator "adopted [the president's] testimony that in some cases an off-Broadway production could constitute a first-class production, but in others, an off-Broadway production would be a stock [second-class] right." Resp. to Resp'ts' Mot. to Vacate at 24 (dkt. no. 32). This supports the proposition that the award is ambiguous in this particular respect.

The rest of the award and record do not resolve this ambiguity, and if anything, show the need for greater clarity so that the parties can avoid future litigation. The award discusses how there are "several non-dispositive and non-exclusive factors that may be useful in determining whether a production is first-class." Interim Arbitration Award at 31 (dkt. no. 21). These factors include, for example, the presence of investors, SEC filings, and membership in the Society of London Theater (SOLT). The award also explains that the "mere fact that one or more professional actors appear in a production" does not control whether a production is first class either. *Id.* at 26. The award even quotes an industry expert who admits "that there is not always a bright line between first-class productions and secondary rights productions" and that "there are

14

sometimes grey areas." *Id*. at 32. Put simply, the arbitrator's award does not delineate the boundary of first-class versus non-first-class rights.

Dramatic's final argument that "precision is unnecessary" does not carry the day. An injunction order—which is what we are talking about here—must "be precise and self-contained, so that a person subject to it who reads it and nothing else has a sufficiently clear and exact knowledge of the duties it imposes on him." *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 619 (7th Cir. 1998); *see also Patriot Homes, Inc. v. Forest River Hous., Inc.*, 512 F.3d 412, 415 (7th Cir. 2008) (explaining that an injunction's "requirement of specificity spares courts and litigants from struggling over an injunction's scope"). As the award is currently described, there is uncertainty regarding the dividing line between first-class and non-first-class rights. The proposition that a determination of first-class versus non-first-class rights may sometimes come down to the specifics of a particular contract, as exemplified by some off-Broadway productions, reflects this: it suggests the possibility of litigation any time a contract in this gray area is entered into.

The Court concludes that the award's use of the term "non-first-class rights" is ambiguous and requires remand to the arbitrator for clarification.

**B.     Dramatic's motion**

Dramatic asks the Court to confirm a modified award that extends the judgment. Dramatic also asks the Court to award attorney's fees associated with the federal court litigation.

**1.     Judgment language**

Dramatic asks the Court to confirm a modified award that extends the judgment

to "all persons who are in active concert or participation with the Respondents."  Resp. to Resp'ts' Mot. to Vacate Arbitration Award at 29 (dkt. no. 32).  Dramatic contends this is a *pro forma* request to align the judgment's language with Federal Rule of Civil Procedure 65, which provides that any injunction order binds "other persons who are in active concert or participation" with the parties.  Fed. R. Civ. P. 65(d)(2).

Because the Court is remanding the case to the arbitrator for clarification of the term "non-first-class rights," the Court cannot simultaneously confirm the award, whether modified or not.  The Court therefore denies this request without prejudice to renewal.

The Court, however, notes that Dramatic's proposed modification is essentially a simple matter of form.  Federal Rule of Civil Procedure 81(a)(3) states that in proceedings under the FAA, the federal rules "apply only to the extent that matters of procedure are not provided for in those statutes."  Fed. R. Civ. P. 81(a)(3).  The FAA does not provide any further procedure relating to injunctions that might otherwise cover the subject matter of Rule 65.  So regardless of whether Dramatic formally requests the modification, the eventual judgment will be subject to Rule 65 and necessarily bind those in active concert.

### 2.    Attorney's fees

Dramatic also asks the Court to award attorney's fees associated with the litigation in federal court.  Although the FAA typically bars fees, a preexisting contractual agreement can nevertheless authorize such an award.  *See Menke v. Monchecourt*, 17 F.3d 1007, 1009 (7th Cir. 1994); *see also Hyatt Franchising*, 876 F.3d at 903 (permitting attorney's fees beyond a fee-shifting clause when the losing party "pointlessly extend[s]"

the arbitration in federal court).

That is the case here. The indemnity provision of the 1969 agreement requires Lee to pay "reasonable attorney's fees" that are caused by "breach or alleged breach of [the] agreement." Resp'ts' Mot. to Vacate, Ex. A ¶ 1(b) (dkt. no. 22-2). The arbitrator concluded that the Estate breached the 1969 agreement, and Dramatic has incurred attorney's fees and expenses in the present case defending against the respondents' motion to vacate.

Although the Court is remanding the award for clarification on a specific term, that clarification will not alter the arbitrator's bottom-line conclusion that the Estate breached the 1969 agreement, which is what triggers Dramatic's entitlement to attorney's fees. Accordingly, the Court concludes that Dramatic is entitled to attorney's fees under the 1969 agreement, the amount of which the Court will determine at a later date, following clarification by the arbitrator of the "non-first-class rights" term.

## Conclusion

For the reasons stated above, the Court denies the respondents' motion to vacate the interim award of arbitration [dkt. no. 22] but remands the case to the arbitrator for clarification of the term "non-first-class rights" as discussed within this opinion. The petitioner's motion to confirm [dkt. no. 10] is terminated without prejudice to renewal following the arbitrator's decision on remand. A joint status report is to be filed on July 1, 2022, and the case is set for a telephonic status hearing on July 6, 2022 at 9:15 a.m., using call-in number 888-684-8852, access code 746-1053.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: June 17, 2022

17

SA17

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **THE DRAMATIC PUBLISHING COMPANY,** | ) ) | |
| **Petitioner,** | ) ) ) | |
| **vs.** | ) ) | **Case No. 21 C 5541** |
| **THE ESTATE OF NELLE HARPER LEE, by and through its personal representative TONJA CARTER, and HARPER LEE, LLC,** | ) ) ) ) ) ) | |
| **Respondents.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY, District Judge:

Dramatic Publishing Company brought this suit against respondent Estate of Nelle Harper Lee and Harper Lee, LLC (the "Estate") to confirm an arbitration award concerning the stage rights to adaptions of Nelle Harper Lee's novel, *To Kill a Mockingbird*. In earlier decisions, this Court denied the Estate's cross-motion to vacate the award, remanded the case to the arbitrator for clarification, and confirmed the arbitrator's award of attorney's fees and costs in favor of Dramatic. *See Dramatic Publishing Co. v. Carter*, No. 21 C 5541, 2022 WL 2194586 (N.D. Ill. June 17, 2022); Order on Mot. to Confirm Final Award, *Dramatic Publishing Co. v. Carter*, No. 21 C 5541 (N.D. Ill. Sept. 23, 2021). Dramatic now moves to confirm the award as clarified by the arbitrator and to clarify various other issues. The Court grants the motions for the reasons stated below.

SA18

**Background**

The Court takes the following facts from its prior orders and the parties' briefing. A more detailed recounting of the allegations can be found in the Court's June 17, 2022 decision on Dramatic's motion to confirm the interim award and the Estate's motion to vacate. *See Dramatic Publishing Co. v. Carter*, 2022 WL 2194586.

In October 2021, an arbitrator issued an "interim" arbitration award finding in favor of Dramatic on certain of its claims against the Estate. The arbitrator held that Dramatic was entitled to $185,227 in damages, declaratory and other equitable relief, and reasonable attorney's fees and costs in an amount to be determined. Dramatic filed this suit to confirm the interim award the next day, and the Estate moved to vacate that award. The Court denied the Estate's motion to vacate, largely approved the arbitrator's rulings as set out in the interim award, and remanded for clarification of a particular term in the equitable relief awarded by the arbitrator. The Court also held that Dramatic is entitled to attorney's fees associated with the litigation in federal court, which the Court would determine at a later date.

In January 2022, while the Court's decision on the interim award was pending, the arbitrator awarded Dramatic $2,556,999 in attorney's fees and costs ("Final Award"). A few weeks later, the arbitrator granted Dramatic's motion for modification of the final award and increased the award of fees and costs to $2,577,204 ("Corrected Final Award"). Dramatic moved to confirm the Corrected Final Award. The Estate did not move to vacate or otherwise challenge that award, so on September 23, 2022 the Court confirmed the arbitrator's determination of fees and costs in the amount of $2,577,204. Five days later, the Estate transferred to Dramatic $2,580,417.42, which represented

2

the fees and costs in the Corrected Final Award plus the interest accrued after the Court confirmed that award. The Estate did not pay the $185,277 damage award or any interest on that award.

On September 1, 2022, Dramatic filed a supplemental motion to confirm all of the arbitrator's awards and orders. Dramatic requested for the first time that the Court confirm the arbitrator's September 2, 2021 order, which stated that any settlement between the Estate and the Estate of Gregory Peck regarding stage rights "will include a statement that the agreement is subject to Dramatic's stage rights as such rights are determined in this Arbitration or in any appeal thereof." Suppl. Mot. to Confirm Arbitration Award, *Dramatic Publishing Co. v. Carter*, No. 21 C 5541, Ex. A at 1 (N.D. Ill. Sept. 1, 2022). Dramatic also asked the Court to clarify that it is entitled to post-judgment interest on the arbitration award. The Estate opposes both of these requests.

The arbitrator issued a clarification of the interim order in late September 2022 and made minor corrections in a revised clarification (the "Clarified Award") on October 11. Dramatic renewed its motion to confirm the Clarified Award that same day, and the Estate did not assert any additional grounds to vacate it.

On December 8, 2022, Dramatic moved to accelerate confirmation of the Clarified Award. The Estate took no position on the motion, and the Court terminated it as moot during a telephonic hearing on December 15, 2022.

### Discussion

"Judicial review of arbitration awards is extremely limited." *Johnson Controls, Inc. Systems & Servs. Div. v. United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Industry of U.S. & Canada, AFL-CIO*, 39 F.3d 821, 824 (7th Cir. 1994). A

3

court may modify an award only if there was an evident material miscalculation or material mistake, the arbitrators issued an award on a matter not submitted to them, or the award contains some imperfection of form that does not affect the merits of the controversy. 9 U.S.C. § 11. In addition, a court may vacate an award "where the arbitrators exceeded their powers." *Id.* § 10(d). Upon application by a party to the arbitration "at any time within one year after the award is made," a court may enter an order confirming the award so long as it is not vacated or modified.[1] *Id.* § 9.

## A. Clarified award

On remand from the Court, the arbitrator defined the term "non-First-Class" in the Clarified Award. He also awarded Dramatic $56,090 in supplemental attorney's fees and costs and directed the Estate to reimburse Dramatic for $9,375 in arbitration fees relating to the clarification. Dramatic moved to confirm the Clarified Award. To avoid any contention of waiver, the Estate reasserted arguments raised in its motion to vacate that the Court had already overruled in its June 2022 order. Because the Estate does not assert any new grounds to vacate the Clarified Award, the Court grants Dramatic's renewed motion to confirm.

## B. Supplemental motion to confirm

Dramatic moves the Court to confirm a September 2, 2021 order (the "Agreed Order") by the arbitrator that required the Estate to include a statement about

---

[1] Courts disagree as to whether the one-year provision in section 9 is a mandatory statute of limitations or a permissive provision, and the Seventh Circuit has yet to address the issue. *See Kolowski v. Blatt, Hasenmiller, Leibsker & Moore, LLC*, No. 7 C 4964, 2008 WL 4372711, at *2 (N.D. Ill. Mar. 20, 2008) (collecting cases). Because Dramatic filed its motions to confirm within a year of the arbitrator's awards and orders, the Court need not decide that question in this case.

Dramatic's stage rights in any agreement arising from a separate arbitration. It also asked the Court to clarify that it is entitled to post-judgment interest on the Final Award and the Corrected Final Award from the date the arbitrator entered those awards to the date the awards were satisfied.

### 1. Stage rights

The Estate argues that Dramatic's motion is untimely because the Agreed Order is not mentioned in the interim or final awards. The order need not be part of either award to be ripe for confirmation. *Publicis Commc'n v. True North Commc'ns, Inc.*, 206 F.3d 725, 729 (7th Cir. 2000) ("[T]his circuit and others have found arbitration decisions lacking the "award" tag to be final . . . . A ruling on a discrete, time-sensitive issue may be final and ripe for confirmation even though other claims remain to be addressed by arbitrators."). The Agreed Order decided the discrete issue of whether the Estate must state in other arbitration agreements addressing stage rights that those agreements are subject to Dramatic's rights, and the risk of inconsistent rulings from different arbitrators without such a statement made the issue time-sensitive. The Estate neither challenges the substance of the Agreed Order nor provides any legal support for its arguments. The Court therefore confirms the Agreed Order, as it is ripe for confirmation and Dramatic filed its motion to confirm within a year.

### 2. Post-judgment interest

The Estate's contention that post-judgment interest accrues solely after entry of judgment by a court similarly lacks merit. It relies solely on *Contract Development Corp. v. Beck*, 255 Ill. App. 3d 660, 627 N.E.2d 760 (1994), in which the Illinois Appellate Court noted that the arbitrator "failed to indicate that interest would be assessed" and

held that "interest at the rate of 9% should have been mandatorily imposed from the date the judgment was entered confirming the arbitrator's award." *Id.* at 672–73, 627 N.E.2d at 769. Yet *Contract Development* did not address whether interest could accrue on an arbitration award before the court entered a judgment, and the Illinois Appellate Court and other courts in this district have since held that interest begins accruing on the date the arbitrator enters the award. *See, e.g.*, *Shackelford v. Allstate Fire and Casualty Ins. Co.*, 2017 IL 162607, ¶ 16, 170 N.E.3d 567, 571; *Prime United Inc. v. Sears Holdings Mgmt. Corp.*, No. 12 C 5364, 2013 WL 3754829, at *4 (N.D. Ill. July 16, 2013); *Robertson-Ceco Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Penn.*, 292 F. Supp. 2d 1082, 1086 (N.D. Ill. 2003). The Court therefore holds that Dramatic is entitled to nine percent post-judgment interest on the Final Award and the Corrected Final Award from the dates the arbitrator entered those awards.

## Conclusion

For the reasons stated above, the Court grants the petitioner's renewed motion to confirm the interim arbitration award as clarified by the arbitrator [dkt. no. 59] and its supplemental motion to confirm arbitration awards [dkt. no. 51]. The parties are directed to promptly confer regarding the form and language of a judgment for entry by the Court and are to provide an agreed form of judgment, or proposed alternatives if they cannot agree, by January 4, 2023. The proposed judgment should also calculate interest pursuant to the Court's ruling through January 5, 2023. With regard to attorney's fees and costs in connection with litigation before the Court, the Court foregoes compliance with Local Rule 54.3. Petitioner's fee petition is to be filed by no later than January 27, 2023, and respondents' response is to be filed by February 17,

SA23

2023.  The case is set for a telephonic status hearing on February 22, 2023 at 9:05

a.m., using call-in number 888-684-8852, access code 746-1053.

_____
MATTHEW F. KENNELLY
Date:  December 29, 2022                    United States District Judge

SA24

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THE DRAMATIC PUBLISHING COMPANY, | ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | Case No.: 1:21-CV-05541-MFK |
| TONJA CARTER, et al., | ) ) | |
| Respondents. | ) ) | |

**FINAL JUDGMENT ORDER**

This case was initiated by Petitioner Dramatic Publishing Company ("Dramatic") on October 19, 2021, following arbitration proceedings against Respondents The Estate of Nelle Harper Lee, by and through its personal representative Tonja Carter (the "Estate"), and Harper Lee, LLC ("LLC"). This case involved motions to confirm and cross-motions to vacate several awards entered in the arbitration proceedings.

In accordance with the Court's previous Memoranda and Orders, Judgment is hereby entered in favor of Petitioner Dramatic and against Respondents, and it is hereby **ORDERED AND ADJUDGED** as follows, and the Clerk is directed to enter judgment accordingly:

1.      The Corrected Final Award is **CONFIRMED** ([Doc. 35.1]);

2.      Pursuant to the Corrected Final Award, the Estate and LLC are joint and severally liable for $2,577,204.00 in attorneys' fees and costs. (The Estate and LLC already have satisfied this sum.) [1]

---

[1] On September 28, 2022, the Estate transferred to Dramatic $2,580,417.42, which represented the fees and costs in the Corrected Final Award plus the 9% interest that accrued after the Court confirmed that award. Pursuant to the Court's December 29, 2022 Order (Doc. 72), the Estate is

3.     Consistent with the Corrected Final Award, the Estate is **ORDERED** to pay Dramatic **$151,730.89 in interest;**

4.     The Estate and LLC are ORDERED to pay, jointly and severally, additional attorneys' fees and costs stemming from the remand of the arbitration totaling $56,090.00. (The Estate and LLC already have satisfied this sum.)

5.     The Court **CONFIRMS** the arbitrator's September 2, 2021 Agreed Order ([Doc.51, Exhibit A]), and declares:

   a.   The Estate will not enter into any settlement in the Peck Arbitration or with any of the parties in the Peck Arbitration (Case No. 01 15 0004 7377) involving live stage rights in the presence of an audience that conflicts in any way with any of Dramatic's rights under the 1969 Agreement as such rights are determined in this Arbitration (Case No. 01-19-0000-7463). Any settlement agreement entered into by the Estate in connection with the Peck Arbitration that addresses the issue of stage rights will include a statement that the agreement is subject to Dramatic's stage rights as such rights are determined in this Arbitration or in any appeal thereof.

   b.   In the event the Estate seeks a declaration in the Peck Arbitration regarding live stage rights in the presence of an audience it will make clear that any such declaration is subject to Dramatic's stage rights as determined in this Arbitration or in any appeal thereof. In the event the arbitrator in the Peck Arbitration is asked to resolve any issues relating to live stage rights, the Estate will inform the Peck Arbitration arbitrator of the existence of this Arbitration and will provide the Peck Arbitration arbitrator with a copy of all awards and judgments entered in connection with this Arbitration. In no event, will the Estate seek any relief in the Peck Arbitration that would infringe on any stage rights held by Dramatic as such rights are determined in this Arbitration or in any appeal thereof.

   c.   The Estate is hereby ordered to take all necessary steps to ensure that the judgment and order in Atticus Corp. et al v. Carter et al, Case No. 22-cv-00059, currently pending in the United States District Court for the Southern District of Alabama are amended to reflect that the agreed order is subject to Dramatic's stage rights as set forth in this judgment or as modified in any appeal thereof.

---

required to pay 9% interest from the date on which the arbitrator entered his awards. As a result, the Estate is ordered to pay the difference between its September 28, 2022 payment ($2,580,417.42) and the Corrected Final Award amount final award plus 9% interest from the date the award was entered and September 28, 2022 ($2,732,148.31). That difference is **$151,730.89**

6.    The Court **CONFIRMS** the Corrected Interim Award, as clarified by the arbitrator ([Doc. 21, 59.1]), and declares:

    a.    The terms of the original grant in the 1969 Agreement survive termination. Under the 1969 Agreement, Dramatic has worldwide exclusive rights to all non-first-class theater or stage rights in *To Kill a Mockingbird* ("non-first-class rights" as defined below) and has all rights under the Agreement that provide for Dramatic to enjoy the full exercise of all non-first-class theater or stage rights.

    b.    Dramatic has not infringed the federal copyright protecting *To Kill a Mockingbird.*

    c.    Dramatic may continue to license both versions of *To Kill a Mockingbird*.

    d.    The Estate and the LLC shall pay to Dramatic any and all future royalties or other payments they receive from Rudinplay Affiliates or any other person or entity from any non-first-class productions of *To Kill a Mockingbird*.

    e.    The Estate and the LLC shall be enjoined from (i) licensing or granting any third party, including, but not limited to, Scott Rudin ("Rudin") and Rudinplay, Inc., Atticus LLC, any other entity owned, controlled or operated by Scott Rudin, and any entity assigned or licensed rights from Rudinplay (collectively referred to herein as "Rudinplay Affiliates"), any non-first-class stage rights in *To Kill a Mockingbird;* (ii) encouraging, inducing, assisting, approving, or consenting to any wrongful interference with Dramatic's licensees anywhere in the world by Rudin or Rudinplay Affiliates; (iii) encouraging, inducing, assisting, approving or consenting to Rudin's or Rudinplay Affiliates' wrongful licensing of Rudinplay's version of *To Kill a Mockingbird* for any non-first-class production throughout the world; (iv) directly interfering with Dramatic's licensees' licensed non-first-class productions of either version of the Sergel Play; and (v) otherwise interfering with Dramatic's rights to license non-first-class and amateur productions of either version of the Sergel Play.

    f.    The term "first-class rights" is comprised of the theatrical or stage rights for the following categories of dramatic productions of *To Kill a Mockingbird*:

        i.    **Broadway Productions**.

            (a) Broadway Productions are For-Profit Commercial Productions (as defined in section i (b), below) that take place in venues of 500 or more seats located in Manhattan, New York City ("Broadway Theaters"). The production must be governed by the Actors Equity "Production Agreement" or an analogous agreement whose substantive terms and pay scale are substantially the same as the Actors Equity Production Agreement.

SA27

(b) "For-Profit Commercial Productions" consist only of productions that are wholly financed by for-profit entities whose purpose is to provide their investors with a positive return on their investment. The fact that a production may engage for-profit enterprises as part of their production (*e.g.*, a for-profit tour promoter) or otherwise rely on entities that operate for profit, shall not, by itself, render it a "For-Profit Commercial Production."

(c) At present the following Broadway Theatres whose productions constitute "Broadway Productions" are:

> Ambassador, 215 West 49th Street;
> American Airlines, 227 West 42nd Street;
> Brooks Atkinson, 256 West 47th Street;
> Ethel Barrymore, 243 West 47th Street;
> Vivian Beaumont,150 West 65th Street;
> Belasco,111 West 44th Street; Booth, 222 West 45th Street;
> Broadhurst, 235 West 44th Street;
> Broadway,1681 Broadway;
> Circle in the Square,1633 Broadway;
> Cort,138 West 48th Street;
> Samuel J. Friedman,261 West 47th Street;
> Gershwin,1633 Broadway;
> John Golden, 252 West 45th Street;
> Helen Hayes, 240 West 44th Street;
> Al Hirschfeld, 302 West 45th Street;
> Hudson, 139-141 West 44th Street;
> Imperial, 249 West 45th Street;
> Bernard B. Jacobs, 242 West 45th Street;
> Walter Kerr, 219 West 48th Street;
> Longacre, 220 West 48th Street;
> Lunt-Fontanne, 205 West 46th Street;
> Lyceum,149 West 45th Street;
> Lyric, 213 West 42nd Street;
> Majestic, 245 West 44th Street;
> Marquis,1535 Broadway;
> Minskoff, 200 West 45th Street;
> Music Box, 239 West 45th Street;
> Nederlander,208 West 41st Street;
> New Amsterdam, 214 West 42nd Street;
> Eugene O'Neill, 230 West 49th Street;
> Palace,1564 Broadway;
> Richard Rodgers,226 West 46th Street;
> St. James,246 West 44th Street;
> Gerald Schoenfeld, 236 West 45th Street;
> Shubert,225 West 44th Street;

Neil Simon, 250 West 52nd Street;
Stephen Sondheim,124 W. 43rd Street;
Studio54, 254 West 54th Street;
August Wilson, 245 West 52nd Street;
Winter Garden,1634 Broadway.

(d) The theaters listed above are presumed to be the only Broadway Theaters as of the date of this clarification. However, because the 1969 Agreement could remain in force for a significant amount of time into the future, and new Broadway theaters might be opened or existing theaters might be closed or repurposed into a different type of venue, more flexibility is required. While the theaters listed above are presumed in this clarification to be the only theaters housing. Broadway Productions, that presumption is rebuttable. A venue that in the future meets the criteria for a Broadway Production stated herein shall be treated as a Broadway Production. Likewise, a venue that in the future no longer meets the criteria stated herein will no longer be treated as a Broadway Production.

ii. **For-Profit Commercial Productions outside New York City**.

(a) "For-Profit Commercial Productions outside New York City" as used in this clarification are tours and sit-downs ("sit-downs" are non-touring production) outside of New York City that take place in venues of 500 or more seats and are For-Profit Commercial Productions as defined in section i.(b), above. The production must be governed by the Actors Equity Production Agreement or an analogous agreement whose substantive terms and pay scale are substantially the same as the Actors Equity Production Agreement.

(b) By way of example, the Dorothy Chandler Pavilion in Los Angeles and the Kennedy Center in Washington D.C. were identified in testimony as theaters having first-class productions that would meet the criteria for this category. The reference to these two theaters is for purposes of illustration only and is not intended as an exhaustive list of theaters that now, or in the future, may qualify as For-Profit Commercial Productions.

iii. **Off-Broadway Productions**.

(a) Off-Broadway productions do not meet the criteria of a Broadway Production because they take place in venues of 100 to 499 seats. Thus, they do not come within the category of "first class" productions. Under the Interim Award, Off-Broadway Productions, in general, fall into the middle-tier category of "stock rights." As such, they are non-first-class rights.

(b) However, "first-class rights" are clarified to encompass Off-Broadway Productions that are For-Profit Commercial Productions (as defined in section i.(b), above) with an open-ended run and which are governed by an Equity Off Broadway contract or an Equity Production contract. Off-Broadway productions that do not meet these criteria are non-first-class productions. For avoidance of doubt, Off-Off-Broadway productions (productions in theaters in New York City having less than 100 seats) are non-first-class productions.

iv. **West End Productions**.

(a) Like Broadway Productions, "West End" productions are uniformly considered first-class. West End Theaters are theaters that present For-Profit Commercial Productions (as defined in section i., above) that take place in or near the West End area of London. The production must be governed by British Equity's contract for West End theater productions or an analogous agreement whose substantive terms and pay scale are substantially the same as British Equity's Agreement for Commercial For-Profit West End Theaters.

(b) At present, the following West End Theaters whose productions constitute "West End Productions" are:
> Adelphi;
> Aldwych;
> Ambassadors (New Ambassadors);
> Apollo;
> Apollo Victoria;
> Cambridge;
> Coliseum;
> Comedy Covent Garden;
> Criterion; Drury Lane;
> Duchess;
> Duke of York's;
> Fortune;
> Garrick;
> Gielgud;
> Haymarket;
> Her Majesty's;
> London Palladium;
> Lyric;
> Mayfair;
> New London;
> Noel Coward;
> Novello Palace;
> Phoenix;
> Piccadilly;

6

SA30

Playhouse;
Prince Edward;
Prince of Wales;
Queen's;
St Martin's;
Savoy;
Shaftesbury;
Trafalgar Studio 1;
Vaudeville;
Victoria Palace;
Westminster;
Wyndham's.

v. **Commercial For-Profit Tours in the United Kingdom**. Commercial For-Profit Tours in the U.K., either emanating from or travelling to a West End Theater, that operate under British Equity's contract for West End theater productions or an analogous agreement whose substantive terms and pay scale are substantially the same as British Equity's Agreement for Commercial For-Profit West End Theaters, are first-class productions. To qualify as a "Commercial For-Profit Tour in the U.K.," the tour must be a For-Profit Commercial Production (as defined in section i.(b), above).

vi. **Commercial For-Profit Tours or Productions outside the U.S. or U.K**. In any countries other than the United States or United Kingdom, Commercial For-Profit Tours or Productions are tours or productions that operate under a contract with the country's professional theatrical acting union (*e.g.* Canadian Actors' Equity Association) whose pay scale reflects the highest-level pay for any theatrical acting union in that country, or an analogous agreement whose substantive terms and pay scale are substantially the same as such a union contract, are first-class productions. To qualify as a "Commercial For-Profit Tour outside the U.S. or U.K.," the tour must be a For-Profit Commercial Production (as defined in section i.(b), above).

vii. **Non-First-Class Theaters and Productions**. Any theater or production that does not meet the criteria to qualify for one of the categories in sections 1 through 6, above, is not a first-class theater or production. For avoidance of doubt, the following are presumed to be non-first-class productions and theaters:
   (a) Any production at the Stratford Festival in Canada, the Regent's Park Open Air Theatre in London, the League of Resident Theaters (LORT), regional professional theaters, COST theaters, and CORST theaters.

SA31

(b) Any production operating under any of the following Actors Equity Association contracts:

Bay Area Project Policy (BAPP);
Bay Area Theatre;
Business Theatre and Events;
Business Theatre & Events Memorandum of Understanding;
Cabaret;
Casino;
Chicago Area Theatre;
Development;
Dinner Theatre;
Disney World;
Guest Artist;
Hollywood Area Theatre;
Letters of Agreement;
LA 50-Seat Showcase;
LA 99-Seat Theatre;
LA Self-Produced Project;
Midsize Theatres;
Mini Agreement;
Musical Stock and Unit Attractions (MSUA);
New England Area Theatres Agreement (NEAT);
New Orleans (NOLA);
NY Showcase;
Orlando Area Theatre (OAT);
Off Broadway, except as provided in Section 3;
Outdoor Drama;
Short Engagement Touring Agreement (SETA);
Small Professional Theatre (SPT);
Special Agreement; Special Appearance;
Staged Reading Code;
Theatre for Young Audiences (TYA);
Transition;
University/Resident Theatres Association (URTA);
Western Civic Light Opera (WCLO).

(c) While the theaters listed in subsection vii.(b), above, are presumed in this clarification to be the non-first-class theaters and productions, that presumption is rebuttable. If in the future a theater or production identified in this section meets the criteria for being a first-class production as set forth in any of the sections i through vi, above, that production shall be treated as a first-class production.

g.  The Estate Shall:
    i.  defend, indemnify and hold harmless Dramatic from and against any and all monetary losses or other losses whatsoever, including attorneys' fees,

8

SA32

caused by any legal or administrative action brought against Dramatic by any of the following Dramatic licensees: (i) Jonathan Church Productions, (ii) any other licensee theater that had scheduled a production of the Play on the ChurchTour; (iii) Arena Fair Theater at Chappelear Theater, Ohio Wesleyan University; (iv) DeSoto Family Theater performing at Landers Theater Center; (v) Hill Country at Bud El.; (vi) Hart Theater in Hillsboro, Oregon; (vii) Curtain Call; (viii) Azusa Pacific University; and, (ix) any other purely amateur theater that was consented to by Mr. O'Donnell that cancelled a production of TKAM after receiving a cease and desist letter from Rudin or the Estate;

ii. defend, indemnify and hold harmless Dramatic from or against any and all losses arising from any legal or administrative action brought against Dramatic by Scott Rudin, Aaron Sorkin, Rudinplay, Rudinplay Affiliates, or Atticus, LLC, or any of their licensees or assignees, or anyone on their behalf connected in any way with Dramatic's exercise of its exclusive worldwide rights to license all non-first-class rights in the Sergel Play;

iii. defend, indemnify and hold harmless Dramatic from or against any and all losses arising from any legal or administrative action brought against Dramatic by any third party as a result of the transfer of any non-first-class rights by the Estate or LLC.

h. The Estate and the LLC shall account for and shall turn over to Dramatic any payments or royalties received by the Estate or the LLC for any non-first-class rights from Scott Rudin, Rudinplay, any other Rudinplay Affiliate, Aaron Sorkin, or any other secondary theatrical publishing and licensing house.

7. Consistent with the Corrected Interim Award, the Estate is ORDERED to pay Dramatic $185,277 plus 9 percent interest for a total of $205,740.96. (The Estate already has satisfied this sum.);

8. Pursuant to the Court's order of June 17, 2022 (Doc. No. 42), the Estate and LLC are ORDERED to pay, jointly or severally, Dramatic's attorneys fees and costs in an amount to be determined by the Court.

DONE this 13th day of January., 2023.

MATTHEW F. KENNELLY
UNITED STATES DISTRICT JUDGE

SA34