No. 23-1309

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

———————————

DRAMATIC PUBLISHING COMPANY,

Petitioner-Appellee,

v.

ESTATE OF NELLE HARPER LEE, by and through its personal representative TONJA
CARTER, and HARPER LEE, LLC,

Respondent-Appellant.

———————————

On Appeal from the United States District Court
for the Northern District of Illinois
Hon. Matthew F. Kennelly
No. 1:21-CV-05541-MFK

———————————

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE
IN SUPPORT OF NEITHER PARTY**

———————————

EMILY L. CHAPUIS
*Acting General Counsel and
Associate Register of Copyrights*
JASON E. SLOAN
*Assistant General Counsel*
BRITTANY R. LAMB
*Attorney-Advisor
United States Copyright Office
Washington, DC 20540*

YAAKOV M. ROTH
*Acting Assistant Attorney
General*

ANDREW S. BOUTROS
*United States Attorney*

DANIEL TENNY
JOSHUA DOS SANTOS
*(202) 353-0213
Attorneys, Appellate Staff
Civil Division, Room 7224
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530*

## TABLE OF CONTENTS

**Page**

INTRODUCTION AND STATEMENT OF INTEREST ................................... 1

STATEMENT OF THE ISSUE ............................................................. 2

STATEMENT OF THE CASE ............................................................. 3

    A.    Statutory Background ......................................................3

    B.    Factual Background ..........................................................6

    C.    Prior Proceedings ............................................................7

SUMMARY OF ARGUMENT ........................................................ 10

ARGUMENT ................................................................................. 14

The Right to Make and Perform New Derivative Works Reverts to an
    Author after Termination of an Exclusive Grant. ................................. 14

CONCLUSION .............................................................................. 35

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                            **Page(s)**

*Atticus LLC v. Dramatic Publ'g Co.*, No. 1:22-cv-10147-DLC,
2023 WL 3135745 (S.D.N.Y. Apr. 27, 2023) .............................................. 9, 18

*Brumley v. Albert E. Brumley & Sons, Inc.*,
822 F.3d 926 (6th Cir. 2016) .............................................................. 30

*Classic Media, Inc. v. Mewborn*,
532 F.3d 978 (9th Cir. 2008) .............................................................. 23

*Fogerty v. Fantasy, Inc.*,
510 U.S. 517 (1994) ........................................................................ 24

*Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.*,
155 F.3d 17 (2d Cir. 1998) .......................................................... 16, 19

*Fred Fisher Music Co. v. M. Witmark & Sons*,
318 U.S. 643 (1943) ........................................................................ 22

*Miller Music Corp. v. Charles N. Daniels, Inc.*,
362 U.S. 373 (1960) ........................................................................ 23

*Mills Music, Inc. v. Snyder*,
469 U.S. 153 (1985) ............................................ 4, 5, 6, 21-22, 22, 23, 26, 27, 28

*Penguin Grp. (USA) Inc. v. Steinbeck*,
537 F.3d 193 (2d Cir. 2008) ............................................................... 30

*Stewart v. Abend*,
495 U.S. 207 (1990) .................................................................... 23, 30

*Twentieth Century Music Corp. v. Aiken*,
422 U.S. 151 (1975) ........................................................................ 14

*Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*,
924 F.3d 32 (2d Cir. 2019) ................................................................. 3

*Woods v. Bourne Co.*,
60 F.3d 978 (2d Cir. 1995) ......................................................... 6, 18, 24

**U.S. Constitution:**

Art. I, § 8, cl. 8  ................................................................ 14, 20

**Statutes:**

Copyright Act of 1976:

17 U.S.C. § 101 ............................................................... 4
17 U.S.C. § 102 ............................................................... 3
17 U.S.C. § 103(a) ........................................................... 4
17 U.S.C. § 103(b) ........................................................ 4, 19
17 U.S.C. § 106 ......................................................... 3, 14-15
17 U.S.C. § 106(1) ........................................................... 3
17 U.S.C. § 106(2) ........................................ 3, 10, 12, 18, 21, 29
17 U.S.C. § 106(4) ........................................................... 3
17 U.S.C. § 201(a) ........................................................... 3
17 U.S.C. § 201(d) ........................................................... 4
17 U.S.C. § 202 ............................................................. 14
17 U.S.C. § 203 .............................................................. 5
17 U.S.C. § 304(a) (1998) ................................................... 32
17 U.S.C. § 304(a) (1976) ................................................... 32
17 U.S.C. § 304(c) .............................. 5, 9, 10, 12, 15, 17, 18, 25, 33
17 U.S.C. § 304(c)(3)-(4) ..................................................... 5
17 U.S.C. § 304(c)(5) ................................... 10, 12, 15, 23, 30
17 U.S.C. § 304(c)(6) ................................... 5, 15, 18, 25, 33
17 U.S.C. § 304(c)(6)(A) ........ 6, 9, 10, 11, 12, 13, 15, 16, 17, 18, 19, 24, 29, 33
17 U.S.C. § 304(c)(6)(A)-(F) .............................................. 5-6, 15
17 U.S.C. § 501(b) ......................................................... 21

17 U.S.C. § 23 (1926) ...................................................... 32

**Legislative Materials:**

H.R. Rep. No. 94-1476 (1976) ......................................... 4, 5, 6, 32

Staff of H. Comm. on the Judiciary, 87th Cong., *Copyright
   Law Revision: Report of the Register of Copyrights on the
   General Revision of the U.S. Copyright Law*
   (Comm. Print 1961), https://perma.cc/2T8K-UY2B ................................22

## INTRODUCTION AND STATEMENT OF INTEREST

The United States has an interest in the proper interpretation of the copyright laws, which foster innovation and creative expression by protecting the rights of authors to profit from their original works while simultaneously allowing the creation and dissemination of new works. The particular provision at issue here allows authors who may have contracted away their copyright rights to recapture those rights while ensuring the continued distribution of any derivative works created in connection with the original contract.

In particular, this case concerns the statutorily authorized termination of an exclusive grant to create and perform a play based on Harper Lee's novel, *To Kill a Mockingbird*, in certain types of productions. As another court has held, upon termination of the grant, the novel's author once again enjoyed the right to commission new plays based on the novel, including for the types of performances that were the subject of the prior grant. The prior grantee, The Dramatic Publishing Company (Dramatic), argues that it may not only continue to exploit the play that had already been written, but may also preclude any other artists from performing new plays under the circumstances described in the grant.

Dramatic's interpretation of the statute is inconsistent with the statute's text, structure, and history.  And Dramatic's logic, if applied more broadly, would stifle innovation by preventing the creation of new derivative works after a termination.  That result is directly contrary to Congress's clear purpose in the termination provisions and the foundational purposes of copyright law.

The United States thus disagrees with Dramatic's interpretation of the copyright laws.  The United States takes no position, however, on whether the arbitration decision at issue in this case should be vacated, or on any other issue in the case.[1]

## STATEMENT OF THE ISSUE

The United States will address only the following question:

Whether, upon an author's termination of an exclusive license to prepare and perform a derivative work, the prior grantee does not retain

---

[1] As Lee's estate points out, the government has filed a very similar amicus brief in a Second Circuit case presenting the same legal issue that we address here.  *See* Appellant's Opening Br. Ex. 1.  The government files this brief to present these arguments to this Court directly.

any exclusive rights in the original work, and the author regains the exclusive right to commission or preclude new derivative works.

## STATEMENT OF THE CASE

### A.     Statutory Background

The Copyright Act of 1976 establishes copyright protection for certain original works of authorship.  *See* 17 U.S.C. § 102.  That protection "vests initially in the author."  *Id.* § 201(a).  The copyright in the author's work is defined as a set of "exclusive rights to do and to authorize" uses of the work that are enumerated in the statute.  *Id.* § 106; *see Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 44 (2d Cir. 2019) ("The Copyright Act grants copyright holders a bundle of exclusive rights.").  For example, as initial copyright owner, the author has the exclusive right "to reproduce the copyrighted work" and "to perform the copyrighted work publicly." 17 U.S.C. § 106(1), (4).

The author's copyright also includes the exclusive right "to prepare derivative works based upon the copyrighted work."  17 U.S.C. § 106(2). "A 'derivative work' is a work based upon one or more preexisting works, such as a … dramatization, fictionalization, motion picture version, sound

3

recording, … or any other form in which a work may be recast, transformed, or adapted." *Id.* § 101. Thus, for example, an author who owns the copyright in her novel has the exclusive right to prepare or authorize adaptations of the novel for film or stage productions. Any such derivative work is eligible for its own copyright protection. *See id.* § 103(a). But a derivative work's copyright "extends only to the material contributed by the author of" the derivative work and does not create any right in the "preexisting material employed in the work" or "imply any exclusive right in the preexisting material." *Id.* § 103(b).

Authors may "transfer[]" either the entire copyright in their works or a portion of their rights to another person. 17 U.S.C. § 201(d). Frequently, authors transfer rights in their works to publishers as a condition of having their works published. *See Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172-73 (1985); H.R. Rep. No. 94-1476, at 124 (1976).

Since 1976, Congress has allowed authors a second chance to reap profit from their work by granting authors a right to terminate a previous grant. The relevant provisions state that authors or statutorily defined heirs may "terminat[e]" "the exclusive or nonexclusive grant of a transfer

4

or license of" a copyright "or any right under it" within a specified period of time and under certain conditions. 17 U.S.C. § 304(c) (listing termination requirements for works copyrighted before 1978); *id.* § 203 (requirements for grants executed in or after 1978). For a work copyrighted before 1978, the author may terminate a grant during a five-year window beginning 56 years after the copyright in the work was secured upon service of proper and timely notice. *Id.* § 304(c)(3)-(4). When an author or heir terminates a grant in accordance with those requirements, "all of a particular author's rights under [the Copyright Act] that were covered by the terminated grant revert, upon the effective date of termination, to that author." *Id.* § 304(c)(6). Congress enacted these provisions "to relieve authors of the consequences of ill-advised and unremunerative grants that had been made before the author had a fair opportunity to appreciate the true value of his work." *Mills Music*, 469 U.S. at 172-73; H.R. Rep. No. 94-1476, at 124.

The termination right does not apply to "work[s] made for hire" or grants made "by will," which Congress categorically exempted. 17 U.S.C. § 304(c). It is also subject to specified statutory "limitations." *See id.*

§ 304(c)(6)(A)-(F).  The limitation regarding derivative works, relevant

here, provides that:

> A derivative work prepared under authority of the grant before
> its termination may continue to be utilized under the terms of
> the grant after its termination, but this privilege does not
> extend to the preparation after the termination of other
> derivative works based upon the copyrighted work covered by
> the terminated grant.

*Id.* § 304(c)(6)(A).  This limitation encourages investment in a derivative

work and protects public access to the work after an author terminates a

previous grant.  *See Mills Music*, 469 U.S. at 173.  This ensures, for example,

that a film studio may continue to distribute a film based on a novel even if

the novel's author later terminates the grant that originally allowed the

studio to make the film.  *See Woods v. Bourne Co.*, 60 F.3d 978, 986 (2d Cir.

1995).  But the limitation does not include any right to prepare new

derivative works.  *See* 17 U.S.C. § 304(c)(6)(A); *see also* H.R. Rep. No. 94-

1476, at 127.

## B.    Factual Background

The dispute at issue here arises from Harper Lee's grant of rights to

create stage adaptations of *To Kill a Mockingbird*.  In 1969, Lee granted

6

Dramatic an exclusive right to make adaptations of *To Kill a Mockingbird* for certain kinds of theatrical performances.  In particular, Lee gave Dramatic "the complete right throughout the world" to create a dramatization of the novel that was "to be the only one the amateur acting rights of which [Lee] will permit to be leased and/or licensed."  Appellant's App. (App.) 140. The grant was limited to "non-first class" theatrical performances, which excludes, for example, first-class performances at venues on Broadway or London's West End.  *See* Appellant's Opening Br. 8-9.

Decades later, Lee terminated the grant to Dramatic and provided all stage rights to a different company, "subject to the rights granted under" the 1969 agreement with Dramatic, "as limited by [the] termination."  App. 152-53.  This second grant of stage rights eventually led to a successful Broadway play written by Aaron Sorkin.  The current owner of those rights, Atticus LLC (Atticus), now seeks to exploit the Sorkin play in "non-first class" performances as well.

### C.    Prior Proceedings

Dramatic brought arbitration claims against Lee's estate, seeking, among other things, a declaration that Dramatic retained the right to

7

exclude any other party from non-first-class performances of stage adaptations based on *To Kill a Mockingbird*.  *See* Appellant's Short App. (SA) 2-3.  The arbitrator ruled in favor of Dramatic, primarily reasoning that, under the derivative-work limitation, "the derivative work can continue to be utilized under the terms of the original grant, which in this case granted Dramatic the exclusive right to license a play … to amateur and stock theaters."  App. 77.  The district court in this case confirmed the award under the deferential standard of review applicable to arbitration decisions, without engaging substantively with the parties' statutory arguments.  *See* SA1; SA9 ("[T]he Court need not address whether the arbitrator erred on that [statutory] issue.").

In separate litigation in the Southern District of New York, Atticus sought a declaration that it has the right to present the Sorkin play in non-first-class performances.  *See Atticus LLC v. Dramatic Publ'g Co.*, No. 1:22-cv-10147-DLC (S.D.N.Y. filed Nov. 30, 2022).  Atticus argued that the termination of Lee's grant to Dramatic caused all rights previously granted to Dramatic to revert to Lee.  As a result, Atticus argued that Lee regained the right to authorize new derivative works based on *To Kill a Mockingbird*

for the kinds of performances described in the grant, and the derivative-work limitation preserved only Dramatic's ability to continue exploiting Dramatic's own existing play.

The district court for the Southern District of New York "readily conclude[d]" that Dramatic does not retain a right to preclude new derivative works based on the novel for the kinds of performances at issue. *Atticus LLC v. Dramatic Publ'g Co.*, No. 1:22-cv-10147-DLC, 2023 WL 3135745, at *5 (S.D.N.Y. Apr. 27, 2023). The court noted that the Copyright Act expressly provides that "exclusive" grants may be terminated. *Id.* (emphasis omitted) (quoting 17 U.S.C. § 304(c)). The limitation regarding pre-existing derivative works, the court explained, merely "permits a grantee to continue to 'utilize' derivative works created during the term of the license without the threat of litigation from the author." *Id.* at *6. And the court rejected Dramatic's argument that exclusivity is a "'term[]'" of use preserved under the derivative-work limitation, reasoning that "[s]uch a reading would thwart the plain language of the Copyright Act, rendering any exclusive license interminable." *Id.* at *7 (emphasis omitted) (quoting 17 U.S.C. § 304(c)(6)(A)). Dramatic appealed. The appeal has been briefed

9

and argued and is pending before the Second Circuit.  *See Atticus LLC v. Dramatic Publ'g Co.*, No. 23-1226 (2d Cir. argued Oct. 21, 2024).  As noted above, the government has submitted an amicus brief in that case substantially similar to the brief we are filing here.  *See supra* p. 2 n.1.

## SUMMARY OF ARGUMENT

Congress has given authors a right to terminate previous "exclusive or nonexclusive" grants of rights.  17 U.S.C. § 304(c).  When an author exercises that termination right, all copyright rights covered by the grant revert to the author.  *Id.* § 304(c)(5).  One of the rights that may revert to the author is the right to create or authorize new derivative works based on the author's work, such as films or plays based on an author's novel.  *Id.* § 106(2).  But Congress has protected public access to derivative works made before the termination by providing that such works may "continue to be utilized under the terms of the grant after its termination," although this privilege does not confer any right with respect to "preparation … of other derivative works" "after the termination."  *Id.* § 304(c)(6)(A).

Here, Harper Lee granted Dramatic an exclusive right to create a stage adaptation of *To Kill a Mockingbird* for certain kinds of performances.

10

Decades later, Lee sent Dramatic a notice of termination. As the New York district court correctly held, an effective termination in these circumstances has straightforward results. Lee would regain the right to create or authorize new stage adaptations of *To Kill a Mockingbird*. Meanwhile, Dramatic could continue exploiting its own existing adaptation under the limits previously agreed upon in the terminated grant. Dramatic could not, however, block performances of new plays based on *To Kill a Mockingbird* by relying on the terminated grant's exclusivity.

Dramatic argues that the derivative-work limitation is broader and preserves an exclusivity right in *To Kill a Mockingbird* itself—namely the right to continue excluding certain productions of new plays based on *To Kill a Mockingbird*, even after Lee terminated Dramatic's grant. That is incorrect. The derivative-work limitation states merely that an existing derivative work "may continue to be utilized under the terms of the grant after [the] termination." 17 U.S.C. § 304(c)(6)(A). The referenced "terms of the grant" are terms for "utiliz[ing]" the extant derivative work, such as royalty terms. *Id.* Such "terms" of use do not include the right to preclude creation or performance of new derivative works based on *To Kill a*

11

*Mockingbird* because exclusivity is not a term about how to utilize Dramatic's existing derivative work. By statute, such a right to exclude is a right in *To Kill a Mockingbird*, which may be exercised regardless of whether Dramatic uses its play, and which reverts to the author "notwithstanding any agreement to the contrary." *Id.* § 304(c)(5); *see id.* § 106(2). The statutory text further makes clear that the prior grantee does not retain any right in the "preparation … of other derivative works" based on the original work "after the termination." *Id.* § 304(c)(6)(A). That instruction makes sense only if the right to create and perform new derivative works reverts to the author.

Taken to their logical conclusion, Dramatic's contrary arguments reduce to the proposition that the derivative-work limitation creates a categorical exemption from termination for all grants to prepare a derivative work. That argument is clearly foreclosed by the text. Congress did not create a categorical exemption for derivative-work grants as it did for a "work made for hire" or grants made "by will," 17 U.S.C. § 304(c), instead preserving only a limited ability to continue using an existing derivative work without violating the author's rights. And the derivative-

12

work limitation itself assumes that the grant can be terminated by referring repeatedly to the "termination" and "terminated grant." *Id.* § 304(c)(6)(A).

The anomalous results that Dramatic's position would produce are enough to reject it. Dramatic's reasoning would suggest that an author cannot terminate *any* rights in a previous grant if a former grantee has created a derivative work, because in its view *all* grant terms are preserved and a copyright right in the original work can be re-framed as a term for utilizing the existing derivative work. Just as strikingly, Dramatic's logic would mean that *no one* could create a new derivative work following a termination if the prior grantee had previously created a derivative work. Here, for example, Dramatic's view leads to the illogical result in which neither the author nor the prior grantee could create or perform new stage adaptations of *To Kill a Mockingbird* for performances satisfying the terms of the original grant. And if Lee's original grant to Dramatic had been broader and granted all rights in derivative works, no one could create or perform new derivative works based on *To Kill a Mockingbird* at all after the termination. That result contravenes not only Congress's purpose in the termination provisions, but the constitutionally recognized interest in

13

"promoting broad public availability of literature, music, and the other arts." *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975); *see* U.S. Const. art. I, § 8, cl. 8.

## ARGUMENT

The United States takes no position on the question whether the arbitration award in this case must be vacated, but submits this brief to address the interpretive question addressed in the arbitrator's decision. The arbitrator misconstrued the Copyright Act's termination provisions in ways that harm the public interest in creation of new derivative works and contravenes Congress's design. Whether or not the arbitrator's error satisfies the standard for vacatur of arbitration awards, this Court should not endorse the arbitrator's erroneous interpretation of copyright law.

### The Right to Make and Perform New Derivative Works Reverts to an Author after Termination of an Exclusive Grant.

The Copyright Act provides authors a copyright in their works. 17 U.S.C. § 202. A copyright comprises a set of "exclusive rights," including the exclusive right to prepare or authorize preparation of a derivative work based on the author's work, such as a film or play based on a novel. *Id.*

14

§ 106.  Authors may grant some or all of those rights to others, but Congress has given authors a right to "terminat[e]" either "exclusive or nonexclusive" grants after a period of time and under certain circumstances, "notwithstanding any agreement to the contrary."  *Id.* § 304(c), (c)(5).  When an author terminates a grant, "all of a particular author's rights under [the Copyright Act] that were covered by the terminated grant revert, upon the effective date of termination, to that author."  *Id.* § 304(c)(6).

Congress categorically exempted "work[s] made for hire" and grants made "by will" from the termination provisions, but otherwise an author's termination right may be exercised in accordance with statutory requirements, subject to enumerated statutory "limitations."  *See* 17 U.S.C. § 304(c)(6)(A)-(F).  The limitation at issue here concerns derivative works. Congress provided that "[a] derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination."  *Id.* § 304(c)(6)(A).  But Congress specified that "this privilege does not extend to the preparation … of other

15

derivative works based upon the copyrighted work covered by the terminated grant." *Id.*

This limitation ensures that an existing derivative work based on the author's work (such as a film based on a book) can continue to be marketed even after the author of the original work terminates the prior grant, thus "encourag[ing] investment by derivative work proprietors and … assur[ing] that the public retains access to the derivative work." *Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.*, 155 F.3d 17, 22 (2d Cir. 1998) (alteration and quotation marks omitted). But under the statute's plain terms, the prior grantee's ability to use the existing derivative work does not preserve any right with respect to *new* works—neither a right to create new works nor a right to exclude the author from authorizing the creation or public performance of new works by others. 17 U.S.C. § 304(c)(6)(A).

In the agreement at issue here, Harper Lee granted to Dramatic an exclusive right to prepare a play based on her novel, *To Kill a Mockingbird*, for certain kinds of performances. Dramatic created a play pursuant to this grant. Several decades later, Lee sent Dramatic a notice of termination.

16

The right to terminate any "exclusive" grant in 17 U.S.C. § 304(c) by its terms allows such a termination.  So long as the termination complied with statutory requirements, it clearly would cause the exclusive right to prepare new derivative works for those kinds of performances to revert to Lee.[2]  The question here is whether the limitation regarding derivative works changes that result.  *See* 17 U.S.C. § 304(c)(6)(A).  The parties agree that the derivative-work limitation protects Dramatic's ability to keep exploiting the play that it created before termination according to the terms of use in the grant (such as royalty terms and restrictions on venues).  But the parties dispute whether Dramatic retains any right to preclude Lee from authorizing *new* adaptations of *To Kill a Mockingbird* for the kinds of performances at issue.

1.    As another court has already concluded, if the termination was effective, the right to authorize, make, or publicly perform new derivative works reverted to Lee, and Dramatic does not retain any right to block performance of new derivative works in productions satisfying the terms

---

[2] The United States takes no position on Dramatic's arguments that Lee's termination was ineffective for other reasons.

of the original grant.  *See Atticus LLC v. Dramatic Publ'g Co.*, No. 22-cv-10147 (DLC), 2023 WL 3135745, at *5 (S.D.N.Y. Apr. 27, 2023).  The termination provisions allow an author to terminate an "exclusive" grant, at which point "all rights under this title" revert to the author, 17 U.S.C. § 304(c), (c)(6).  The right to authorize, prepare, or publicly perform derivative works is a "right[] under this title," *id.* § 304(c)(6), *codified in* 17 U.S.C. § 106(2), and therefore reverts to the author.

Nothing in the derivative-work limitation's language suggests that a prior grantee retains any such right in the original work.  That limitation provides only that existing derivative works may "continue to be utilized under the terms of the grant after its termination."  17 U.S.C. § 304(c)(6)(A).  That language by its terms does not preserve any of the former grantee's rights *in the original work*; it instead prevents authors from using infringement suits to interfere with the continued use of pre-existing derivative works.  *See Woods v. Bourne Co.*, 60 F.3d 978, 986 (2d Cir. 1995) (explaining that without this limitation "authors might use their reversion rights to extract prohibitive fees from owners of successful derivative works or to bring infringement actions against them").

18

The limitation's language also makes clear that it does not preserve all terms of the grant, but only "terms of the grant" for "utiliz[ing]" the derivative work. 17 U.S.C. § 304(c)(6)(A). Such terms of use would include royalty provisions or limits on use (for example, the terms in Lee's grant to Dramatic that limit use to "non-first-class" productions with certain geographical restrictions). *Cf. Fred Ahlert*, 155 F.3d at 22-24 (holding that a grantee's new use of a derivative work violated the terms of use). But just as "[t]he copyright in a … derivative work … does not imply any exclusive right in the preexisting material," 17 U.S.C. § 103(b), so too that limited ability to keep using the derivative work does not include any other copyright interest in the original work, such as the right to preclude creation or performance of new derivative works based on *To Kill a Mockingbird*.

The derivative-work limitation's second clause underscores that a prior grantee retains no interest in "the preparation … of other derivative works based upon the copyrighted work" "after the termination." 17 U.S.C. § 304(c)(6)(A). This language bars a prior grantee from making any new derivative works based on the original work and makes plain that all

19

rights regarding new derivative works revert to the author. If the grantee retained a right to exclude others from making derivative works but could not make new works itself, then *no one* could make or authorize new derivative works. Moreover, the fact that the second clause focuses on the grantee's own creative activities, rather than on its ability to restrict the creative activities of others, reinforces the inference that the first clause has a similar focus.

This case illustrates the anomalous consequences that would occur if a grantee retained such a right to exclude post-termination. Following an effective termination in this case, no one would have the right to authorize new stage adaptations of *To Kill a Mockingbird* for non-first-class performances. Even more strikingly, if Lee had originally granted Dramatic exclusive rights to make and perform any kind of derivative work, then no new plays, films, or even translations based on *To Kill a Mockingbird* could be utilized at all post-termination. That result is irreconcilable with Congress's intent that the limitation would encourage public access to derivative works and the basic purposes of copyright law under the Constitution. *See* U.S. Const. art. I, § 8, cl. 8 (granting Congress

20

the power "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries").

Such an outcome would also create dissonance between provisions of the Copyright Act.  If a grantee retains exclusivity and a corresponding right to exclude following a termination, the right to prepare new derivative works would be either extinguished or unusable—making it impossible for anyone to exercise one of the exclusive rights enumerated in section 106 of the Copyright Act and calling into question whether anyone is the owner of that exclusive right.  *See* 17 U.S.C. § 106(2).  In turn, that could create the strange result that no one would be the "legal or beneficial owner" who could "institute an action for any infringement" of the right to create derivative works.  *See id.* § 501(b).

The statute's history reinforces the proper operation of the termination provisions and the derivative-work limitation.  Congress's adoption of the termination provisions reflects its interest in ensuring that authors can enter into bargains that reflect the worth of their copyrighted works, while also protecting public access to derivative works.  *See Mills*

21

*Music, Inc. v. Snyder*, 469 U.S. 153, 172-73 (1985). Even before the Copyright Act of 1976, Congress had long recognized that authors must often assign their rights before they know how much their works are worth. Congress previously tried to address this problem by providing authors with a right to renew their copyrights, which resulted in a new right, free of all grants made of the original copyright term. But because of the unequal bargaining power that many authors had at the time of assignment, publishers often thwarted that provision by requiring authors to assign their renewal rights at the outset, and the Supreme Court had held such assignments to be lawful. *See id.*; *see also id.* at 183-84 (White, J., dissenting); Staff of H. Comm. on the Judiciary, 87th Cong., *Copyright Law Revision: Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law* 53 (Comm. Print 1961), https://perma.cc/2T8K-UY2B (noting this history); *Fred Fisher Music Co. v. M. Witmark & Sons*, 318 U.S. 643, 657 (1943) (holding lawful an assignment of renewal rights).

At the same time, Congress was concerned about public access to existing derivative works. Under the Copyright Act of 1909, it had been unclear whether publishers could continue to market a derivative work if

they had not obtained the author's renewal rights (which sometimes occurred when renewal rights passed by operation of law to the author's heirs upon their death). *See Mills Music*, 469 U.S. at 183-84 (White, J., dissenting) (describing the statute's history); *see Miller Music Corp. v. Charles N. Daniels, Inc.*, 362 U.S. 373, 375 (1960) (holding that renewal rights passed to heirs when the author died before the renewal term, regardless of the author's prior grant of those rights to another party). Some studios pulled successful films from the market because they feared infringement suits. Others, like the studio that produced *Gone with the Wind*, paid the author's heirs large sums to avoid such suits. *See Mills Music*, 469 U.S. at 183-84, 183 n.8 (White, J., dissenting).

The termination provisions address both problems. Instead of a renewal right that authors could contract away, Congress gave authors a broad right to terminate a copyright grant "notwithstanding any agreement to the contrary." 17 U.S.C. § 304(c)(5); *see Stewart v. Abend*, 495 U.S. 207, 230 (1990) (describing the "inalienable" nature of the termination right); *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 983-95 (9th Cir. 2008) (same). But Congress preserved public access to derivative works that

23

already exist at the time of termination by preventing a situation in which
authors or heirs could hold a derivative work hostage by demanding that it
be pulled from the market.  *See Woods*, 60 F.3d at 986; 17 U.S.C.
§ 304(c)(6)(A).

 That history underscores the correct interpretation of the termination
provisions: an author's termination of an exclusive grant to prepare a
derivative work causes the author to regain the right to create or
commission new derivative works, and the prior grantee retains only the
ability to keep using an existing derivative work made before termination.
In contrast, Dramatic's interpretation would prevent the author (and the
prior grantee) from making or authorizing new derivative works.  That
result would directly contravene Congress's purposes and the foundational
principle that "copyright law ultimately serves the purpose of enriching
the general public through access to creative works."  *Fogerty v. Fantasy,
Inc.*, 510 U.S. 517, 527 (1994).

 **2.** The arbitrator erred in essentially concluding that the
derivative-work limitation categorically exempts exclusive derivative-work
grants from the termination provisions on the ground that the limitation

preserves all "terms of the grant." *See* App. 77. The arbitrator stated that "[t]he Exception does not eliminate exclusive licenses from its scope" and "expressly states that the derivative work can continue to be utilized under the terms of the original grant, which in this case granted Dramatic the exclusive right to license a play … to amateur and stock theaters." *Id.* This argument fundamentally misconstrues the limitation and ignores its context.

Congress did not draft the derivative-work limitation as a complete carveout like the exemption for "work[s] made for hire" or grants made "by will." 17 U.S.C. § 304(c). The provision is a more narrow "limitation[]" among other clarifications of the termination right. *See id.* § 304(c)(6). The limitation's language refers only to an ability to "continue … utiliz[ing]" an existing derivative work and assumes that the termination has taken place by repeatedly referring to the "termination" or the "terminated grant." *Id.* § 304(c)(6)(A). As discussed above, preventing others from creating or performing new derivative works is not a means of "utiliz[ing]" a grantee's own play. Thus, the phrase "under the terms of the grant" does not make Dramatic's rights any broader.

25

Moreover, it would have been bizarre for Congress to use the limitation's narrower language—including references to "termination" and the "terminated grant"—if the limitation was preserving all terms in the grant, such that nothing at all is terminated or reverts to the author. And given Congress's express carveout for works made for hire or grants made by will, it makes little sense to conclude that Congress sought to achieve such a broad exemption through the roundabout means of saying that existing derivative works may be "utilized under the terms of the grant after its termination"—particularly given the practical significance of such an exemption.

The arbitrator sought support for such an expansive reading of the limitation in the Supreme Court's decision in *Mills Music*, 469 U.S. 153, but the arbitrator misread that opinion. *See* App. 78-81. There, a songwriter granted his rights in a musical work to a publisher, which granted licenses to record companies, and the songwriter's heirs later terminated the original grant. The question was whether the publisher was still entitled to royalties under the terms of the first grant post-termination, or whether the record companies had to pay their royalties directly to the songwriter only

26

under the terms of the later contracts. *Mills Music*, 469 U.S. at 155-56, 158. The Court held that the derivative-work limitation preserved all relevant royalty terms in a chain of derivative-work grants, not just the terms in the last contract in the chain. *Id.* at 169.

That decision does not hold that the derivative-work limitation preserves all terms, including a former grantee's rights in the original work. To the contrary, the Court recognized that "the termination has caused the ownership of the copyright to revert to the" author. *See Mills Music*, 469 U.S. at 167. That conclusion would not have made sense if, as the arbitrator concluded, *all* terms survive. At a minimum, the decision does not help Dramatic because the Court did not address an argument that the prior grantee retains a right to preclude new derivative works, despite the limitation's second clause.

The arbitrator relied on general language in *Mills Music* and subsequent decisions, but the cited language does not support the arbitrator's conclusion. For example, the arbitrator sought support for the suggestion that no terms in derivative-work grants can be terminated by citing the Court's statement that "the consequences of a termination …

27

simply do not apply to derivative works that are protected by the

Exception defined in § 304(c)(6)(A)." *Mills Music*, 469 U.S. at 164; *see* App.

79. But by its terms, that language refers to protection for the existing

derivative work itself, and not to any right in the original work, such as a

right to preclude new derivative works based on the original work.

Similarly, the arbitrator relied on the Court's statement that the

derivative-work limitation "preserve[s] the total contractual relationship,

which entitled [the grantee] to make duly authorized derivative works."

*Mills Music*, 469 U.S. at 169; *see* App. 80. That language does not suggest

that the limitation "preserve[s] the total contractual relationship" by

preserving all the terms of the grant that relate to derivative works.

Instead, that language clearly refers to the need to preserve terms *of use* in

all contracts within a chain of grants, rather than just one contract. The

Court elsewhere made clear it was referring to "the terms of the grant *that*

*were applicable to the use* of derivative works." *Mills Music*, 469 U.S. at 177

(emphasis added). And the arbitrator's reading cannot be reconciled with

the statute's plain text, which explicitly provides that when a grant is

terminated, the grantee's "privilege does not extend to the preparation

28

after the termination of other derivative works based upon the copyrighted work covered by the terminated grant." *See* 17 U.S.C. § 304(c)(6)(A).

The arbitrator also reasoned that a right to preclude performances of new stage adaptations of *To Kill a Mockingbird* is effectively part of Dramatic's right to continue utilizing its play. *See* App. 77, 80-81. As explained, that argument is incorrect. By statute, the right to create and perform new derivative works for the performances at issue is a copyright right in the subject work, *To Kill a Mockingbird*. *See* 17 U.S.C. § 106(2). It is not a mere term for using Dramatic's play. The distinction between terms of use and preclusion of new works is clear in practice: Dramatic could exercise a right to preclude new adaptations of *To Kill a Mockingbird* without ever utilizing its existing play. And this is also clear outside the termination context: for example, an author can preclude others from creating new derivative works even if she has never created or authorized a derivative work and therefore none exists.

Moreover, such an attempt to recast rights in the original work as terms of use for a derivative work would suggest that grantees could defeat the termination provisions through creative contracting. Publishers

29

could, for example, insist on promises by the author not to exercise any copyright right—such as distribution of the original work—and frame that transfer of rights as a term of using the derivative work. That is precisely the kind of contractual loophole that Congress set out to avoid when it stated that "[t]ermination of the grant may be effected *notwithstanding any agreement to the contrary*." 17 U.S.C. § 304(c)(5) (emphasis added). Congress created "an *inalienable* right to terminate the grant of a transfer or license." *Penguin Grp. (USA) Inc. v. Steinbeck*, 537 F.3d 193, 197-98 (2d Cir. 2008) (emphasis added); *Stewart*, 495 U.S. at 230 ("The 1976 Copyright Act … provides an inalienable termination right."). That is a "key feature of the termination right" that prevents contract terms from "thwart[ing]" the right. *Brumley v. Albert E. Brumley & Sons, Inc.*, 822 F.3d 926, 930 (6th Cir. 2016).

The arbitrator similarly erred in asserting that Dramatic's reading better serves the statute's purpose because the derivative-works limitation reflects a legislative "compromise" to protect the prior grantee's rights. *See* App. 82. The arbitrator did not explain how the statute's purpose is furthered by preventing both the prior grantee and the author from

30

creating or publicly performing any new derivative works.  And the arbitrator incorrectly brushed aside concerns that Dramatic's reading of the limitation could swallow the termination provisions.  The arbitrator asserted that "the very purpose of the Exception" is "to apportion the right to provide some benefits of the extended period to the derivative author" and that "[h]ere the grant to Dramatic is only a limited license of live stage dramatization rights for amateur acting" that "will not inhibit the Estate from exercising all the myriad rights and derivative rights it still controls." *Id.*  But a "limitation" cannot be read in a way that guts the termination provisions, particularly when Congress chose not to adopt a categorical carveout for derivative works in the way it did for works made for hire and grants made by will.  And the mere fact that the license at issue in this case was narrower than it could have been does not mitigate the concern.

Before the Second Circuit, Dramatic also urged that termination of its exclusive right to certain kinds of theatrical performances of *To Kill a Mockingbird* would improperly disrupt the value that Dramatic received as part of its deal with Lee.  *See* Brief of Defendant-Appellant 36-38, *Atticus LLC v. Dramatic Publ'g Co.*, No. 23-1226 (2d Cir. May 1, 2024).  But Dramatic

31

has already received more than the full benefit of its original bargain.  At the time Lee made her original grant to Dramatic in 1969, copyrights lasted only for an initial term of 28 years and a renewal term of 28 years, for a total of 56 years.  *See* 17 U.S.C. § 23 (1926).  When Congress created the termination right in 1976, it did not disturb rights during that 56-year period.  Instead, Congress extended copyrights by 19 years and designed the termination right to begin with that extension period.  *See id.* § 304(a) (1976); H.R. Rep. No. 94-1476, at 140 ("[T]he extended term represents a completely new property right, and there are strong reasons for giving the author, who is the fundamental beneficiary of copyright under the Constitution, an opportunity to share in it.").  Congress later extended the length of copyrights by another 20 years.  *See* 17 U.S.C. § 304(a) (1998).  Those extensions of Lee's copyright provide Dramatic with *more* value than it bargained for, not less, even if Dramatic does not retain a right to exclude new derivative works.

In any event, the termination provisions are designed to allow the author to cancel the original deal transferring exclusive rights.  The provisions expressly allow termination of an "*exclusive* or nonexclusive

grant," 17 U.S.C. § 304(c) (emphasis added); and the limitation refers to the "termination" and the "terminated grant" without suggesting that exclusive grants cannot be terminated, *id.* § 304(c)(6)(A).

Dramatic's argument also proves too much by suggesting that authors could never terminate a full copyright assignment once the grantee has created a derivative work, as the author's use of the other reverted copyright rights could potentially have some impact on the value of using the preexisting derivative work. That result is irreconcilable with the statute's logic. Congress designed the derivative-works limitation to encourage investment in derivative works and public access to such works. Congress did not set out to protect the grantee's exact market for distribution or exploitation of its derivative work by preventing the public from enjoying any new derivative works.

In short, Congress did not render the statutory right to termination self-defeating by transforming the derivative work "limitation[]" into a sweeping exemption from termination. *See* 17 U.S.C. § 304(c)(6). The limitation creates an important, but limited, allowance for the continued utilization of derivative works that had previously been created under the

terms of a grant.  It does not go further and enable the prior recipient of an exclusive grant to prohibit the creation or authorization of any new derivative works.  Nothing in the statute's text, purpose, or history supports such a counterintuitive result that directly contravenes the basic purposes of copyright law.

## CONCLUSION

For the foregoing reasons, if the Court reaches the question, it should hold that an author's termination causes the right to make or perform new derivative works to revert to the author.

Respectfully submitted,

EMILY L. CHAPUIS
    *Acting General Counsel and*
    *Associate Register of Copyrights*
JASON E. SLOAN
    *Assistant General Counsel*
BRITTANY R. LAMB
    *Attorney-Advisor*
    *United States Copyright Office*
    *Washington, DC 20540*

YAAKOV M. ROTH
    *Acting Assistant Attorney*
    *General*

ANDREW S. BOUTROS
    *United States Attorney*

DANIEL TENNY

*/s/ Joshua Dos Santos*
JOSHUA DOS SANTOS
    *(202) 353-0213*
    *Attorneys, Appellate Staff*
    *Civil Division, Room 7224*
    *U.S. Department of Justice*
    *950 Pennsylvania Ave., NW*
    *Washington, DC 20530*
    *joshua.y.dos.santos@usdoj.gov*

April 15, 2025

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Book Antiqua, a proportionally spaced font.

I further certify that this brief complies with the type-volume limitation of Seventh Circuit Rule 29 and Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,613 words, excluding the parts of the brief exempted under Federal Rule of Appellate Procedure Rule 32(f), according to the count of Microsoft Word.

/s/ Joshua Dos Santos
JOSHUA DOS SANTOS

## CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system, which constitutes service on all parties under the Court's rules because all participants in the case are registered CM/ECF users.


/s/ Joshua Dos Santos
JOSHUA DOS SANTOS

**ADDENDUM**

# ADDENDUM CONTENTS

| Item | Page |
|------|------|

17 U.S.C. § 304(c) ............................................................... A1

17 U.S.C. § 304(c)

§ 304. Duration of copyright: Subsisting copyrights.

* * *

(c) Termination of Transfers and Licenses Covering Extended Renewal Term.--In the case of any copyright subsisting in either its first or renewal term on January 1, 1978, other than a copyright in a work made for hire, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, by any of the persons designated by subsection (a)(1)(C) of this section, otherwise than by will, is subject to termination under the following conditions:

(1) In the case of a grant executed by a person or persons other than the author, termination of the grant may be effected by the surviving person or persons who executed it. In the case of a grant executed by one or more of the authors of the work, termination of the grant may be effected, to the extent of a particular author's share in the ownership of the renewal copyright, by the author who executed it or, if such author is dead, by the person or persons who, under clause (2) of this subsection, own and are entitled to exercise a total of more than one-half of that author's termination interest.

(2) Where an author is dead, his or her termination interest is owned, and may be exercised, as follows:

(A) The widow or widower owns the author's entire termination interest unless there are any surviving children or grandchildren of the author, in which case the widow or widower owns one-half of the author's interest.

(B) The author's surviving children, and the surviving children of any dead child of the author, own the author's entire termination interest unless there is a widow or widower, in which case the ownership of one-half of the author's interest is divided among them.

(C) The rights of the author's children and grandchildren are in all cases divided among them and exercised on a per stirpes basis according to the number of such author's children represented; the

-A1-

share of the children of a dead child in a termination interest can be exercised only by the action of a majority of them.

(D) In the event that the author's widow or widower, children, and grandchildren are not living, the author's executor, administrator, personal representative, or trustee shall own the author's entire termination interest.

(3) Termination of the grant may be effected at any time during a period of five years beginning at the end of fifty-six years from the date copyright was originally secured, or beginning on January 1, 1978, whichever is later.

(4) The termination shall be effected by serving an advance notice in writing upon the grantee or the grantee's successor in title. In the case of a grant executed by a person or persons other than the author, the notice shall be signed by all of those entitled to terminate the grant under clause (1) of this subsection, or by their duly authorized agents. In the case of a grant executed by one or more of the authors of the work, the notice as to any one author's share shall be signed by that author or his or her duly authorized agent or, if that author is dead, by the number and proportion of the owners of his or her termination interest required under clauses (1) and (2) of this subsection, or by their duly authorized agents.

(A) The notice shall state the effective date of the termination, which shall fall within the five-year period specified by clause (3) of this subsection, or, in the case of a termination under subsection (d), within the five-year period specified by subsection (d)(2), and the notice shall be served not less than two or more than ten years before that date. A copy of the notice shall be recorded in the Copyright Office before the effective date of termination, as a condition to its taking effect.

(B) The notice shall comply, in form, content, and manner of service, with requirements that the Register of Copyrights shall prescribe by regulation.

(5) Termination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant.

(6) In the case of a grant executed by a person or persons other than the author, all rights under this title that were covered by the terminated grant revert, upon the effective date of termination, to all of those entitled to terminate the grant under clause (1) of this subsection. In the case of a grant executed by one or more of the authors of the work, all of a particular author's rights under this title that were covered by the terminated grant revert, upon the effective date of termination, to that author or, if that author is dead, to the persons owning his or her termination interest under clause (2) of this subsection, including those owners who did not join in signing the notice of termination under clause (4) of this subsection. In all cases the reversion of rights is subject to the following limitations:

(A) A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant.

(B) The future rights that will revert upon termination of the grant become vested on the date the notice of termination has been served as provided by clause (4) of this subsection.

(C) Where the author's rights revert to two or more persons under clause (2) of this subsection, they shall vest in those persons in the proportionate shares provided by that clause. In such a case, and subject to the provisions of subclause (D) of this clause, a further grant, or agreement to make a further grant, of a particular author's share with respect to any right covered by a terminated grant is valid only if it is signed by the same number and proportion of the owners, in whom the right has vested under this clause, as are required to terminate the grant under clause (2) of this subsection. Such further grant or agreement is effective with respect to all of the persons in

-A3-

whom the right it covers has vested under this subclause, including those who did not join in signing it. If any person dies after rights under a terminated grant have vested in him or her, that person's legal representatives, legatees, or heirs at law represent him or her for purposes of this subclause.

(D) A further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of the termination. As an exception, however, an agreement for such a further grant may be made between the author or any of the persons provided by the first sentence of clause (6) of this subsection, or between the persons provided by subclause (C) of this clause, and the original grantee or such grantee's successor in title, after the notice of termination has been served as provided by clause (4) of this subsection.

(E) Termination of a grant under this subsection affects only those rights covered by the grant that arise under this title, and in no way affects rights arising under any other Federal, State, or foreign laws.

(F) Unless and until termination is effected under this subsection, the grant, if it does not provide otherwise, continues in effect for the remainder of the extended renewal term.

* * *